1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                        --oOo--

4  In Re:                    )  Case No. 1:18-bk-12979-MB
                             )
5  TODD HARRIS GOLDMAN,      )  Chapter 7
                             )
6          Debtor.           )  Woodland Hills, California
   _____)  Monday, November 7, 2022
7                            )  10:00 a.m.
   GOLDMAN,                  )
8                            )
          Plaintiff,         )
9                            )
   vs.                       )  Adv. No. 1:19-ap-01048-MB
10                           )
   OSTRICH HOUSE, LLC, et al.,)
11                           )
          Defendants.        )
12 _____)

13

14                           TRIAL RE: NOTICE OF REMOVAL OF
                             CLAIM RELATED TO BANKRUPTCY
15                           CASE

16                           COUNTER-CLAIM

17                           JASMIN ISMAIL, COUNTER-
                             CLAIMANT
18                           VS.
                             NICOLE GOLDMAN, AN INDIVIDUAL,
19                           COUNTER-DEFENDANT

20                           MOTION FOR ORDER DISALLOWING
                             CLAIMS 16 AND 17 OF JASMIN
21                           ISMAIL

22            TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MARTIN R. BARASH
23            UNITED STATES BANKRUPTCY JUDGE

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

1 | APPEARANCES:

2 | For the Plaintiff:          SUSAN I. MONTGOMERY, ESQ.
                               Susan I. Montgomery At Law
3 |                            1100 Glendon Avenue
                               15th Floor
4 |                            Los Angeles, California 90024
                               (310) 556-8900
5 |
     For the Defendant:        WILLIAM E. WINFIELD, ESQ.
6 |                            Nelson Comis Kettle &
                                 Kinney, LLP
7 |                            5811 Olivas Park Drive
                               Suite 202
8 |                            Ventura, California 93003
                               (805) 604-4106
9 |
     Court Recorder:           Julie Cetulio
10 |                           United States Bankruptcy Court
                               21041 Burbank Boulevard
11 |                           Woodland Hills, California
                                 91367
12 |
     Transcriber:              Jordan Keilty
13 |                           Echo Reporting, Inc.
                               9711 Cactus Street, Suite B
14 |                           Lakeside, California 92040
                               (858) 453-7590
15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

iii

1                        I N D E X

2   WITNESSES:              DIRECT    CROSS   REDIRECT   RECROSS

3   Jasmin Ismail            --        9        38        --

4   Nicole Griffin           41       148      265        --

5
    EXHIBITS                     IDENTIFIED      RECEIVED
6
    Plaintiff's
7
    3      Emails                    8              43
8
    4      Excerpt of transcript    12             21
9
    5      Affidavit                22             29
10
    6      Tighty Whitie document  129            145
11
    7      Email                   146            148
12
    114A  Bills                   115            122
13
14  Defendant's

15  M      Text chain              209            --

16  N      Check                   151            155

17  U      Minute order            211            --

18  V      Court order             215            217

19  X      State Court pleading    219            237

20  Y      Emails                  238            242

21  CC     Email                   242            245

22  FF     Email                   225            237

23  GG     Complaint               248            --

24  II     Schedule of assets      250            254

25  JJ     Trial brief             255          Withdrawn

iv

| EXHIBITS (Cont'd.) | IDENTIFIED | RECEIVED |
|---|---|---|
| Defendant's | | |
| QQ    Email | 260 | 261 |
| RR    Email | 262 | 263 |

1

1  WOODLAND HILLS, CALIFORNIA TUESDAY NOVEMBER 7, 2022 10:00 AM

2                              --oOo--

3       (Call to order of the Court.)

4            THE COURT:  Okay.  Today is November 7th, and

5  we're here for day two of this trial, Goldman versus

6  Goldman, et al., or, to be more specific, Goldman versus

7  Ismail.

8            Before we get started, I'm going to start Zoom

9  because I think there's one or a number of people that

10  wanted to observe.

11      (Pause.)

12            THE COURT:  Okay.  All right.  So, we got that,

13  that part of things working.

14            All right.  So, let's have appearances of counsel.

15            MS. MONTGOMERY:  Good morning, your Honor.  Susan

16  Montgomery appearing for Nicole Goldman, who is present in

17  the courtroom.

18            THE COURT:  Thank you.

19            MR. WINFIELD:  Good morning, your Honor.  William

20  Winfield for Jasmin Ismail.

21            THE COURT:  Very good.  Welcome to both of you.

22            All right.  Where we left off was in the middle of

23  the Plaintiff's case in chief on the Plaintiff's claims.

24            Anything we need to -- and I assume Ms. Montgomery

25  is going to call Nicole Goldman next?  Forgive me.  You're

2

1  going by Goldman or what are you going by these days?

2          MS. GRIFFIN:  Griffin.

3          THE COURT:  Griffin.  Okay.  So, I assume you're

4  going to call Ms. Griffin, but is -- is that the plan and is

5  there anything else we need to talk about preliminarily?

6          MS. MONTGOMERY:  I had --

7          THE COURT:  Actually, can you go to the podium,

8  because the folks that are watching at home, we don't have a

9  camera on the -- on the desk.

10          MS. MONTGOMERY:  Okay.  I had a few -- I had a few

11  more questions for Ms. Ismail.

12          THE COURT:  Okay.

13          MS. MONTGOMERY:  And then we'll go to Ms. Griffin.

14          THE COURT:  Okay.

15          MS. MONTGOMERY:  And that's -- that will be it for

16  the case in chief.

17          THE COURT:  Okay.  All right.  Very good.

18          So --

19          MS. MONTGOMERY:  Oh, the only thing I wanted to

20  mention -- I don't know if your clerk did -- we had amended

21  Exhibit 114 which were the bills that we had submitted.

22          THE COURT:  Okay.

23          MS. MONTGOMERY:  And we just augmented them.

24          THE COURT:  Now, is that -- you have to help me

25  refresh your recollection.  Is that an exhibit we had

3

1 admitted?

2          MS. MONTGOMERY:  No.

3          THE COURT:  Okay.  So --

4          MS. MONTGOMERY:  And I gave --

5          THE COURT:  -- when we get to it, we'll -- we'll

6 just remember to make a note of that.  I assume Mr. Winfield

7 has a copy of your --

8          MS. MONTGOMERY:  Yes.

9          THE COURT:  -- updated Exhibit 114?

10          MS. MONTGOMERY:  Yes.  You can -- and it includes

11 the stuff that was in the original.  So, you can really just

12 toss it when you get to it.

13          THE COURT:  Okay.

14          MS. MONTGOMERY:  If that's what you have.

15          THE COURT:  All right.

16          MS. MONTGOMERY:  And I think the clerk has one for

17 the witness.

18          THE COURT:  Okay.  All right.  Thanks.

19     (Pause.)

20          THE COURT:  Okay.  What else?

21          MS. MONTGOMERY:  I don't know whether -- when

22 we're doing -- Mr. Winfield made a filing last Thursday of

23 documents related to his response -- further response to the

24 claim objection, and I went ahead and filed a response to

25 that.  I just wanted to make sure you got it.

4

1          THE COURT:  Okay.  I got -- I have his filing.  I

2  don't have yours.  So, I'm going to ask my law clerk --

3          MS. MONTGOMERY:  It's very short.

4          THE COURT:  Actually, I don't -- I don't know if

5  that -- whether that computer is connected to the printer or

6  not these days.  We just lost Mr. Dosh (phonetic).  So,

7  maybe Ms. Colson can print it out.  I haven't looked at

8  either of them.  I just know they're here.

9          MS. MONTGOMERY:  Do you want -- are we just

10 dealing with them later?

11         THE COURT:  Yeah.  Let's just deal with them

12 later.

13         MS. MONTGOMERY:  Now, I assume this was something

14 that at some point, Mr. Winfield, you were going to offer in

15 whole or in part.  What's the essence of your response?

16         MS. MONTGOMERY:  We didn't have any warning, and I

17 don't think he was authorized by the Court to put in further

18 supplements, and we didn't have an opportunity to review and

19 really respond to them.  However --

20         THE COURT:  Okay.

21         MS. MONTGOMERY:  -- we have looked at them now,

22 and Ms. Griffin would like -- would respond to at least some

23 of them.  I mean, I think the first two exhibits, I and J,

24 are not authenticated.  There's lack of foundation, but we

25 know what they are, and --

5

1    THE COURT:  Okay.  So, I think I intimated last
2 time -- I don't know that I did anything formal about it,
3 but you'll have to remind me.  It seemed to me that -- that
4 Ms. Ismail's counterclaim more or less overlaps the issues
5 in the claim objection.  And, so, there -- there undoubtedly
6 may be an issue about, you know, whether this was timely
7 provided or not, although, I've sort of -- I guess I've
8 changed the rules by expanding the -- by sort of recognizing
9 that the -- the evidentiary aspect of the hearing probably
10 ought to just include whatever relates to the claim
11 objection.

12    So, we'll deal with it when we -- when it comes
13 up.  You know, there's a -- there's sort of a timing issue
14 here.  Everybody kept saying we think we can -- you know,
15 we'll be done today.  Well, one of you said you think you'll
16 be done today, but now I'm -- I'm not so sure when you think
17 of it in terms of the counterclaim.

18    MS. MONTGOMERY:  Well, the counterclaim isn't --
19 shouldn't be long I don't think.

20    THE COURT:  Yeah.  Okay.

21    MS. MONTGOMERY:  I mean, I get that it's up to Mr.
22 Winfield, but we'll see.

23    THE COURT:  All right.  All right.  We can --
24 we'll deal with that when it's time.

25    So, Mr. Winfield, anything preliminarily you want

6

1 to address?

2          MR. WINFIELD:  Yes, your Honor.  I was under the

3 impression that we were done with -- with Ms. Ismail, and I

4 had done redirect with Ms. Ismail last week.  Yeah, I

5 thought that -- and when I got the transcript, I thought she

6 had -- she had said no more further questions, but --

7          THE COURT:  Okay.  What --

8          MR. WINFIELD:  -- that doesn't mean -- that

9 doesn't mean that she might potentially be able to recall

10 her for something if that's what's happening.

11          THE COURT:  Yeah.  Yeah, yeah, yeah.  So --

12          MS. MONTGOMERY:  Basically impeachment, but it's

13 not a -- it's not many questions.

14          THE COURT:  Okay.  Well --

15          MS. MONTGOMERY:  The question is based on what

16 they just filed.

17          THE COURT:  Okay.  I think it probably makes sense

18 to let her just do it.  I've been -- I'm going to -- I have

19 been and will continue to be flexible because we have sort

20 of claims going in multiple directions and --

21          MR. WINFIELD:  Well, that makes sense because

22 there's --

23          THE COURT:  -- people wearing different hats.

24          MR. WINFIELD:  -- part of my redirect I would like

25 to redo.  So, I guess it would work both ways.

7

1        THE COURT:  All right.  Okie dokie.  All right.

2   Well, Ms. Ismail, why don't you -- I'm sorry?

3        MS. MONTGOMERY:  And do you swear her?

4        THE COURT:  Yeah, of course.  It's been -- it's

5   been a month and a half.

6        So, why don't you step over to the witness stand,

7   please.  Raise your right hand.

8            JASMIN ISMAIL - PLAINTIFF - SWORN

9        THE COURT:  Okay.  Have a seat, and go ahead and

10  -- you need your glasses?  Okay.

11       THE WITNESS:  Sorry.

12       THE COURT:  No problem.  All right.  I need mine

13  too.  All right.  Go ahead and state your name again for the

14  record.

15       THE WITNESS:  Jasmin Ismail.

16       THE COURT:  Okay.  So, Ms. Ismail, you were here a

17  month and a half or so ago, and you've been resworn.  You're

18  under oath.  Ms. Montgomery has a few additional questions

19  for you, and then Mr. Winfield is going to have some

20  additional redirect, and we'll go from there.  Okay.  All

21  right.  I'm not going to repeat my whole spiel.

22       All right.  Go ahead.

23       MS. MONTGOMERY:  Quick question.  On any of these

24  impeachment exhibits, do you want them labeled like

25  impeachment 2 or do you want them just continuing with our

8

1 Plaintiff's exhibit?  The next one is 120.

2          THE COURT:  Yeah.  I started -- for better or

3 worse, I started to call them impeachment.  So -- or

4 Plaintiff's impeachment.  So, we're up to Impeachment Number

5 3.

6          MS. MONTGOMERY:  I think we just had -- we didn't

7 admit the -- there was one letter that was going back and

8 forth, but we really just --

9          THE COURT:  It may not have been admitted, but

10 identified it as Impeachment 2.

11          MS. MONTGOMERY:  Oh, okay.

12          THE COURT:  So, let's just start with Impeachment

13 3.

14          MS. MONTGOMERY:  Okay.

15          THE COURT:  And I'm going to call it Plaintiff's

16 Impeachment 3.  Do you have copies for the Court and the --

17          MS. MONTGOMERY:  I do.  I don't know if it will

18 put me -- but I only have three -- three or four total.

19          THE COURT:  Okay.

20          MS. MONTGOMERY:  And I have copies.

21          THE COURT:  Well, you can approach the witness and

22 hand it to the witness for now, yes.

23          MS. MONTGOMERY:  Okay.  Let me just -- I want to

24 ask her a few questions before.

25          THE COURT:  Okay.  No problem.  Your witness.

9

1            MS. MONTGOMERY:  Okay.

2                    RECROSS EXAMINATION (RESUMED)

3   BY MS. MONTGOMERY:

4   Q    Ms. Ismail, do you recall at your last examination on

5   September 22nd you testified that you were not aware that

6   Todd hit Nicole or abused her?  That's correct?

7   A    Correct.

8        (Pause.)

9            MS. MONTGOMERY:  May I approach, your Honor?

10           THE COURT:  Yes.

11  BY MS. MONTGOMERY:

12  Q    Ms. Ismail, the address at the top of this email,

13  nikihuey, H-U-E-Y, @yahoo.com, is that your correct address,

14  email address?

15  A    I don't know.  That's not my address.

16  Q    That's -- I'm sorry.  That's Mickey?  That's your

17  daughter's address, to which you send things to?

18  A    Yes, that was her address.

19  Q    Okay.  Looking down below, it says "Show original

20  message," and it says, "On Friday, December 23rd, 2011."  Do

21  you see that?

22  A    Yes.

23  Q    Okay.  And next to it, there's an email address,

24  jasminhuey@yahoo.com.  Do you see that?

25  A    I see that.

10

1  Q    And that is your address, correct?

2  A    That's my address.

3  Q    Okay.  And if you look at the second paragraph --

4  excuse me -- do you see that the statement:

5              "Just remember one thing.  Don't

6          let anyone abuse you in any shape or

7          form.  No one has that right.  I know

8          that Todd hits you and emotionally

9          abuses you, and you don't deserve that

10         for any reason.  No one does."

11     Do you see that?

12 A    I did not write this email.  This is not my email.

13 Q    Really?

14 A    Yes.  She doctors up -- she creates documents.  Another

15 created document.

16 Q    You never sent this -- this email that --

17 A    No, I did not.

18 Q    -- says "Happy Birthday, Princess"?

19 A    No, I did not write this email.

20 Q    Okay.

21 A    Just like March 20th, 2017, you produced doctored

22 (indiscernible).  I did not write that.  She doctored.

23 Q    In what -- in what way was it doctored?

24 A    Which one?

25 Q    This email?

11

1  A     No.  March 20, 2017.

2  Q     I'm not talking about March 20th.  I'm talking about

3  this email that says it was sent December --

4  A     I did not write this email.

5          MR. WINFIELD:  Objection.  Argumentative, your

6  Honor.

7          THE COURT:  Yeah.  Okay.

8          MR. WINFIELD:  And could we remind the witness --

9          THE WITNESS:  This is crazy.

10         THE COURT:  Sustained.

11         MR. WINFIELD:  -- to answer the question.

12         THE COURT:  Sustained.  Ms. Ismail?

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  I understand this is -- this can get

15 emotional, but try to listen to the question and only answer

16 the question.

17         THE WITNESS:  Yes, your Honor.

18         THE COURT:  Okay.  All right.  And, if there's

19 something that needs to be teased out, your lawyer will

20 tease it out when it's his turn.  Okay.

21 BY MS. MONTGOMERY:

22 Q     Ms. Ismail, do you recall that you testified under oath

23 on November 24th, 2015 in proceedings in the Family Law

24 Court?

25 A     Yes, I do.

12

1    MS. MONTGOMERY:  Okay.  Your Honor, I have a copy

2 of the complete transcript, and then I have excerpts of the

3 transcript.  I don't know if you want the complete

4 transcript.  I have that just so that you have it and mark

5 it as Exhibit Rebuttal 4 or --

6    THE COURT:  Plaintiff's Impeachment 4.

7    MS. MONTGOMERY:  Do you want the whole -- do you

8 want the whole one so you can --

9    THE COURT:  Yeah.

10    MS. MONTGOMERY:  -- see the context?

11    THE COURT:  Yeah.

12    (Pause.)

13    MS. MONTGOMERY:  May I approach, your Honor?

14    THE COURT:  Yes.

15 BY MS. MONTGOMERY:

16 Q    So, Ms. Ismail, this is a copy of a transcript.  Do you

17 recall that you were examined during a hearing before the

18 Family Law Court on November 23rd, 2015?

19 A    Yes, I do.

20 Q    And the purpose of that hearing was Ms. Griffin was in

21 the process of trying to get a restraining order against

22 Todd Golden, correct?

23 A    Yes.

24 Q    And you testified --

25    THE COURT:  Can I stop you for a second?

13

1          So, I got handed up two documents, one sort of a

2   fatter one with a clip and the other is stapled.  The one

3   that's sort of fat --

4          MS. MONTGOMERY:  Is complete.

5          THE COURT:  -- says November 24th on it, and

6   that's -- that's what has the yellow tag for Impeachment 4.

7   And then the smaller one says November 23rd.  So,

8          MR. WINFIELD:  I only have the smaller one, your

9   Honor.

10          THE COURT:  And, Mr. Winfield, what's the date on

11   yours?

12          MR. WINFIELD:  Mine is November 23rd.  It begins

13   on page 117.

14          THE COURT:  Okay.

15          MS. MONTGOMERY:  Ms. Griffin says that this was a

16   two-day hearing, the 23rd and the 24th, and the small

17   document that I've given to the witness and to Mr. Winfield

18   and that I have is a -- is an excerpt from the transcript,

19   and we've given you the entire transcript.

20          THE COURT:  Yeah.  Here's the problem.  So, I'm

21   looking at page 117 on the small document --

22          MS. MONTGOMERY:  Yes.

23          THE COURT:  -- dated November 23, and page 117 in

24   the fat document which has a different date, and they look

25   different.  They are not the same page 117.  So, I'm happy

14

1 to hand them back to you and let you sort it out, and maybe

2 -- maybe the answer is is they just need to be tagged

3 separately.  Maybe you don't --

4          MS. MONTGOMERY:  Why don't we just use -- just use

5 the small one.

6          THE COURT:  Okay.  Okay.  All right.  So, I'm

7 going to return this --

8          MS. MONTGOMERY:  Okay.

9          THE COURT:  -- fat one for now, and I'm going to

10 -- and I've crossed out the Impeachment Number 4 on it

11 because it is not Number 4.  I'm going to mark --

12          MS. MONTGOMERY:  The small one.

13          THE COURT:  -- the smaller one with staples, and

14 that is an excerpt, as Plaintiff's Impeachment 4.  Okay.

15 And I'm going to -- we'll just say it's re-identified as of

16 10:23 on the clock.  All right.  Okay.

17          MS. MONTGOMERY:  All right.

18 BY MS. MONTGOMERY:

19 Q    Ms. Ismail, if you'd turn to the first -- to the second

20 page of this small document that's been marked as Rebuttal

21 Number 4, do you see where it says "Jasmin Ismail called to

22 testify on behalf of the Petitioner"?

23 A    Yes, ma'am.

24 Q    Okay.  Having been first sworn and was examined and

25 testified.  So, this appears that you appeared in the

15

1 courtroom and you testified under oath, correct?

2 A    Correct.

3 Q    Okay.  If you'd turn to page 118, the next page.

4 A    Okay.

5 Q    You were asked -- I believe Mr. Brott (phonetic) asked:

6          "Q    In September of 2011, did you

7          observe Mr. Goldman act in an abusive

8          way to your daughter?"

9      Can you please read your answer.

10 A    Hold on one second.  September, what date?  I don't

11 know what this refers to.

12          THE COURT:  Page 118, line six.

13          THE WITNESS:  Yeah.  Yes, your Honor, I see that.

14          THE COURT:  Line six.

15          THE WITNESS:  Yes.

16          THE COURT:  Question --

17 BY MS. MONTGOMERY:

18 Q    This is your testimony.

19          THE COURT:  Yeah.  I'm sorry.  I just --

20          THE WITNESS:  Yes, September.  Okay.  I'm trying

21 to picture, your Honor, in my mind when I --

22          THE COURT:  Oh, okay.  I thought you were having

23 trouble finding the testimony.

24          THE WITNESS:  No, no, no.  I have it.  I'm just

25 trying to understand what she's asking me.

16

1          THE COURT:  All right.  Go ahead, Ms. Montgomery.

2   BY MS. MONTGOMERY:

3   Q    All right.  The question was:

4          "Q     Did you observe Mr. Goldman act

5          in an abusive way to your daughter?"

6   Can you please read your answer?

7   A    I said yes.

8   Q    Okay.  Second question was:

9          "Q     What happened?  Perhaps I can

10         help you.  Do you recall hearing from

11         your daughter when she was in Florida

12         and you were in Ohio?"

13  Would you please read your answer?

14  A    Yes.

15         "A     Nicole called me saying that Todd

16         had pushed her down the stairs in

17         Florida."

18  Q    And --

19         "Q     And where were you?"

20  A    I was in Ohio.

21  Q    Okay.  And it asks what you did -- what you did.

22  A    I -- yes.

23  Q    The -- the answer beginning at line 17, please read it.

24  A          "A     I and my sister got in the car

25         and go all night to get to Florida."

17

1  Q    The question was:

2          "Q    Why did you go to Florida?"

3      Can you just read the last at line 20?

4  A        "A    Because Nicole said she was in

5              danger.  He pushed -- she said he pushed

6              her down the stairs.  She had a new

7              baby.  The baby was just born August 13,

8              and she was crying, and she didn't know

9              what to do.  Then we thought that we

10             should drive out there to get her,

11             basically to bring her home."

12 Q    Okay.  So, in fact, you testified under oath that you

13 -- that you went to Florida to pick up your daughter because

14 she had been thrown down the stairs, correct?

15 A    I did testify to that, but when I got there, there was

16 nothing wrong.  Nicole was in short shorts and short tank

17 top.

18 Q    That wasn't the question.

19 A    And as soon as I opened the door, she says, "Good

20 you're here.  We're going out" --

21         THE COURT:  Stop.

22         THE WITNESS:  -- "to dinner."

23         MS. MONTGOMERY:  Stop.

24         THE COURT:  Stop.  Stop.  Stop.  Stop.

25

*Echo Reporting, Inc.*

18

1          THE WITNESS:  I'm sorry, your Honor.

2          THE COURT:  Okay.  Again, just answer the

3   questions.

4          Mr. Winfield -- you're paying Mr. Winfield good

5   money to represent you.  Let him do that.

6          THE WITNESS:  I apologize, your Honor.  It's too

7   much.

8          THE COURT:  I understand.

9          THE WITNESS:  It's too much happening.

10          THE COURT:  But this is how -- this is how trial

11   works.

12          THE WITNESS:  Yes, your Honor.

13          THE COURT:  It's up to him to --

14          THE WITNESS:  I apologize.

15          THE COURT:  -- ask you to elaborate if Ms.

16   Montgomery doesn't.  Okay?

17          THE WITNESS:  Yes, your Honor

18          THE COURT:  All right.  Listen to the question and

19   just answer the question.

20          Go ahead.

21          THE WITNESS:  I apologize, your Honor.

22   BY MS. MONTGOMERY:

23   Q    Can you turn to page -- it's marked 124.  Do you recall

24   at the time of the trial, when you were testifying, that you

25   were presented with an Exhibit A, which was a picture of Ms.

19

1  Goldman with the -- with a bloody lip?  Do you recall that?

2  A    There was a picture.  This --

3         THE COURT:  Stop.  It's a yes or no question.

4         THE WITNESS:  Yes, your Honor.

5         MS. MONTGOMERY:  Okay.

6         THE COURT:  Answer the question yes or no.  Do you

7  remember being shown the picture?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  Thank you.

10        Go ahead.

11 BY MS. MONTGOMERY:

12 Q    You were asked:

13        "Q    Were you there when it happened?"

14    And you responded:

15        "A    Yes, sir.  I was in the house."

16 A    Yes.

17 Q    Okay.  And you were asked:

18        "Q    And did you -- did you hear a

19        raucous?"

20    You responded:

21        "A    Yes."

22    The question was:

23        "Q    And did you then go to where --

24        did you hear Ms. Goldman cry out or

25        something?

20

1      You said -- you responded:

2           "A     Yeah.  She ran out crying.

3           Q     Did you help her?  Was she on her

4      way to a job?

5           A     She had a job the next morning.

6           Q     Did you help her ice the lip?

7           A     Yes, I did."

8      And on the following page:

9           "Q     Following your helping your

10          daughter with her cut lip, did Mr.

11          Goldman say anything to you admitting

12          that he had done it?

13     And your response:

14          "A     He has said that he has.  He's

15          asked me not to testify in regards to

16          that.  He has asked me -- stated that I

17          know you signed a declaration because

18          when he asked me not to testify, I said

19          'How?  I can't do that, you know.  I'm

20          going to tell the truth.'  He said,

21          'Well, just don't show up.  If you don't

22          show up, it will be fine.  But if you do

23          show up, just say that the box fell off

24          in the garage when she was in the garage

25          and that's how she got injured.'"

21

1     Do you see that?

2    A    I see that.

3    Q    Okay.  Okay.  You previously testified that you did not

4    have any conversations with Todd Goldman about him

5    transferring his ownership in the Bayview property before he

6    did that.

7    A    That's correct.

8    Q    Do you recall that testimony?

9    A    Yes.

10   Q    Okay.

11        THE COURT:  Sorry.  Ms. Montgomery, did you want

12   to move to admit the transcripts?

13        MS. MONTGOMERY:  Yes, the abbreviated transcript.

14        THE COURT:  Yeah.  Any objection?  Okay.  That's

15   admitted.

16        MR. WINFIELD:  Your Honor, I think I do have an

17   objection, your Honor, without --

18        THE COURT:  Okay.  What's our objection?

19        MR. WINFIELD:  It's incomplete.  I don't have the

20   entire transcript.  I do see it may be part of an original

21   transcript, but I haven't seen the entire transcript.

22        MS. MONTGOMERY:  We have it on the computer.  I

23   can -- we can email it to Mr. Winfield, the complete

24   version.

25        THE COURT:  All right.  Well, I don't think we're

22

1 going to get -- we're going to be done today.  So, I'm

2 provisionally admitting it.  She -- she basically

3 authenticated the testimony with -- that was discussed.  So,

4 but I'll make sure you have a chance to look at the whole

5 transcript and have a chance to revisit it if there's

6 something else you want to draw out.

7      (Pause.)

8          MS. MONTGOMERY:  Your Honor, may I approach?

9          THE COURT:  Yes.

10          MS. MONTGOMERY:  Do you want me to give the

11 exhibit to the witness?

12      (Pause.)

13          THE COURT:  Thanks.  All right.  This looks like

14 it's an affidavit, titled "Affidavit in Opposition to

15 Affirmative Defenses."  I'm going to mark it for

16 identification only as Impeachment 5.

17 BY MS. MONTGOMERY:

18 Q    Ms. Ismail, I have put in front of you a document.

19 It's three pages.  It's marked as "Affidavit in Opposition

20 to Affirmative Defenses."  This is part of Exhibit K that

21 you filed with the Court last week.  Do you recognize this?

22 A    Yes.

23 Q    And this is -- turning to the last page, is that your

24 signature?

25 A    Yes, ma'am.

23

1  Q    And, in fact, it was notarized?

2  A    Yes, ma'am.

3  Q    You had it notarized on the 26th of November 2018,

4  correct?

5  A    Correct.

6  Q    And this is testimony that you submitted in an action

7  in Florida, correct?

8  A    In a partition lawsuit filed by Nicole, yes.

9  Q    And the information in here, you testified under oath

10  true and correct, true?

11  A    Yes.

12  Q    Okay.  If you'd turn to the second page, looking at

13  paragraph seven.  You testified:

14          "A    Mr. Goldman said he did not have

15          the cash to repay me, and the California

16          property was tied up in the divorce.

17          However, due to the bifurcation of

18          marriage, he had a 25 percent interest

19          in the property located at 565 Bayview

20          in Belair, Florida, which he agreed to

21          deed me in satisfaction of the debts

22          owed.  I settled his and Nicole's debts

23          in the amount of 275,466.20 in exchange

24          for the deed for his 25 percent of the

25          Florida property.

24

1      Do you see that?

2  A    I see that.

3  Q    And, turning the page to paragraph eight, you said:

4              "I agreed to accept the deed in

5              lieu of repayment of the loan, and I

6              further agreed that I would not seek to

7              collect the money owed under the loans

8              from either Mr. Goldman or Huey, having

9              accepted the deed.  I accepted the deed

10             to protect my own financial interests as

11             it appeared that neither Mr. Goldman or

12             Huey had the cash to pay the money owed

13             to me."

14     Do you see that?

15 A    I see that.

16         MS. MONTGOMERY:  That's all I have for Ms. Ismail,

17 your Honor.

18         THE COURT:  Okay.  All right.  Mr. Winfield.

19                   REDIRECT EXAMINATION

20 BY MR. WINFIELD:

21 Q   Ms. Ismail, looking at Exhibit -- I guess it's K in

22 front of you, the affidavit, the --

23         THE COURT:  Oh, it's -- at least in this

24 proceeding it's -- it's Plaintiff's Impeachment 5.

25         MR. WINFIELD:  Okay.

*Echo Reporting, Inc.*

25

1          THE COURT:  But it -- it says Exhibit K from some

2    file stamp for something else.

3          MR. WINFIELD:  That's because it's part of my

4    augmentation that I --

5          THE COURT:  Oh, I see.

6          MR. WINFIELD:  -- provided.

7          THE COURT:  I see.

8          MR. WINFIELD:  And I provided those, you know, as

9    advance notice to her so she'd know what we'd --

10          THE COURT:  Okay.

11          MR. WINFIELD:  -- be presenting.

12          THE COURT:  All right.

13          MR. WINFIELD:  So, I'm glad to see that worked.

14    BY MR. WINFIELD:

15    Q    The -- Ms. Ismail, in paragraph eight, why did you say

16    that you agreed to accept the deed in lieu -- in lieu of

17    repayment of loans?

18    A    I agreed because the reason I said that because neither

19    one of them had any money.  And, finally, he transfers this

20    property with bunch of liens on the property.  I mean, I

21    knew I wasn't going to get anything.  I was losing money

22    every day because I had a loan.  I borrowed $553,000 to help

23    them pay off the mortgage.  That's how I got -- you know, I

24    got into this mess, to help my daughter.

25          So, they kept fighting amongst themselves, and they

*Echo Reporting, Inc.*

26

1   kept filing stuff here and there and kept getting -- neither

2   one of -- initially Todd didn't agree to sell the house.

3   Then finally he did after the judgments where he was ordered

4   to pay attorneys' fees and so forth and so on.  So, in my --

5   in January of '17, I sent an email finally.  I was -- I was

6   tired, you know.  I was paying for everything, taxes,

7   insurance, maintenance, electric bill, water bill.  I mean,

8   it was piling up, and neither one of them cared, you know.

9       So, finally, I begged, and after the judgments were put

10  on -- after Todd was ordered to pay the fees, he wanted to

11  sell the property.  He agreed to sell the property.  So --

12  and he wanted to pay child support and all of his debt, you

13  know.

14      So, I sent an email finally, and Nicole was trying to

15  collect, became a plaintiff in collection case even though

16  the judgments were not for her.  She became a plaintiff, and

17  she was suing -- it was just chaos.  You know, I mean, this

18  is a divorce case of three years.  And my granddaughter was

19  stuck in the middle.

20      So, I sent an email begging both of them to please

21  agree to sell the property, and I forwarded the same email

22  to Nicole's and Mr. Gold's attorney in Florida.  They came

23  back and said, "Oh, why would you want to get rid of this

24  property?  You want to control the property."  They refused

25  to sell the property.  This is January 30th, 2017.

1      Then I was sent emails -- so, basically, you know, I'm

2 the one who's stuck paying.  And, then, he finally --

3 whatever happened, whatever he did.  He transferred -- I --

4 I had no knowledge of what he was doing.  And then I got a

5 call from Mr. Grumer in -- I get an email in March of --

6 March 7, saying "Has any one of you heard about the lawsuit

7 that Todd filed," which I -- we didn't know.  He filed a

8 lawsuit against me and Nicole.

9           MS. MONTGOMERY:  Your Honor, this is --

10          THE WITNESS:  And then --

11          MS. MONTGOMERY:  This goes way beyond the --

12          THE WITNESS:  -- you have to understand what

13 happened, your Honor.

14          MR. WINFIELD:  Your Honor --

15          THE WITNESS:  Then March -- March --

16          THE COURT:  Stop.  Stop.  Stop.  Stop.

17          MR. WINFIELD:  Your Honor, may I try again?

18          THE COURT:  Yes.

19          MR. WINFIELD:  I -- I think I asked an inartful

20 question.

21          THE COURT:  Yes.

22          MR. WINFIELD:  It wasn't close to --

23          THE COURT:  He's going to ask you questions to --

24          THE WITNESS:  Okay.

25          THE COURT:  -- grow out the story.

28

1        THE WITNESS:  Okay.  I'm sorry.

2        THE COURT:  It's -- it's not okay to just give a

3   narrative.  It's just not how it works here.  Go ahead.  The

4   objection is sustained.

5   BY MR. WINFIELD:

6   Q    Okay.  Ms. Ismail, in paragraph 8, it says "I agreed."

7   I agreed.

8   A    Uh-huh.

9   Q    I want you to give me a short answer and explain why

10  you said "I agreed" if you had previously said that you

11  didn't know in advance he was giving you the deed.

12  A    No, I did not.

13  Q    Okay.  The question I asked is --

14  A    Oh, I agreed because --

15  Q    -- why did you use the word "I agreed" in the affidavit

16  if you haven't know in advance.

17  A    Because it would take one more way (indiscernible) Todd

18  Goldman, and it was allowing me to sell the property even

19  though I wasn't going to make anything, allowed me to sell

20  the property and stop the bleeding, and hopefully it would

21  sell for more to try to make up some of the losses.  That's

22  all it was by agreeing.  That's all I could do.

23        THE COURT:  Thank you.

24        THE WITNESS:  Neither one of them had the money.

25  So --

29

1 BY MR. WINFIELD:

2 Q    Okay.  I wasn't asking why you accepted the deed.

3 A    Okay.

4 Q    I -- when you said "I agreed," did that mean that you

5 knew in advance he was going to send you this deed?

6 A    No.  It was already done.  I mean, I didn't ask him to

7 transfer it to me.  I -- I didn't -- I didn't even know how

8 to get out of the -- what he did.  I mean, it was already

9 transferred.  I was called by Mr. Grumer, Nicole's attorney,

10 said that he transferred the property, which I didn't

11 believe him at first, you know.

12          MR. WINFIELD:  Okay.  Your Honor, I would move to

13 admit Impeachment Exhibit --

14          THE COURT:  5.

15          MR. WINFIELD:  Right.

16          THE COURT:  Okay.  Without objection.  So, I want

17 to ask just to make sure I follow along.  Hold on a second.

18          This affidavit, this is after the fact, after the

19 fact of the -- by the time you made this affidavit, you --

20 he had already transferred the interest in the house to you,

21 is that right?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  Okay.

24          THE WITNESS:  This was in partition case in

25 Florida that Nicole filed.

30

1          THE COURT:  Okay.  All right.  So, he transferred

2    it, and then you testified that you agreed to this deal

3    where you would take that in lieu of the debt?

4          THE WITNESS:  Yes, because --

5          THE COURT:  In satisfaction of the debt?

6          THE WITNESS:  Yes, your Honor, because they were

7    trying to move the case back to -- from Florida to

8    California.

9          THE COURT:  Okay.  All right.

10   BY MR. WINFIELD:

11   Q    Did you agree to this before he gave you the deed?

12   A    No.  I didn't know anything about it.  In fact, he

13   tried to give me the money from Tarzana houses.  You adjust

14   our debt to 50.  I didn't do that because I don't want to

15   harm my child in any shape or form, you know.  I don't want

16   to do anything against her.  So I said no, you know,

17   whatever the Court decides.

18   Q    Thank you.  Okay.  You earlier testified that when you

19   and your sister went to Florida, when she called you and you

20   that you were -- that she had been pushed down the stairs,

21   correct?

22   A    Correct.

23   Q    Can you tell me in -- in a short answer what happened

24   when you arrived?

25   A    When I arrived, Nicole opened the door, and we had been

1  on the phone with Nicole almost there, you know, on the

2  phone.  And Nicole opened the door, and Todd came down the

3  stairs, and Nicole says, "Oh, good.  You're here.  You can

4  watch the baby.  We're going out to dinner," and they left.

5  That was it.  She had short shorts on.  She had a tank top

6  on.  There were no bruises.  There's long stairs down the

7  stories.  There's a tile floor.  Nothing.  And we both

8  looked at each other.  It was me and my sister over there.

9  We both looked at each other like, what, what?  You know, I

10 drove a thousand miles to try to protect my child, and this

11 was just a joke to her at the time, you know.  And then --

12 and we -- we didn't question Todd because we don't want to

13 hurt their marriage, you know.  I mean, we -- we thought it

14 was hormones.

15 Q    Why did you -- why did you testify in --

16          THE COURT:  All right.  Well, I think the box

17 needs to go where it -- stop for a second.  The box needs to

18 go where it's needed.

19          THE WITNESS:  I'm sorry.  Yes, please.

20          THE COURT:  It looks like there's two boxes there.

21 Oh, it's something else.  All right.

22     (Pause.)

23          THE COURT:  All right.  Go ahead.

24 //

25 //

32

1  BY MR. WINFIELD:

2  Q    Why do you think your relationship with your daughter

3  broke down?

4  A    Because Nicole asked me to do a lot of things for her.

5  This restraining order trial, when it occurred, you know,

6  when my child says somebody harmed me, I support -- I want

7  to protect my child.  So, this went on, and I -- so, first I

8  kind of believed -- I wasn't sure, you know.  So, I -- I'm

9  like, okay.  I believe you.  And then she asked me to do all

10  kinds of stuff, and then she's on the -- on the phone call

11  with the -- with the therapist, and she pretends -- in my

12  house, in the bedroom, pretends to be calling and talking

13  like, you know, and then comes out laughing, and she goes,

14  "Oh, you -- you don't know what's going to hit him," you

15  know.  And then she wanted to take my granddaughter to the

16  therapist, try to turn her against him, her father.  And all

17  these things went on.  Then she wanted me to pretend and

18  call people, pretend to be Nicole.  Then she wanted me to

19  send a bunch of documents in a text --

20           THE COURT:  What was the question, Mr. Winfield?

21  This --

22  BY MR. WINFIELD:

23  Q    Why do you think your -- your relationship broke down

24  with Nicole?

25           THE COURT:  Okay.  You're going to have --

33

1          MS. MONTGOMERY:  Your Honor --

2          THE COURT:  You're going to have to ask her bite-

3 size questions, and --

4          MR. WINFIELD:  Your Honor --

5          THE COURT:  And I think -- and I need you to

6 control your own client.

7          MR. WINFIELD:  Your Honor, may I have permission

8 to ask leading questions?

9          THE COURT:  Yeah.  I'm going to give you a little

10 leeway just to help curtail the narrative.

11 BY MR. WINFIELD:

12 Q    Ms. Ismail, in early 2017, did you ultimately file an

13 affidavit supporting Todd in the divorce case?

14 A    Yes.  I filed a declaration in support --

15          MS. MONTGOMERY:  Objection, your Honor.

16          MR. WINFIELD:  That's fine.

17          THE COURT:  It's a yes or no question.

18          THE WITNESS:  Yes, your Honor.

19          THE COURT:  Go ahead.

20 BY MR. WINFIELD:

21 Q    Okay.  And what has happened -- after that happened,

22 was there a change in the relationship with your daughter?

23 A    Yes.

24 Q    Tell me briefly why did you file an affidavit in 2017

25 supporting Todd?

34

1  A    My daughter was keeping my granddaughter away from her

2  father intentionally, and I --

3  Q    Thank you.

4  A    -- filed a declaration --

5         THE COURT:  No narratives.

6  BY MR. WINFIELD:

7  Q    After the -- you filed that affidavit, did Nicole begin

8  filing legal actions against you?

9  A    Yes.  She filed -- she filed --

10 Q    Thank you.

11 A    -- a --

12 Q    How many times has she filed legal actions against you?

13 A    Eleven.

14 Q    And how many of those 11 are still pending?

15 A    None except for this one.

16 Q    Okay.  And were they all resolved in your favor?

17 A    Yes.

18 Q    Did you ever agree to give any false testimony on

19 behalf of Todd?

20 A    No.

21 Q    Did you ever give any false testimony on behalf of

22 Todd?

23 A    No.

24      (Pause.)

25 Q    I'd like to clarify.  The last day that you were here,

35

1 Ms. Montgomery was asking you some questions about artwork

2 on the Internet by Todd Goldman, and -- and I believe you

3 told me you wanted to correct one thing you stated there.

4 She stated --

5          MS. MONTGOMERY:  Objection.  I didn't ask about

6 art work on the Internet.

7          MR. WINFIELD:  What was your objection?

8          MS. MONTGOMERY:  It's a mischaracterization of the

9 -- of my questions.  Beyond the scope of the direct.

10          MR. WINFIELD:  It's beyond the scope of today's

11 direct.  I believe that we -- we addressed it before.  And,

12 so, I'm trying to clarify something that happened.

13          THE COURT:  Yeah.  So --

14          MR. WINFIELD:  I have a transcript -- I haven't

15 provided it to her -- of the hearing.  Let me try this a

16 different way.

17          THE COURT:  I mean, I'm looking at --

18          MR. WINFIELD:  No, that's -- that's fine, your

19 Honor.

20          THE COURT:  I'm looking at page 123:

21          "Q    At that time, did he also give

22          you the furniture and some of the

23          artwork?

24          A    No.  I was not aware of that at

25          all."

36

1          Et cetera.  Is that the artwork --

2          MR. WINFIELD:  No.  I --

3          THE COURT:  -- reference you were talking about?

4          MR. WINFIELD:  No.  It's at page 158.

5          THE COURT:  Okay.  So, let's see.

6          MR. WINFIELD:  There's a question at line 13.  It

7  says:

8          "Q    Do you know whether it's

9          advertised on the Internet as artwork

10         done by Todd Goldman?"

11         THE COURT:  Is that what you're asking about, 158?

12         MR. WINFIELD:  Yes.

13         THE COURT:  I mean, there's a whole -- there's a

14 whole thing.  Have you heard -- on page -- beginning of page

15 157, line 18:

16         "Q    Have you heard a company, a

17         company called Ellezarine, LLC,

18         something like that?

19         A     Yes.

20         Q     What is that company?

21         A     It's out there.  There's nothing.

22         Q     Really?  And that's a company that

23         you own, correct?

24         A     I guess, yeah.

25         Q     And it is selling underwear --

37

1          Underwear Amors, is that correct?

2          A      No.

3          Q      Do you know what Underwear Amors

4          is?

5          A      Yes.

6          Q      What is it?

7          A      It's a property.

8          Q      It's a what?

9          A      It's artwork that I paid somebody

10         to do.

11         Q      Is it, in fact, artwork that Todd

12         has done for T-shirts?

13         A      No.

14         Q      Do you know whether it's

15         advertised on the Internet as artwork

16         done by Todd Goldman?

17         A      I don't know."

18  BY MR. WINFIELD:

19  Q    Okay.  So, your answer, where you said "I don't know,"

20  would you like to amend that answer?

21  A     Yeah.  I didn't know at the time, but it is being used

22  as -- it is being marketed as art Todd -- art of Todd or

23  something like that.

24  Q    Is it being marketed on your website?

25  A     No.

38

1          MR. WINFIELD:  Okay.  No further questions, your

2  Honor.

3          THE COURT:  Okay.  Recross whenever you're ready.

4  Take your time.

5                  RECROSS EXAMINATION

6  BY MS. MONTGOMERY:

7  Q    Ms. Ismail, have you lied under oath in preparing or in

8  signing declarations for Niki?

9  A    Nicole wrote all the declarations and had us sign it.

10 Q    That's not my question.

11 A    That's the answer.

12 Q    Did you read the declarations before you signed them?

13 A    Not necessarily. Nicole wrote declarations for me, for

14 him, for her.  She demanded that we sign it.  And if we

15 didn't, she was going to post her naked photos --

16 Q    Okay.  That's --

17 A    -- on Facebook --

18 Q    That's not the question.

19 A    -- and all the while for my parents to see and all the

20 people to see.  Okay.  That's pretty embarrassing.

21 Q    That --

22 A    She forced us to sign those declarations.  Do you want

23 to know the truth?

24 Q    No, I want you to stop.

25 A    That's the truth.

39

1  Q    I want you to answer my questions.  You testified --

2  A    I answered your questions.

3            THE COURT:  Stop.  Stop.  Stop.  Stop.

4            Go ahead.  Next question.

5            THE WITNESS:  How do you do this?

6  BY MS. MONTGOMERY:

7  Q    You testified -- you testified at trial in November

8  2018, correct?

9  A    November 2018?

10 Q    The transcript that we read, in 2015, correct?

11 A    Correct.

12 Q    And did you testify truthfully while you were under

13 oath?

14 A    At the time she said he was --

15 Q    I didn't ask --

16           THE COURT:  It's a yes or no question.  You have

17 to answer yes or no.

18           THE WITNESS:  Yes.  At the time, yes.  Yes, your

19 Honor.

20           THE COURT:  Okay.  Thank you.

21           MS. MONTGOMERY:  All right.  That's all, your

22 Honor.

23           THE COURT:  Okay.  All right.  Mr. Winfield?

24 //

25 //

40

1                         REDIRECT EXAMINATION

2    BY MR. WINFIELD:

3    Q    Was the testimony you gave in court in 2015 based upon

4    what Nicole told you?

5    A    Yes.

6    Q    Did you later learn that some of that information was

7    not correct?

8    A    Yes.  All of it.  She used me to --

9              MR. WINFIELD:  No further questions, your Honor.

10             THE WITNESS:  -- take his child away.

11             THE COURT:  Okay.  All right.  Anything else?

12             MS. MONTGOMERY:  No, your Honor.

13             THE COURT:  Okay.  Ms. Ismail, if you'd step down.

14   Thank you.

15             THE WITNESS:  Thank you, your Honor.

16             THE COURT:  All right.

17             MS. MONTGOMERY:  Your Honor, we'd like to call Ms.

18   Griffin.

19             THE COURT:  All right. Ms. Griffin, why don't you

20   take the witness stand.

21               NICOLE GRIFFIN - DEFENDANT - SWORN

22             THE COURT:  Have a seat.  Make sure the microphone

23   is pointed kind of at your face so we can hear you.  And why

24   don't you state and spell your first and last name, please.

25             THE WITNESS:  Nicole Griffin, N-I-C-O-L-E,

*Echo Reporting, Inc.*

41

Griffin, G-R-I-F-F-I-N.

2          THE COURT:  Okay.  All right.  Go ahead.  Your

3  witness.

4                    DIRECT EXAMINATION

5  BY MS. MONTGOMERY:

6  Q    Ms. Griffin, let me clarify a few things.  There was a

7  document that has been identified as Rebuttal Exhibit 3.  Do

8  you have that in front of you?  It's an email, and the re

9  line says "Happy Birthday, Princess."

10  A    Yes.

11  Q    Is that your email at the top where it states

12  nikihuey@yahoo.com?

13  A    Yes.

14  Q    Is this an email that you received?

15  A    Yes.

16  Q    Did you receive this email on or about December 23rd,

17  2011?

18  A    Yes.

19  Q    Is that approximately when your birthday is?

20  A    Yes.  My birthday is the next day.

21  Q    And is this an email that you actually received on your

22  email server?

23  A    Yes.

24  Q    Did you make any modifications to this email?

25  A    No.

42

1  Q    And this -- is this the email that, in fact, you

2  received from your mother?

3  A    Yes.

4          MS. MONTGOMERY:  Your Honor, I'd ask that this

5  email be admitted into evidence.

6          MR. WINFIELD:  Objection.  Lacks foundation.  It

7  hasn't been established that this is the actual email.  I --

8  I'd like to ask questions about this, foundation.

9          THE COURT:  You can -- you can inquire before I

10 rule on the objection.  He can -- he can ask questions about

11 the documents, but I have to decide what -- what to do.

12                      VOIR DIRE

13 BY MR. WINFIELD:

14 Q    Ms. Griffin, the -- at the top of this Impeachment

15 Exhibit 3, it says the -- Nikihuey@yahoo to Nikihuey@gmail.

16 Why was it necessary to email between your emails?

17 A    Because in 2011, I was using my Yahoo email address,

18 and approximately at the end of 2014, I started using a

19 Gmail address because my ex-husband had accessed my prior --

20 I had to switch from Yahoo to Gmail.  So, I forwarded it to

21 the email address that I now use.

22 Q    Do you have a copy of the actual Yahoo email?

23 A    I can provide you one.

24 Q    Do you have an actual copy of this email in Yahoo?

25 A    Printed?  I'm sorry.  I don't have --

43

1           THE COURT:  I don't understand any better than you

2  do.

3           THE WITNESS:  I don't have a printed copy.  If

4  you're going to request one, I'm happy to print one from my

5  Yahoo email over break.

6           THE COURT:  I appreciate that.  I mean, this is

7  trial.  So, I mean, I -- I don't know what to tell you.

8           THE WITNESS:  I forwarded it to myself to -- it's

9  my email.  They're both my emails.

10           THE COURT:  I mean, that's her explanation.

11           THE WITNESS:  Nobody uses -- Ms. Montgomery knows

12  I don't use Yahoo anymore.  She emails me at Gmail.

13  BY MR. WINFIELD:

14  Q   Isn't it true that you altered another email, the March

15  30, 2017 email?

16           MS. MONTGOMERY:  Objection.

17           THE WITNESS:  No.

18           MS. MONTGOMERY:  No foundation.

19           THE COURT:  Okay.  Is that it?

20           MR. WINFIELD:  Yes.

21           THE COURT:  All right.  The exhibit's in.  It's

22  admitted.  I think, you know, the -- the issue is really

23  authentication at this point.  I find the witness credible

24  on the issue enough to get past the authentication bridge.

25  You can make whatever arguments.  You can offer rebuttal

44

1  evidence if you have it later, but I think there's enough

2  here to admit it.  And, of course, I'm cognizant of Ms.

3  Ismail's testimony denying it, and I'll have to ultimately

4  make a credibility determination as between the two, but the

5  document is admitted into the record.

6          MR. WINFIELD:  Thank you.  May I have just a

7  moment, your Honor?

8          THE COURT:  Yeah, of course.

9      (Pause.)

10         MR. WINFIELD:  Thank you, your Honor.

11         MS. MONTGOMERY:  Your Honor, are you ready to

12 proceed?

13         THE COURT:  No.  Hold on.  Okay.  Go ahead.  Thank

14 you.

15             DIRECT EXAMINATION  (RESUMED)

16 BY MS. MONTGOMERY:

17 Q   Ms. Griffin, when did you marry Todd Griffin -- Todd

18 Goldman?

19 A   April 3rd, 2011.

20 Q   And were you expecting Elle at the time that you -- you

21 married him?

22 A   Yes.

23 Q   How far along were you?

24 A   She was born in August.  So, halfway.

25 Q   Was your mother, Jasmin, supportive of the marriage?

45

1  A    No, not initially.  She wasn't supportive of any of the

2  relationship, and then afer Elle was born, she made an

3  effort to try.

4  Q    Prior to your marriage, did Jasmin support you

5  financially?

6  A    Yes.

7  Q    Can you give examples of the type of expenses that she

8  paid on your behalf prior to marriage?

9  A    She paid for my car insurance.  She paid for college

10 tuition.  She would put money in my ROTH IRA.  If I -- if I

11 needed something, she would pay for it.

12 Q    How old were you at the time you were married?

13 A    I was 24, 25.

14 Q    And did she ever have -- ask you to repay what she gave

15 you for college?

16 A    No.

17 Q    Did she ever ask you to repay moneys that she placed

18 into the ROTH IRA?

19 A    No.

20 Q    Did she ever ask you to repay car insurance?

21 A    No.

22 Q    During your marriage, did Todd physically abuse you?

23 A    Yes.

24 Q    You heard Jasmin testify that she claimed she was not

25 aware that Todd was abusive, correct?

46

1  A    Yes.

2  Q    And was that testimony accurate?

3  A    No.

4  Q    Why was it not accurate?

5  A    She was well aware of what was going on in our

6  relationship.

7  Q    How do you know that she was aware?

8  A    I told her.  She was in the house the one time he hit

9  me, and she heard it.

10 Q    Let's start -- let's go back to October 2011.  Do you

11 recall an incident in which Todd abused you and Jasmin was

12 either present or nearby and would be aware -- was aware of

13 the abuse?

14 A    Yes.

15 Q    Can you describe it?

16 A    Yes.  We were in Sedona, Arizona for my aunt's wedding,

17 and Elle was born in August.  So, she was tiny.  And I was

18 in our hotel room with Todd, and I was holding Elle, and he

19 kicked me in my lower back, and I called my mom.

20 Q    And was she there at the hotel?

21 A    She came to the room with the other two people that are

22 in court today with her.

23 Q    And were you visibly injured?

24 A    There wasn't blood, but I have a herniated disc from

25 it, and she told Todd.  She asked Todd what had happened, he

47

1  and her boyfriend.  They -- they stood up for me.

2  Q    Your mother and her boyfriend stood up for you?

3  A    Yes.

4  Q    Did she say anything else to Todd at the time?

5  A    She told him he had to stop, and he said that I was

6  blocking the TV.

7  Q    And that was the basis on which he kicked you?

8  A    Yes.  I was in the way, and I -- he couldn't see the

9  TV.  That was what he told her, and my Aunt's wedding was

10 the next day, and nobody wanted to cause a problem.  Nobody

11 called my Aunt, and that was fine.  And she had her wedding.

12 Yes, she was there.  She knew about that incident.

13 Q    Okay.  In December 2011, Jasmin has testified regarding

14 a fall that you took down the stairs in the Florida

15 property.  You heard her testimony here today, correct?

16 A    Yes.

17 Q    Can you describe the incident in your own words, what

18 happened?

19 A    Todd pushed me down the -- the flight of stairs in the

20 Bayview property, which is where we were living at the time.

21 Q    And was Elle present, your daughter?

22 A    Well was present.  I wasn't holding her or anything,

23 but he pushed me down the stairs, and then he took the car

24 that had the car seat in it, and he left.

25 Q    So --

*Echo Reporting, Inc.*

48

1  A    And that's when I called her, and she and her sister,

2  who's present in court today, did drive down to Florida from

3  Ohio.

4  Q    And why did you call her?

5  A    I didn't know what else to do.

6  Q    Okay.  So, at the time that she and her sister arrived

7  in Florida, was Todd at the house?

8  A    Yes.  He had come back by that point, and he was

9  apologizing and apologetic and said he was really stressed

10 out about the new baby being in the house.  We didn't leave

11 for dinner.

12 Q    I was going to say did you leave and go to dinner as --

13 as the testimony --

14 A    No.  I do think the following day that we -- she and

15 her sister stayed for I want to say a couple of days, and

16 the following day, they did say, He's stressed out.  You

17 should go to dinner.  I do remember going to dinner.  I

18 think it was the following day.  But I didn't answer the

19 door in a tank top and shorts and go to dinner.

20 Q    In September 2014, shortly -- I'm sorry.  In January

21 2014, there was a discussion in the trial about a bloody

22 lip.  Do you recall that?

23 A    Yes.

24 Q    Can you describe the incident where it occurred?

25 A    Yes.  We were living in Sherman Oaks at the time, and

49

1  it was in the morning.  I had flown back.  I was in Hawaii

2  for a week shooting for a job, and I had flown back, and

3  Jasmin and my ex-husband and Elle came to Hawaii too because

4  I was still nursing at the time.  And I had another job the

5  following morning, another shoot, photo shoot.  So, I had to

6  wake up really early after getting back late.  And Todd was

7  pissed because I woke up early and I was making noise, and

8  he hit me in the bedroom.  And Ms. Ismail and actually my

9  ex-uncle was also in the house at the time.  They weren't in

10 the room.  This happened in the bedroom, but he hit me, and

11 I screamed out and ran outside, and she helped me ice my

12 lip, and she took a picture for me.

13 Q    Okay.  Who is she?

14 A    I'm sorry.  Ms. Ismail helped me ice my lip and took a

15 picture and --

16 Q    This is Jasmin?

17 A    Yes.  Sorry.  Jasmin.

18 Q    So, she saw that your lip had been bloodied?

19 A    Yes.

20 Q    This wasn't an issue of you just telling her that you

21 had been harmed.  She could -- she physically saw the abuse,

22 correct?

23         MR. WINFIELD:  Objection.  Leading.

24         THE COURT:  I think you can --

25         MS. MONTGOMERY:  I'm just clarifying.

*Echo Reporting, Inc.*

50

1          THE COURT:  I think you can get -- you can get --

2  I'll sustain the objection, but I think you can get at the

3  same information without --

4  BY MS. MONTGOMERY:

5  Q    Jasmin has indicated that you told her things.  Was

6  this a situation where you had told her what happened?

7          MR. WINFIELD:  This is still leading.

8          MS. MONTGOMERY:  Let me rephrase it.

9          THE COURT:  Yeah.  Why don't you rephrase it,

10  yeah.

11  BY MS. MONTGOMERY:

12  Q    Did Jasmin see any abuse?

13  A    She saw the bloody lip, and she heard me call out and

14  the photograph was presented at the time of my domestic

15  violence trial.

16  Q    And who took the photo?

17  A    Jasmin.

18  Q    Did you tell Jasmin ahead of the time that you were

19  going to leave Todd and file for divorce?

20  A    Yes.  I had a couple of conversations with her leading

21  up to it.

22  Q    Do you know approximately when that was?

23  A    Very soon before, maybe within a week.

24  Q    And when did you actually file for divorce?

25  A    October 28th, 2014.

51

1  Q    Was Jasmin supportive of you filing for divorce?

2  A    No, not initially.  She told me to wait because it was

3  too much money tied up with him, and it wasn't a good time,

4  but she eventually was supportive.

5  Q    And you went -- you, nevertheless, went forward and

6  filed the papers, correct?

7  A    Yes.

8  Q    And at the time, Jasmin was -- where was she living?

9  A    In Ohio.

10 Q    When you filed the papers on October 2014, did you tell

11 Jasmin?

12 A    Yes.

13 Q    What was your (sic) response?

14 A    That she'd be there.  It was kind of a -- it was -- she

15 didn't initially want me to do it because there was too much

16 money of hers and her parents tied up with him, and then it

17 was a we're going to do this.  I'm going to be there for

18 you, and I'm going to help you.

19 Q    And did she come to Los Angeles to be with you?

20 A    Yes.

21 Q    Do you know approximately when she came to Los Angeles?

22 A    I'd say within a few days, pretty immediately.

23 Q    Was there an event that caused you to file on October

24 28th, 2014?

25 A    Yeah.  It was a -- it was a long time coming I guess

52

1  you could say in hindsight.  I've since found old

2  conversations between me and my ex-husband's parents saying

3  I can't handle this anymore, and that was in January 2014.

4  But --

5          MR. WINFIELD:  Objection to the extent it's

6  hearsay.

7          THE WITNESS:  It was my statements to --

8          THE COURT:  Okay.  Okay.  Okay.  All right.  We're

9  kind of getting off into a narrative.  So, why don't you --

10         MS. MONTGOMERY:  Okay.

11         THE COURT:  Why don't you rephrase the question.

12         MS. MONTGOMERY:  All right.

13 BY MS. MONTGOMERY:

14 Q    Was there an event that occurred within say a week of

15 you filing for divorce on October 28, 2014 that caused you

16 to file?

17 A    Yes.  We -- there were a lot of fights between Todd and

18 I that week.  My daughter twice in that week repeated some

19 relatively racist comments.

20 Q    Okay.  Let me stop.  What type of -- when you say that

21 she repeated racist comments, was this in your presence?

22 A    Yes.

23 Q    Can you describe what you're talking about?

24 A    One is we were at the Ralph's on Ventura and Sherman

25 Oaks, and the deli guy was a Black guy, and she was three

1   and said, "Daddy doesn't like those people because they're

2   dirty" to the guy -- well, to me but within earshot of the

3   guy.  But then he was just so angry that week, and one of

4   the arguments he ended up taking out --

5   Q    Okay.  So, you had -- there were further arguments

6   during that week?

7   A    Yes, just about anything, and -- and that last

8   argument, he ended up taking her, putting her in the car and

9   driving off with her.

10  Q    Did he -- okay.

11  A    Taking her -- I'm sorry.  And he drove off without her

12  strapped into her car seat and started texting me photos of

13  her being in the car not strapped into the car seat, and

14  that -- that was it.  It was affecting her, which is what

15  Jasmin always told me was what was going to happen is it was

16  going to affect her and that I would leave.  So, I did.

17  Q    So, notwithstanding all the financial issues, you

18  decided to go forward and file for divorce?

19  A    Yes.

20         MR. WINFIELD:  Objection.  Asked and answered.

21         THE COURT:  Overruled.

22  BY MS. MONTGOMERY:

23  Q    Did you speak to Jasmin regularly following the divorce

24  filing?

25  A    Yes, constantly.

54

1  Q    How often would you say that you spoke to her in a

2  normal day?

3

4  A    Multiple times a day.

5  Q    What was the nature of those conversations?

6  A    Everything from goings on with Elle to what was going

7  on in the divorce and me filing and if he was served or not

8  served or Todd, he -- I mean Todd Goldman, or if Todd was

9  following orders or not following orders or what was

10 happening with court, what were the next steps, how long is

11 this going to take, what was being done in regards to the

12 finances and the houses that my grandparents and she were

13 tied up in on.

14 Q    Okay.  Now, you heard in the prior day, on September

15 22nd, when Jasmin was testifying, she said she was not privy

16 to what was going on in the divorce, correct?

17 A    Yes.

18 Q    Was that an accurate statement?

19 A    No.

20 Q    Can you describe why that was inaccurate?

21 A    I would tell her and share with her, and she was in

22 L.A. with me very frequently, looking at documents, going

23 through documents, the court filings and documents regarding

24 the dissolution.  That's when she saw all that, and also she

25 had conversations with my attorneys regarding different

55

1  orders and whatnot from the court and from the dissolution

2  action.

3  Q    Was she familiar with family law proceedings?

4  A    Yes.

5  Q    Were you?

6  A    No.

7  Q    Did you have -- what type of discussions did Jasmin

8  have with your counsel -- who -- with whom did she have

9  discussions?

10 A    She had discussions with my first family law attorney

11 from which I initially filed, Michael McGuire, and he and

12 she had conversations about FLRPL, which is a family law --

13 family law real property lien.

14         MR. WINFIELD:  Objection.  Hearsay.

15         THE WITNESS:  I was present for these --

16         THE COURT:  Okay.  You've got to be quicker with

17 the objections, Mr. Winfield.  I mean --

18         THE WITNESS:  She never had conversations with --

19         THE COURT:  You know, I -- stop for a second.

20 Stop for a second.

21         THE WITNESS:  Sorry.

22         THE COURT:  I'm not going to -- you know, I'm not

23 going to make objections for you, and she -- it was obvious

24 to me, you know, she asked what conversations did somebody

25 else have with your lawyer without establishing whether it

56

1  was in front of her or not.  Obviously, she's talking about

2  things that happened outside her presence.  It's not very

3  probative, and it's -- it's hearsay, right.  But -- but we

4  just went on for 45 seconds without an objection.  So --

5          MR. WINFIELD:  I agree I do need to be quicker.

6          THE COURT:  Yeah, yeah.  Okay.  So, but -- but I'm

7  going to let -- I'm going to just stop the question there,

8  okay.  I'm going to let Ms. Montgomery reask --

9          MS. MONTGOMERY:  Okay.

10          THE COURT:  -- you know, what -- what did this --

11  you know, you got to ask -- you got to --

12          MS. MONTGOMERY:  Right.

13          THE COURT:  You got to ask questions about what

14  this witness saw, what this witness heard, et cetera, and

15  make it clear that that's what you're asking.  Otherwise,

16  when I go back over this transcript, I'm not going to be

17  terribly impressed, you know, the witness talking about -- I

18  don't know whether she was there or not.  So, why don't

19  you --

20          MS. MONTGOMERY:  Right.

21  BY MS. MONTGOMERY:

22  Q    Did you have meetings with your attorney, Michael

23  McGuire, while Jasmin was present?

24  A    Yes.

25  Q    Do you know the substance of the meetings in which

*Echo Reporting, Inc.*

57

1   Jasmin was present with Michael McGuire?

2   A    Yes.

3   Q    Can you describe the general substance?

4   A    Yes.  It was in regards to my attorneys' fees because

5   Mr. McGuire would -- needed to file a motion or a request

6   for order with the Court requesting attorneys' fees from my

7   ex-husband.  In the interim, he wanted to ensure -- secure

8   -- secure fees.  So, he had conversations with us about

9   getting a FLRPL, which is a family law real properly lien

10  against Ms. Ismail's portion of the Florida house because he

11  couldn't get it from mine, and that's because of the --

12          MR. WINFIELD:  Objection.  The question's been

13  answered.  Now it's --

14          THE WITNESS:  Oh, I'm sorry.

15          MS. MONTGOMERY:  Ms. Griffin --

16          MR. WINFIELD:  -- narrative going beyond.

17          THE COURT:  Yeah.  Sustained.

18  BY MS. MONTGOMERY:

19  Q    Did -- did Mr. McGuire explain in your presence to

20  Jasmin that she -- that no one was authorized to transfer

21  property without the approval of the Court?

22          MR. WINFIELD:  Objection.  Leading.

23          THE COURT:  Sustained.

24  BY MS. MONTGOMERY:

25  Q    Did Jasmin understand that you were not able to

58

1   transfer your interest in property because of the divorce?

2          MR. WINFIELD:  Calls for speculation.

3          THE COURT:  Sustained.

4   BY MS. MONTGOMERY:

5   Q    Did Mr. McGuire explain to Jasmin why you couldn't

6   provide the lien on the Bayview property?

7   A    Yes.

8   Q    And what were you told?

9   A    Due to the ATRS, which are the automatic temporary

10  restraining orders that all family law litigants -- as soon

11  as you file for dissolution, you're under these orders.  I

12  couldn't transfer any separate property, community property,

13  quasi-community property.  Todd's and my stuff was held up

14  until the Court decided what could happen with it.  So, he

15  was --

16  Q    And was Jasmin present during these discussions?

17  A    Yes.

18  Q    Would you turn to Exhibit 104.

19         MS. MONTGOMERY:  Your Honor, I believe this was

20  admitted on the 22nd through the testimony of Jasmin, that

21  she had sent this email.

22         THE COURT:  Okay.  I'm sorry.  Tell me the exhibit

23  number again.

24         MS. MONTGOMERY:  104.

25         THE COURT:  Okay.  Uh-huh.

59

1  BY MS. MONTGOMERY:

2  Q    Ms. Griffin, are you looking at Exhibit 104?

3  A    Yes.

4  Q    And do you recognize the line at the top from -- it

5  indicates Jasminhuey@yahoo.com?

6  A    Yes.

7  Q    And the to is to Nikihuey@gmail.com, correct?

8  A    Yes.

9  Q    And was that your -- was that your address on March

10  30th, 2017?

11  A    Yes.

12  Q    Is this a document, an email that you received from Ms.

13  Huey -- or from Ms. Ismail?

14  A    Yes.

15  Q    And if you look down at the very last paragraph on the

16  first page, can you read that paragraph?

17  A          "Do you remember first how Michael

18          McGuire and Debra tried to get me to let

19          them put a lien for fees on my 50

20          percent share of Bayview property?  You

21          with your big brown eyes, with tears and

22          your boyfriend both said I should do it,

23          and they overnighted the paperwork.

24          Thank God I finally got some senses into

25          my head."

60

1  Q    That's enough.  Is -- is this the discussion that

2  you're referring to when you talk about a discussion between

3  Michael McGuire and Jasmin in your presence?

4  A    Yes.

5  Q    Was Jasmin -- to your knowledge, was she aware of

6  orders that had been entered by the Family Law Court

7  requiring Todd to pay rent?

8          MR. WINFIELD:  Objection.  Lack of foundation.

9          THE COURT:  Why don't you rephrase your question.

10 BY MS. MONTGOMERY:

11 Q    Did you --

12          THE COURT:  Sustained.

13 BY MS. MONTGOMERY:

14 Q    Did the Family Law Court issue an order that required

15 Todd to pay rent?

16 A    Yes.

17 Q    And did you show the order to Ms. Ismail?

18 A    Yes.

19 Q    And did the Court order Todd by -- by order of the

20 court to pay car -- your car insurance?

21 A    Yes.

22 Q    And did you show such an order to Ms. Ismail?

23 A    Yes.

24 Q    And did they -- did the Court also order Todd Goldman

25 to pay utilities and other maintenance on the Tarzana

61

1 property?

2 A    Yes.

3 Q    Is that the property that you were living in with Elle?

4 A    Yes.

5 Q    And did this -- did you show those orders to Jasmin?

6 A    Yes.

7 Q    Did Jasmin know whether or not Todd had complied with

8 hose orders?

9         MR. WINFIELD:  Objection.  Calls for speculation.

10 BY MS. MONTGOMERY:

11 Q    To your knowledge?

12         THE COURT:  Yeah, I don't -- I don't think she can

13 have knowledge of what Ms. Ismail knows.  She can have

14 knowledge of things that were communicated by Ms. Ismail,

15 but I don't think you can ask about what Ms. Ismail knew in

16 her head.

17         MS. MONTGOMERY:  Okay.

18 BY MS. MONTGOMERY:

19 Q    When Todd failed to comply with the various orders

20 including the payment of the utilities, did Ms. Ismail make

21 such payments?

22 A    Yes.

23 Q    Was there a time when the water and pow -- and power at

24 the Tarzana property was turned off?

25 A    The water was, and our electric was almost turned off.

62

1  Q    And was that because the payments ordered by the Court

2  -- that the Court ordered Todd to make were not made?

3  A    Yes.

4  Q    And did Ms. Ismail make those payments instead of Todd?

5  A    Yes.

6  Q    And --

7           MR. WINFIELD:  Objection.  I object to the form of

8  the question.  I think the question could be did she make

9  the payments, but the -- on behalf of Todd or something is

10 -- is a misleading question.

11          THE COURT:  All right.  You got to --

12          MR. WINFIELD:  It's argumentative.

13          THE COURT:  Number one, you've got to be faster.

14 And, number two, the -- I don't know what the on behalf of

15 means either.  So, but she established through the testimony

16 that Todd was responsible.  She established that the water

17 had been shut off and the electricity was about to be shut

18 off, and she seems to have established that Ms. Ismail paid

19 it.  So, those are the basic facts that I draw from all

20 that.

21          MR. WINFIELD:  But then asking questions as to the

22 motive becomes an argumentative question.

23          MS. MONTGOMERY:  I'm not asking motive.  I'm just

24 asking if Ms. Ismail paid.

25          THE COURT:  I think -- I -- I -- my understanding

63

1  is that it was for reference.  So --

2          MS. MONTGOMERY:  Right.

3          THE COURT:  -- I'm going to overrule the

4  objection, but it -- it's noted, and I didn't draw anything

5  more from it than that it was there for identification of,

6  you know, the timing of Ms. Ismail's payments or payment was

7  following nonpayment, which nonpayment was Mr. Goldman's

8  responsibility.  So, I didn't draw any inference -- I'm not

9  going to draw any inference regarding motive from that

10 question.

11 BY MS. MONTGOMERY:

12 Q    Ms. Griffin, did Ms. Ismail make car payments for your

13 vehicle?

14 A    Yes.

15 Q    And did Ms. Ismail pay maintenance for the Tarzana

16 property?

17 A    Yes.

18 Q    What type of maintenance did she pay for?

19 A    Utilities, and then the other things that Todd was

20 ordered to pay with the gardener and the pool because those

21 were unpaid for a long time.

22 Q    Were there -- did you have any discussions with Ms.

23 Ismail regarding the repayment of these expenses?

24 A    No, nothing beyond that she knew Todd was responsible

25 and he wasn't paying them.

64

1  Q    Did you have any discussions with Ms. Ismail that these

2  were loans to you?

3  A    No.

4  Q    Is it your understanding that these were payments for

5  her daughter, similar to the college tuition, car insurance

6  that she paid previously?

7  A    Yes.

8         MR. WINFIELD:  I'd object and move to strike that

9  these aren't payments for which claims are made.  It's not

10  part of the counterclaim.

11         MS. MONTGOMERY:  I can't tell what's part of the

12  counterclaim.

13         THE COURT:  Overruled.  Yeah.  Well, that's an

14  issue.  That's fair.  I agree.  I mean, what's part of the

15  counterclaim, what's included in the proof of claim, all

16  that's going to have to be sorted out, and you can -- you

17  can make your arguments later, but I'm taking -- the

18  testimony is sufficiently probative of things that we are --

19  you know, that are at issue that I'm going to hear the

20  testimony.  If you want to argue later that this testimony

21  doesn't go to the heart of your counterclaim and why, then

22  that's fine, but I'm not going to exclude the evidence.

23         Go ahead.  Overruled.  Next question.

24  BY MS. MONTGOMERY:

25  Q    Let's talk about the transfer of the -- of the Bayview

65

1  property.  If you look at Exhibit -- I believe it's 102,

2  which has previously been admitted.  Do you recognize this

3  as a quitclaim deed?

4  A    Yes.

5  Q    And this -- what is the date on this quitclaim deed?

6  A    September 12th, 2014.

7  Q    And this was done shortly before you filed for divorce,

8  correct?

9  A    Yes, about a month and a half.

10 Q    Okay.  Do you know why the property was transferred at

11 this time?

12 A    Yes.

13 Q    Can you describe why it was transferred from -- well,

14 who is Lenore Goldman?

15 A    That's Todd Goldman's mother.

16 Q    And this quitclaim deed transfers the Bayview property,

17 is that correct?

18 A    Yes.

19 Q    And it's transferring a 50 percent interest to you and

20 Todd and 50 percent to Jasmin Ismail, is that correct?

21 A    Yes.

22 Q    Can you describe why it was transferred by Lenore

23 Goldman in September 2014?

24 A    Yes.  Todd wanted to sell the Bayview house, and he

25 wanted to sell it and take the money from that to put into

66

1    the Tarzana house which we were in.  And, in order to sell

2    the house, since Ms. Goldman was on title, she would have to

3    sign the sale documents or whatever to sell the house.

4        The house had a roof problem in around 2012 I want to

5    say.

6            THE COURT:  Which one?

7            THE WITNESS:  Sorry.  The Florida, the Bayview

8    property that Ms. Ismail now owns.  So, it had a roof

9    problem that was kind of Charlie Brown fixed I guess you'd

10   say.  Todd hired a company that wasn't licensed.  It's a

11   small community.  You have to have certain permits to do

12   stuff to your house or the Board has to approve to look at

13   it or something, and he didn't do that.  So, she knew that

14   that was how it was fixed, and she wouldn't sign off on it.

15   BY MS. MONTGOMERY:

16   Q    Okay.  Hang on.  So, she refused to transfer or to sign

17   off on sale of the property, correct?

18   A    Yes.

19   Q    Is this a piece of property that she had purchased?

20   A    No.

21   Q    She being Lenore Goldman.

22   A    No.  Todd purchased it, but it was placed in her name.

23   Q    Okay.  Was there a mortgage on this property?

24   A    At the -- yes, prior to the transfer --

25   Q    Okay.

67

1  A     -- there was a mortgage.

2  Q     And was the -- who was the -- if you know, who was the

3  mortgage in the name of?

4  A     Lenore and David Goldman, David being Lenore's husband,

5  Todd's father.

6  Q     And did Todd pay -- had Todd been paying the mortgage

7  payments?

8  A     Yes.

9  Q     When the transfer was made to -- 50 percent to Jasmin,

10 did Jasmin pay the -- pay off the mortgage?

11 A     Yes.

12 Q     And, in return for paying off the mortgage, did she

13 receive a 50 percent interest in the property?

14 A     Yes.

15 Q     Was there ever another mortgage placed on this

16 property?

17 A     Not to my knowledge, no.

18 Q     Okay.  Did you know at the time of the transfer that

19 the property was going to be placed in your name?

20 A     No.

21 Q     Did you have any discussions with Todd that the

22 property would be put into your name?

23 A     No.

24 Q     Did you learn subsequently that it was put into your

25 name and Todd's name --

68

1  A    Yes.

2  Q    -- for 50 percent?

3  A    Yes.

4  Q    Was there a time when your relationship with Jasmin

5  broke down?

6  A    Yes.

7  Q    Can you pin that down to approximately the time of

8  year?

9  A    It started breaking down in early 2016 and was --

10  started from there and fell apart.

11  Q    Okay.  In 2016, was that also the time that Todd had

12  filed for bankruptcy?

13  A    Yes.  His first bankruptcy was going on then.  He'd

14  filed Chapter 11 bankruptcy, yes.

15  Q    And was there any particular arguments or other -- or

16  an event that caused you to have a breakdown in the

17  relationship between you and your mother?

18  A    Yes.  The bankruptcy was going on.  He had filed a

19  lawsuit against her and her parents.  He was bombarding them

20  with litigation, which he promised he would do, and so she

21  was stressed, and then she would argue with me frequently,

22  which wasn't uncommon, just arguing, but I think it was in

23  February, but it was early 2016, and we were in the Tarzana

24  house.  She came to stay with me, and she threw a remote

25  control at my head, and she missed, but she threw a remote

69

1  control at me, and that was with Elle there.

2     And after that, I wouldn't leave Elle alone with her.

3  Prior to that, she would help me with Elle just like she

4  helped me with everything else.  After that, I wouldn't let

5  her be alone with Elle.  I moved out of the Tarzana house

6  permanently, and that's what started the breakdown.  We

7  still had common interests in getting the property sold and

8  trying to stop the litigation with Todd.  So, we were

9  definitely -- we had the same motivations I guess litigation

10  wise, as far as attorneys copying us on the same emails and

11  whatnot.

12          THE COURT:  I'm sorry.  I just want to clarify.

13  Who threw a remote control at you?

14          THE WITNESS:  Jasmin.

15          THE COURT:  She did.  Okay.  At least that's --

16  that's your testimony.  Okay.

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.  Thank you.

19  BY MS. MONTGOMERY:

20  Q    Was she following -- did you specifically tell her she

21  -- you were no longer going to allow Elle to be with her

22  alone?

23  A    I don't know if I explicitly did or if I just started

24  doing it.  And preparing for this, I reviewed old emails and

25  stuff, and there were some messages from her to me saying, I

70

1  know you're not letting me be alone from Elle.  And then I

2  know that I would meet her at a park or meet her out at

3  Aquino Moss or whatnot, but I wouldn't leave her alone with

4  Elle.

5  Q    And did that result in a change of her behavior towards

6  you?

7  A    Yes.  I mean, it became demanding access to Elle and to

8  be left alone with Elle and constant bombardment with emails

9  and texts and whatnot.  And then she sent an email saying

10 that if I didn't leave her alone with Elle, that she was

11 going to go to Oxley's office, which is my ex-husband's

12 attorney's office, and I didn't respond or engage, and

13 that's what she did.

14 Q    So, what type of threats -- going to Mr. Oxley's

15 office, what was the threat?

16 A    I think that was just her ultimate she's going to flip

17 sides.  I'm going to go testify for Todd.

18 Q    And did she do that?

19 A    She ultimately did, but I wasn't about to sell my

20 daughter out because I was afraid of what she was going to

21 go to.

22 Q    And after that time, you said you moved out of the

23 Tarzana house?

24 A    Yes.

25 Q    And where did you move to?

*Echo Reporting, Inc.*

71

1  A    To Woodland Hills with my aunt and uncle.

2  Q    Taking Elle?

3  A    Yes.  I had custody of Elle.

4  Q    And did Jasmin ever live with you again?

5  A    No.

6  Q    Was she living with you in the Tarzana property?

7  A    Not -- no, she wasn't living with me, but she was here

8  frequently.

9  Q    When you vacated the Tarzana property, did you take

10  anything with you from that Tarzana property?

11  A    Just our belongings, our clothes, and Elle's toys and

12  stuff from her room.  It was a big house.  We didn't use

13  much or do much there.

14  Q    Now, during the divorce proceedings, were you aware

15  that the Bayview property had been rented?

16  A    Not when it was rented, not initially.  I was never

17  told it was rented.

18  Q    How did you -- how did you find out that the property

19  was being rented?

20  A    After the order for the sale of the Bayview property

21  for Todd's portion to pay all the child support he owed and

22  the attorneys' fees came through, I started to google the

23  address all the time to see what was going on with the

24  house, and -- I mean, I still do it -- and it was listed on

25  Air B and B by Todd.  So, that was how I found out about it.

72

1  But it was listed.  That's how I found out it was listed for

2  rent.

3  Q    And at what point in time -- how did you find out that,

4  in fact, it was rented?

5  A    My family law attorney here, Brott, had to retain

6  counsel in Florida, Mr. Grumer, to enforce the orders from

7  here, and Mr. Grumer conducted discovery and found out that

8  rent was being paid on the Bayview property to Todd.

9  Q    And did you ever receive any share of the rent paid?

10 A    No.

11 Q    Did there come a time when you became aware of the

12 police report that was filed by Jasmin and Todd --

13 A    Yes.

14 Q    -- with regard to the Bayview property?

15 A    Yes.

16 Q    How did you become aware of that report?

17 A    In March of 2018, it was the second day of our long

18 cause trial in Pomona.  I got a call from Detective Berry,

19 who was the detective in Florida that handled this, and he

20 was calling me since I was an owner of the property and

21 wanted to know if I wanted to get a statement regarding the

22 theft in the property.  I had no idea what he was talking

23 about, and this was the second day of our 10-day trial, and

24 I was shocked.  And I said, "Can you email me the report?"

25 And he --

73

1          MR. WINFIELD:  Objection.  This is going beyond

2  the question.  It's becoming a narrative.

3          THE WITNESS:  I'm sorry.

4  BY MS. MONTGOMERY:

5  Q    Would you turn to Exhibit -- I think it's 110 or it's

6  actually 110A.

7  A    So, would it be the one not in the binder?

8  Q    Probably.  The first page of it is -- it has "Affidavit

9  of Lieutenant Brian Berry."  I think 110A has already been

10 admitted.

11         THE COURT:  Yeah.  Hold on a second.  Let's --

12         MR. WINFIELD:  I'm having trouble finding it.

13         MS. MONTGOMERY:  This is the Court's -- the police

14 report and the Court made a copy of the certified copy that

15 was slightly smaller or reduced in size from the one that we

16 had --

17         THE COURT:  110A was admitted at page 134 of the

18 transcript last time around.

19         THE WITNESS:  Just so you know, the original of

20 that is on the witness stand.

21         THE COURT:  Okay.

22         THE WITNESS:  I don't know if you need it.

23 BY MS. MONTGOMERY:

24 Q    The original certified copy?

25 A    Yeah.

74

1  Q    So is this the --

2          THE COURT:  All right.  Stop for a -- stop for a

3  second.  Let Mr. Winfield catch up.

4      (Pause.)

5          MR. WINFIELD:  Are we talking about the document

6  that on the first page says Belair Police Department?

7          THE COURT:  No.  It says on the first page

8  "Affidavit of Lieutenant Brian Berry."

9          Ms. Montgomery, maybe you -- I don't know if you

10 showed it to Mr. Winfield maybe.

11         MS. MONTGOMERY:  He -- your clerk copied the

12 document.

13         THE COURT:  Yeah.

14         MS. MONTGOMERY:  I showed him the certified --

15         THE COURT:  I don't know.  It looks like this, Mr.

16 Winfield, if you can see the outline.

17         MS. MONTGOMERY:  Ms. Griffin, can you hold -- you

18 have the certified copy there.

19         THE WITNESS:  Yeah.

20         MS. MONTGOMERY:  Can you just hold it up so we can

21 see it?

22         MR. WINFIELD:  I see that.  I'm not pointing to

23 the right document.

24         MS. MONTGOMERY:  It was given to you by the

25 Judge's clerk.

75

1          THE COURT:  We can -- you know, it's kind of time

2  for a bathroom break anyway.  So, we'll make another copy

3  for you, Mr. Winfield.  All right.

4          MR. WINFIELD:  Thank you, your Honor.

5          THE COURT:  It's not --

6          MS. MONTGOMERY:  My questions were just for just

7  identification that she obtained this.  I'm not asking

8  questions about the document itself.

9          THE COURT:  All right.  Well, anyway, let's take a

10 bathroom break anyway.  We've been going --

11         MS. MONTGOMERY:  Okay.

12         THE COURT:  -- for almost three hours.  So, keep

13 it brief as -- as necessary.  Just remember you're still --

14 you're still under oath.  You're still sworn.  We'll just

15 take 5 or 10 minutes and --

16         MS. MONTGOMERY:  Okay.

17         THE COURT:  -- we'll be in recess.

18     (Proceedings recessed briefly.)

19         THE COURT:  All right.  All right.  Did you -- did

20 you get Mr. Winfield's --

21         THE CLERK:  Yes, sir, I did.

22         THE COURT:  The courtroom deputy gave Mr. Winfield

23 the document.

24         Do you have the document?

25         MR. WINFIELD:  I do have it.

76

1          THE COURT:  Okay.  All right.  Now we --

2          MR. WINFIELD:  And also my notes indicate -- my

3  list of exhibits indicates that it was admitted.  I just

4  didn't have the --

5          THE COURT:  Yeah.  Okay.

6          MR. WINFIELD:  -- exhibit.

7          THE COURT:  All right.  Feel like we're working

8  with fire now.

9          All right.  Ms. Montgomery, Ms. Griffin's on the

10 stand.

11          You're still sworn, under oath.

12          Why don't you pick up where we left off, when

13 you're ready.

14 BY MS. MONTGOMERY:

15 Q    Ms. Griffin, you were looking at the police report

16 which is marked as Exhibit 110A, the certified copy.  Do you

17 have that in front of you?

18 A    Yes.

19 Q    Did you get the -- did you order the certified copy?

20 A    Yes.

21 Q    Is this a copy of the document that you obtained?

22 A    Yes.

23 Q    And who did you obtain it from?

24 A    The detective who is now Lieutenant Berry.

25 Q    And previously, there was a longer document.  What did

*Echo Reporting, Inc.*

77

1  you -- you said you spoke to Mr. Berry, correct?

2  A    Yes.

3  Q    What did he send you that you at your request?

4  A    He was able to email me the report, what the actual --

5  what the police typed up, and then he mailed me -- snail

6  mailed me a CD of all the attachments that were provided by

7  Todd and Jasmin.

8  Q    And all of those are included in the certified copy

9  that you made or obtained, correct?

10  A    Yes.

11  Q    Let's turn to the family law trial that occurred in

12  March 2018.  Were you represented at this trial?

13  A    Yes.

14  Q    By whom?

15  A    Brian Kramer.

16  Q    How long did this trial go for?

17  A    Ten days.

18  Q    What was the subject matter of the trial?

19  A    It was suppose to be all encompassing for everything,

20  custodial issues, financial issues, property issues,

21  everything.  But, ultimately, it was primarily custodial

22  issues, and then one day was devoted to finances.

23  Q    And was Jasmin present throughout the trial?

24  A    Yes.  She was there every day.

25  Q    Was she in the courtroom every day?

78

1  A    Yes.

2  Q    So, she heard all of the testimony that was given

3  throughout the trial?

4  A    Yes.

5  Q    Would you turn to Exhibit 112, which has already been

6  admitted.  Do you have Exhibit 112?

7  A    Yes.

8  Q    Can you describe or identify what Exhibit 112 is?

9  A    It's the court reporter's transcript from Thursday,

10 March 8th, 2018.

11 Q    This is just the transcript of one day of the trial,

12 correct?

13 A    Yes.

14 Q    And was this the day on which the property issues were

15 being discussed and decided?

16 A    Yes.

17 Q    And have you reviewed -- or have you read this

18 transcript?

19 A    Yes.

20 Q    Previously?

21 A    Yes.

22 Q    Does it accurately reflect the proceedings that

23 occurred in the Family Law Court on March 8th, 2018?

24 A    Yes.

25 Q    If you turn to page 15 of the transcript --

*Echo Reporting, Inc.*

79

1            THE COURT:  I'm sorry.  What was that page number

2  again?

3            MS. MONTGOMERY:  Fifteen of Exhibit 112.

4            THE COURT:  Great.  Thank you.

5  BY MS. MONTGOMERY:

6  Q    Looking at this -- at this page in this transcript, did

7  the Court, in fact, award Todd Goldman the interest or any

8  interest in the Tidy Whitey Toys company?

9  A    Yes.

10 Q    And did that include all of the patents or images?

11 A    Yes.  That was my understanding.

12 Q    What was your -- what was your understanding of the

13 product that was included in the Tidy Whitey Toy Company?

14 A    They were characters created by Todd Goldman.  They're

15 animals wearing underwear, and in his businesses, he would

16 sell products with his art and images on it, like T-shirts

17 and stuffed animals, and these were primarily intended to be

18 stuffed animals.

19 Q    And is it your understanding that your mother had

20 loaned a total of $200,000 to Todd for the purpose of the

21 Tighty Whitie Toy Company?

22 A    Yes.

23 Q    And was it your understanding that $100,000 of it had

24 been returned by Todd?

25 A    Yes.

80

1  Q    At the time of this hearing on March 8th, 2018, did

2  there remain an outstanding debt to your mother of $100,000?

3       (No response.)

4  Q    If you know?

5  A    I don't know, because their declarations that they gave

6  to the police that I got the day before this date stated

7  that he transferred her -- the art and the furniture in the

8  house to --

9            MR. WINFIELD:  Objection.  Nonresponsive.

10           THE WITNESS:  I don't know.  I'm sorry.  I don't

11 know.

12 BY MS. MONTGOMERY:

13 Q    At the time that the Court was conducting a hearing on

14 March 8th, was there a discussion here -- or was -- was

15 Jasmin still claiming that she was owed $100,000 to your

16 knowledge?

17 A    I believe so, yes.

18 Q    And was the Court in awarding the Tighty Whitie Toy

19 Company to Todd Goldman assigning to him the $100,000 debt

20 to the extent it existed?

21 A    Yes.

22 Q    You said that you have continued to do online research

23 regarding Todd Goldman and his artwork or products, is that

24 correct?

25 A    Yes.

81

1  Q    Why have you continued to do such research?

2  A    Because he still owes me hundreds of thousands of

3  dollars and still manages to live a pretty nice lifestyle

4  himself but says he has nothing and files bankruptcy even

5  though he continues to do the same businesses he was doing

6  prior to bankruptcy.  So, I'm --

7  Q    Does he still owe you support payments for Elle on a

8  monthly basis?

9  A    Yes.

10  Q    And has he paid those support payments?

11  A    Not all of them.

12  Q    Has he -- he's paid some?

13  A    He has paid some.

14  Q    In the course of your computer research, did you locate

15  a company that was called -- how do I pronounce it --

16  Ellezarine, LLC?

17  A    Yes.

18          THE COURT:  Could you spell that?

19          MS. MONTGOMERY:  E-L-L-E-Z-A-R-I-N-E, LLC.

20          THE COURT:  Thank you.

21  BY MS. MONTGOMERY:

22  Q    What is the -- are you familiar with what this company

23  is or the name of the company?

24  A    Yes.

25  Q    What does the name of the company represent?

82

1  A    That's my daughter's name.

2  Q    Her first name and middle name?

3  A    Her first name is Elle, and her middle name is Zarine.

4  Q    And you heard your mother testify that she is the owner

5  of the LLC?

6  A    Yes.

7  Q    And in your research, did you confirm that to be true?

8  A    Yes.

9  Q    And did you determine what Ellezarine, LLC was selling?

10 A    Yes.

11 Q    And what were they selling?

12 A    Ellezarine, LLC owns about 28 trademarks and three

13 copyrights that all tie to Todd Goldman.  It's the same

14 stuff just -- it was the stuff he was selling through David

15 and Goliath.

16         MR. WINFIELD:  Objection.  Foundation.

17         THE WITNESS:  I, though marriage, was well aware

18 of --

19         THE COURT:  Okay.  Okay.

20         THE WITNESS:  Oh, I'm sorry.  I shouldn't --

21         THE COURT:  Stop there.  Yeah, just stop there.

22         THE WITNESS:  I'm sorry.

23         THE COURT:  Okay.

24         MS. MONTGOMERY:  Okay.

25         THE COURT:  You can lay some foundation, but --

1 BY MS. MONTGOMERY:

2 Q    With regard to Tighty Whitie Toys, did you see copies

3 of the images that Todd Goldman created in connection with

4 Tighty Whitie Toys?

5 A    Yes.

6 Q    And you're familiar with those?

7 A    Yes.

8 Q    And in your research, did you come across

9 Underwearimals?

10 A    Yes.

11 Q    Is Underwearimals -- that's U-N-D-E-R-W-E-A-R-I-M-A-L-S

12 -- is that -- how is that connected to Ellezarine, LLC?

13 A    Ellezarine --

14        MR. WINFIELD:  Objection.  Foundation.

15        MS. MONTGOMERY:  You asked what her researched

16 showed.

17        THE COURT:  Okay.  Yeah, I mean, you can -- you

18 can explore on cross.  She said she did computer research,

19 and she found some stuff.  You can test how well she --

20 where she found it and how well she understands and what she

21 saw, but she's testifying to what she saw when she did

22 research.  There's nothing -- I'm not accepting -- there's

23 no -- there's no statement as to which the truth or nontruth

24 is at issue.  She's just describing what she found on the

25 Internet.  I'm going to allow it.

84

1          Overruled.  Go ahead.

2  BY MS. MONTGOMERY:

3  Q    Are the pictures that you identified online for

4  underwear animals, are those the same images that were being

5  used and sold through what, Tighty Whitie Toys?

6  A    Yes.

7  Q    And did you, in fact, print copies of both the Tighty

8  Whitie Toy artwork and the Underwearimals artwork?

9  A    Yes.

10 Q    So, to your knowledge, is Todd Goldman and Jasmin

11 together from the images that were originally Tighty

12 Whitie --

13          MR. WINFIELD:  Objection.  Speculation.

14          THE COURT:  Yeah.  There's no foundation for why

15 -- who's responsible for this website, Ms. Montgomery.

16          MS. MONTGOMERY:  Well, he --

17          THE COURT:  You can lay some --

18          MS. MONTGOMERY:  Okay.

19          THE COURT:  You can lay some foundation.  I

20 understand you've made a connection between the name of the

21 business and -- and Ms. Griffin's daughter.

22          MS. MONTGOMERY:  Okay.

23          THE COURT:  But you haven't made -- I don't know

24 what the connection is definitively between Ms. Ismail or

25 Mr. Goldman.

85

1  BY MS. MONTGOMERY:

2  Q    What -- based on the research that you did on the

3  computer, what website did you go to to determine what

4  Ellezarine, LLC owned?

5  A    The Ohio Secretary of State.

6  Q    Did you go to the Office of Patents and Trademarks?

7  A    Yes.  I went to USPTO.gov to research what Ellezarine,

8  LLC owned.

9  Q    And is there a list of trademarks that Ellezarine, LLC

10 owned?

11 A    Yes.

12 Q    And does -- if you -- is there a separate list of

13 trademarks that Tighty Whitie Toys owned?

14 A    No.

15 Q    Was there a list of David and Goliath trademarks that

16 he owned?

17 A    Yes.

18 Q    And are the -- for the Tighty Whitie Toys, are the

19 images that were listed for David and Goliath, are those the

20 same images for David and Goliath?

21 A    As for Underwearimals?

22 Q    Yes.

23 A    Yes.

24 Q    The pictures are identical, correct?

25 A    Yes.  It's the same art.

86

1          MR. WINFIELD:  Objection.  Foundation.

2          THE COURT:  How so?  She said she went to the --

3  the website for the USPTO.

4          MR. WINFIELD:  She's talking about identical

5  pictures that --

6          MS. MONTGOMERY:  Would you like to see the

7  identical pictures, Mr. Winfield?

8          MR. WINFIELD:  That might be a good foundation.

9          MS. MONTGOMERY:  We didn't know that this -- we

10 didn't learn about this -- about the connection to the

11 Tighty Whitie Toys until after all of the exhibits were

12 identified, but we do have copies, at least one copy of the

13 Tighty Whitie Toys images and the copy of the Underwearimals

14 which --

15         THE COURT:  All right.

16         MS. MONTGOMERY:  -- specifically say -- now, I

17 don't know if your Honor wants to allow those to be put in

18 as another exhibit, and I would do it after lunch so that we

19 can go make copies.

20         THE COURT:  Yeah.  Let's -- let's deal with that

21 after lunch.  I mean, Mr. Winfield is challenging the

22 foundation for --

23         MS. MONTGOMERY:  Right.

24         THE COURT:  -- Ms. Ismail's testimony.  So --

25         MS. MONTGOMERY:  Okay.

87

1          THE COURT:  Okay.

2          MS. MONTGOMERY:  As long as we're talking about

3     challenging the information, Mr. Winfield also challenged

4     the -- one of the -- the rebuttal exhibits as being an

5     improper alteration of an exhibit that was between the Yahoo

6     email and the Gmail.

7          THE COURT:  He -- he made that argument.  I

8     overruled his objection.

9          MS. MONTGOMERY:  Right.

10         THE COURT:  Provisionally.

11         MS. MONTGOMERY:  Provisionally.

12         THE COURT:  Yeah.

13         MS. MONTGOMERY:  Do -- we have -- Ms. Griffin is

14    able to pull up on her phone her original Gmail -- Yahoo.

15         THE COURT:  All right.

16         MS. MONTGOMERY:  Do you want us to send it to your

17    clerk so that you can --

18         THE COURT:  No.  I mean, the main thing is -- is

19    to give it to Mr. Winfield.  I don't know --

20         MS. MONTGOMERY:  Well, I just want to --

21         THE COURT:  I don't know yet whether it needs to

22    go to my clerk or not.

23         MS. MONTGOMERY:  We want to have it printed out,

24    and I don't want anybody to challenge the printout.  We can

25    go ahead, and we can print it at lunchtime.

*Echo Reporting, Inc.*

88

1          THE COURT:  Well --

2          MS. MONTGOMERY:  Or we can show it on the

3   computer.

4          THE COURT:  Before we -- before we take a break

5   for lunch, which I don't know how much more questioning you

6   have --

7          MS. MONTGOMERY:  I don't have a lot.

8          THE COURT:  -- we can deal with that.

9          MS. MONTGOMERY:  Okay.

10         THE COURT:  We do have a -- we do have a chambers

11   email, and if you -- you sent the document simultaneously to

12   Mr. Winfield and the chambers email address, we could -- we

13   could assist in that way.

14         MS. MONTGOMERY:  Okay.  Thank you, your Honor.

15         MR. WINFIELD:  And I have a related question to

16   that.  Are we then -- for impeachment purposes, are we

17   allowing impeachment exhibits that were not produced during

18   discovery?

19         THE COURT:  Yes.  Oh, that were not produced

20   during discovery?  I don't know.  That's subject to -- you

21   know, if it was the subject of a request and it wasn't

22   produced, I suppose there's an argument that you ought not

23   be able to do that if -- if it existed and you didn't

24   produce it.  So --

25         MS. MONTGOMERY:  I don't know whether it was or it

89

1  wasn't, but it was --

2          THE COURT:  -- I don't know what --

3          MS. MONTGOMERY:  -- just located.

4          THE COURT:  I don't know what you -- what?

5          MS. MONTGOMERY:  It was just located.  In going

6  through and preparing shortly before trial we found --

7          THE COURT:  Well, I think he's talking about

8  something he wants to introduce --

9          MR. WINFIELD:  Well, I'm --

10         THE COURT:  -- as an impeachment exhibit.

11         MR. WINFIELD:  It's the same kind of thing,

12  because I think as long as it goes both ways, that's fine.

13         THE COURT:  Yeah.  It goes both ways.

14         MS. MONTGOMERY:  Okay.

15         THE COURT:  All right.  But let's -- let's see

16  what -- see what else you have right now.

17  BY MS. MONTGOMERY:

18  Q    Jasmin has testified.  You heard Jasmin testify that

19  you had an agreement with her to pay back all of her

20  advances and other money she gave you, is that correct?

21  A    Yes, I heard her testify to that.

22  Q    Okay.  Did you ever have such an agreement?

23  A    No.

24  Q    Was it your understanding that the moneys given to you

25  by your mother were gifts?

90

1  A     Yes.

2  Q     Did you have any understanding that you were entering

3  into loans with your -- between you and your mother?

4  A     No.

5  Q     Was it your --

6          THE COURT:  I want to stop you there because

7  there's not an opportunity here to fine tune the

8  understanding of the trier of fact.

9          Which moneys are you talking?

10          MS. MONTGOMERY:  Any of the moneys.

11          THE COURT:  I'd like you to -- I'd like you to

12  tease out which moneys.  There's been discussion of the

13  $200,000 that was loaned for purposes -- I'm not going to

14  say to whom because I understand that may be the ultimate

15  question, but there's been testimony about $200,000 that was

16  loaned for purposes of the Tighty Whitie business.  Okay.

17  There's been testimony of other amounts before the marriage.

18  I think there's probably been some testimony, although I'm

19  less clear on it, about amounts after the marriage.

20          MS. MONTGOMERY:  And then during the marriage.

21          THE COURT:  Right, and during the marriage.  So,

22  just -- I know it may be a little laborious -- put a fine

23  point -- I want to -- I want to understand what her

24  testimony is as specifically as possible because I'm sure

25  that I'm going to hear from the other side a different

91

1 story, and I want to be able to match, you know, apples to

2 apples as they say.

3          MS. MONTGOMERY:  Your Honor had indicated, and I

4 think correctly, that there is clearly an overlap between

5 the claims by Ms. Ismail as -- the cross-claims by Ms.

6 Ismail stating that moneys were lent and are owed to -- are

7 owed by Ms. Griffin, and they overlap with the claim -- with

8 the proofs of claim and the claim objections.

9          THE COURT:  Right.

10          MS. MONTGOMERY:  And I can't tell -- I had assumed

11 when I read the cross-claims that we were just talking about

12 the $100,000 on the Tighty Whitie.

13          THE COURT:  Right.

14          MS. MONTGOMERY:  However, Ms. Ismail then turned

15 around and testified last -- or on the 22nd that she had a

16 much larger claim.  It was just reduced to the $100,000, but

17 she's really owed in her cross-claims a lot more money and

18 other money besides the $100,000 left to Tighty Whitie.

19          THE COURT:  Okay.

20          MS. MONTGOMERY:  So, I'm trying to understand if

21 Ms. Griffin knows what other moneys were given to her that

22 could be the subject matter of such claims.

23          THE COURT:  Okay.  So -- all right.  So, then, to

24 put her testimony in -- your questions in context, if I'm

25 not mistaken, you asked if any money -- if she has any

92

1  understanding about any loan arrangement with respect to

2  money that who received?  She received or --

3           MS. MONTGOMERY:  That she received.

4           THE COURT:  -- or she and her husband as a marital

5  community received?

6           MS. MONTGOMERY:  Either -- either one.

7           THE COURT:  All right.  Why don't you walk her

8  back through that and make sure the testimony is clear about

9  -- I want to make sure I understand what her testimony is

10 and be able to, again, match apples to applies and oranges

11 to oranges.

12          I know I'm going to hear a different story from

13 the other side.  I want to know what -- exactly what Ms.

14 Griffin's testimony is right now.

15          MS. MONTGOMERY:  Okay.

16 BY MS. MONTGOMERY:

17 Q    Ms. Griffin, before you were married to Mr. Goldman,

18 did you receive any kind of -- any funds from your mother?

19 A    Yes.

20 Q    What type -- what was the purpose of the funds you

21 received from your mother beyond the tuition you testified

22 to and the funding of a ROTH IRA and car payments, correct?

23 A    Um-hmm.

24 Q    Were other -- did you receive other moneys from your

25 mother prior to your marriage to Todd Goldman?

93

1  A     Yes.

2  Q     Were those payments to you, did you ever have an

3  agreement with your mother that these were loans to be

4  repaid?

5  A     No.

6  Q     Was it your understanding that they were gifts?

7  A     Yes.

8  Q     Did you similarly receive money during the time that

9  you were married to Todd Goldman, between April 20 --

10 A     2011.

11 Q     -- April 2011 and when you filed for divorce October

12 28th, 2014, correct?

13 A     Yes.

14 Q     Did you receive moneys from your mother during that

15 time period?

16 A     Yes.

17 Q     Was the $200,000 that was -- you have identified for

18 Mighty Whitie --

19 A     Tighty Whitie.

20 Q     -- Tighty Whitie Toys, that was -- that included among

21 the amounts that you received during -- or that your husband

22 received during your marriage?

23 A     Yes.

24 Q     Okay.  And is it your understanding that the payment

25 from you -- or from your mother for the Tighty Whitie Toys

94

1  was to your husband -- your ex-husband?

2  A    Yes.

3  Q    And it was not to you, correct?

4            MR. WINFIELD:  Objection.  Leading.

5            THE COURT:  Uh --

6            MS. MONTGOMERY:  I'm just trying to clarify.

7            THE COURT:  Yeah.  It's -- okay.  I'm going to

8  sustain that and just let you -- it's an easy fix.  Just

9  reask the question.

10  BY MS. MONTGOMERY:

11  Q    Did your mother loan -- or did your mother give

12  $200,000 to Todd Goldman for purposes -- or for Tighty

13  Whitie Toys?

14  A    Yes.

15  Q    Was that a payment to you?

16  A    No.

17  Q    Was that a cashier's check specifically to Todd

18  Goldman?

19  A    Yes.

20  Q    Were there discussions between you, your mother, and

21  Todd Goldman that the -- that the money was to be returned

22  by Todd Goldman?

23  A    I was privy to -- I was there for conversations between

24  Todd Goldman and Jasmin regarding repayment, and it was Todd

25  asking her to write up -- write it up, and she --

95

1          MR. WINFIELD:  Objection.  Hearsay.

2          THE WITNESS:  I was there, and I heard it, and he

3 asked her --

4          THE COURT:  Okay.  Stop.  Stop.  Stop.

5          THE WITNESS:  I'm sorry.

6 BY MS. MONTGOMERY:

7 Q    All right.  When you -- and -- and when you --

8          THE COURT:  Wait, wait.  Wait, wait.  There's an

9 objection, okay, to --

10         MS. MONTGOMERY:  But she was present --

11         THE COURT:  Okay.

12         MS. MONTGOMERY:  -- when discussions were -- were

13 had between --

14         THE COURT:  Okay.  Reask the question and ask her.

15 Ms. Ismail is the party opponent here.  Mr. Goldman in this

16 adversary is not anymore.  He's not part of this adversary.

17 So, I think it matters who said what.

18 BY MS. MONTGOMERY:

19 Q    Did Ms. Ismail ask you to pay the $100,000 back?

20 A    No.  She asked Todd to pay the $100,000 back.

21 Q    When you had a hearing in the Family Law Court on March

22 8th, 2018, was Ms. Ismail present in the courtroom?

23 A    Yes.

24 Q    And in that courtroom, where the Tighty Whitie Toys was

25 assigned to Todd Goldman, was Ms. -- was Jasmin present when

96

1  the -- when $100,000 loan was assigned to Todd to pay

2  Jasmin?

3  A    Yes.

4  Q    And was a -- did you agree to that assignment?

5  A    Yes.

6  Q    And did Jasmin object -- make any objection to that

7  assignment while she was present in the courtroom?

8  A    No.

9        MR. WINFIELD:  Objection.  I don't know how an

10  observer in the courtroom has the right to make an

11  objection.  Assumes facts not in evidence.  She wasn't a

12  party to the trial.  How would she have the right to make an

13  objection?

14        THE COURT:  Okay.  I'm going to -- I'm going to

15  overrule the objection.  Save it for argument.  Save it for

16  cross.  You can get at that in cross.  That's not a -- I

17  think it would -- I think it was a fair question and a fair

18  answer.  You have a point that you want to draw out.  Draw

19  it out on cross and -- and/or argument.  Go ahead.

20  BY MS. MONTGOMERY:

21  Q    Were there other -- besides this $100,000, $200,000

22  that was paid by Jasmin during your marriage, were there

23  other moneys that you -- that you or Todd received from

24  Jasmin?

25  A    Yes.

97

1  Q    Do you have a list of those moneys that were paid to --

2  to you or Todd Goldman?

3  A    I have what Ms. Ismail filed last week, but I don't

4  personally -- are you asking if I personally have a list?

5  Q    Yeah.

6  A    No.

7  Q    Did -- when you received money from Jasmin, how did you

8  receive it?  Was it in -- like, was it in cash or check?

9  What form did the money take?  How was it advanced to you?

10  A    Usually gift cards, sometimes cash, like for my

11  birthday, usually gift cards.

12  Q    Okay.  And do you -- did you have an agreement with

13  Jasmin to repay her for the gift cards?

14  A    No.

15  Q    Did she ask you to repay you (sic) for the gift cards?

16  A    No.

17  Q    What type of gift cards did she receive -- did you

18  receive from her?

19  A    Hundreds, on anything from Target to Toys R Us, Pottery

20  Barn, Nordstrom, lots of Starbucks, gas station gift cards,

21  Kroger or Ralph's, Gymboree.

22  Q    Did you also receive Pottery Barn?

23  A    Yes.

24  Q    How -- can you explain how it was that Jasmin had all

25  of these gift cards that she could give to you?  Where did

98

1  they come from?

2  A    She would purchase them from customers at her gas

3  station at a steeply discounted price.  So, she would pay --

4  if there's a $100 gift card to Target, she would pay, I

5  don't know, $70 to the people that would come to her gas

6  station.  And I think also she would list on Craig's List to

7  buy them, but that's -- that's me speculating.  The gas

8  station I --

9          THE COURT:  Okay.  Don't -- don't speculate.

10         THE WITNESS:  Sorry.  I caught myself after.  So,

11  I called myself out.

12         THE COURT:  All right.  I appreciate it.  I'm

13  sorry.  You finished answering the question?

14         THE WITNESS:  Yes.

15  BY MS. MONTGOMERY:

16  Q    Okay.

17  A    Through customers at her gas station.

18  Q    Did she provide you with these gift cards before your

19  marriage?

20  A    No.  She didn't start that business, that side

21  business, until after my marriage.

22  Q    Okay.

23         THE COURT:  I'm sorry.  What side business?

24         THE WITNESS:  Buying and selling gift cards.

25         THE COURT:  I see.  And, just to kind of fill in

99

1  the dots here, just for my background, what gas station?

2         THE WITNESS:  Jasmin owns or owned -- I don't know

3  if anymore -- owned a gas station in Cincinnati, Ohio with

4  her parents that she and her sister and Rick, who are

5  present, ran.  And they would work there.  So, if customers

6  came in --

7         THE COURT:  Okay.  That's helpful.  I just wanted

8  to know what gas station.

9         THE WITNESS:  Sorry.

10        THE COURT:  Yeah.  I just hadn't heard testimony

11 about a gas station.

12        MS. MONTGOMERY:  Right.

13        THE COURT:  All right.

14 BY MS. MONTGOMERY:

15 Q    So, how -- can you describe for the Court how she came

16 into these deeply discounted gift cards?  How did it work?

17 A    Customers at the gas station who maybe --

18        MR. WINFIELD:  I think objection to foundation.

19        THE COURT:  Sustained.  I think you -- you got

20 lucky once.

21        MS. MONTGOMERY:  Okay.

22        THE COURT:  She -- she explained -- it's not --

23 it's not clear to me how she knows what -- how her mother

24 obtained the gift cards, but Mr. Winfield let her testify to

25 it, and -- but I don't think he's going to let you a second

100

1  time.  So --

2              MS. MONTGOMERY:  Okay.

3              THE COURT:  -- I'm going to sustain it.

4  BY MS. MONTGOMERY:

5  Q    Did you have -- do you have personal knowledge as to --

6  or did you ever witness Jasmin obtaining gift cards at the

7  gas station?  Were you ever present?

8  A    Yes.

9  Q    And what would occur in your presence?

10 A    It would be when I was visiting Ohio and if I was at

11 the gas station, and people come in with a gift card, and

12 she would buy it from them.  And what I was told by her was

13 that it was just a cash transaction, and these were people

14 that needed a beer and cigarettes.  So, you could buy it

15 steeply discounted.

16 Q    Okay.  Did Jasmin demand that you pay expenses on the

17 Bayview property?

18 A    No.

19 Q    At any time?

20 A    I think after our falling out, then she started -- in

21 her lengthy emails, she would make a comment here and there,

22 and she would, but prior to that, no, never any email that

23 she sent me or copied me on was about trying to --

24 initially, she wanted to sell the house.  She really wanted

25 to sell the Bayview property.  And then, when she got the

101

1 other percentage, she didn't want to sell the Bayview

2 property anymore.  But, no, to answer your question.

3 Q    Okay.

4         THE COURT:  You may have covered this before, but

5 can you ask the witness the time frames she was at the --

6         MS. MONTGOMERY:  Bayview property?

7         THE COURT:  Yeah, at the different properties.  I

8 know you covered that with -- I think you covered that with

9 Tarzana, but it would be helpful just to understand --

10        MS. MONTGOMERY:  Okay.

11        THE COURT:  -- kind of what the history is.

12 BY MS. MONTGOMERY:

13 Q    When did you -- did you personally live in the Bayview

14 property?

15 A    Yes.

16 Q    What period of time was that?

17 A    From the end of October 2010 until February 2012.  So,

18 Elle was born in Florida, and then we moved shortly

19 thereafter.

20 Q    And you lived there prior to actually marrying Todd

21 Goldman?

22 A    Yes.

23 Q    Did you ever live at Bayview after 2012?

24 A    No.

25 Q    Okay.  And where did you move to from the Bayview

102

1  property?

2  A    We came back to California.

3  Q    And where did you live in California?

4  A    First we rented a condo -- a condo in Venice for a year

5  I believe, and then we rented a house in Sherman Oaks for I

6  think a year as well, and then we moved into Tarzana.

7  Q    So, when did you actually live in Tarzana?

8  A    I think it was June or about June of 2014, maybe May

9  2014, and I officially moved out in I want to say February

10 or March 2016, yeah.  So, for 2015 essentially, we lived

11 there but we didn't sleep there, Elle and I.  So, we would

12 drive up to Woodland Hills and sleep at my aunt's house.

13 Q    And why did you do that?

14 A    I didn't want to be there alone.

15 Q    Okay.  And did you receive moneys from your mother for

16 remodeling of the Tarzana property?

17 A    Yes, for painting.  That was all we did.  We painted.

18 Q    Did you purchase any curtains for --

19 A    Yes.  Yes, we purchased -- I didn't know that was

20 remodeling.

21 Q    I don't know it is, but --

22 A    We did purchase curtains from Pottery Barn.  The whole

23 back of the house is like -- is French doors with windows so

24 you can see the whole house.  And, so, curtains were

25 purchased for that.

103

1 Q    And did you use the Pottery Barn gift cards that your

2 mother sent you to make those purchases?

3 A    Yes.

4 Q    And when you moved out of the Tarzana property, did you

5 remove the curtains and thing that you had purchased at

6 Pottery Barn?

7 A    No.

8 Q    So, they -- to your knowledge, they were left there?

9 A    Yeah.  The only thing that I know that we took that was

10 purchased at Pottery Barn was Elle's bedding.

11 Q    Okay.

12        MR. WINFIELD:  Nonresponsive.  She asked about

13 other belongings.

14        MS. MONTGOMERY:  I asked what she purchased at

15 Pottery Barn --

16        THE WITNESS:  Right.

17        MS. MONTGOMERY:  -- and whether or not she removed

18 from the Tarzana property any property that she purchased at

19 Pottery Barn.

20 BY MS. MONTGOMERY:

21 Q    And your testimony is you removed Elle's bedding,

22 correct?

23 A    Yes.

24        THE COURT:  Okay.  The objection's overruled.

25 You can draw it out on cross.  Let's just keep going,

104

1  please.

2           MS. MONTGOMERY:  Okay.

3  BY MS. MONTGOMERY:

4  Q    And you testified that you never had an agreement

5  between you and your mother to repay any of the moneys that

6  were advanced to you with regard to say Bayview property?

7  A    Correct.

8  Q    No -- there's no agreement in writing that you would

9  make any contributions?

10 A    Correct.

11 Q    And you now know that the property was rented out,

12 correct?

13 A    Yes.

14 Q    And did you receive any share of those rental payments?

15 A    No.

16          THE COURT:  I'm sorry.  You shift -- I think you

17 shifted gears.  The curtains were in Tarzana?

18          MS. MONTGOMERY:  That was in Tarzana.

19          THE COURT:  The curtains were in Tarzana, and now

20 you're talking about Bayview.  Okay.

21          MS. MONTGOMERY:  Well, I want to go back to -- I

22 want to go back to Tarzana and just confirm again --

23          THE COURT:  Okay.

24          MS. MONTGOMERY:  -- that there was no agreement

25 between you and your mother to pay for any of the gift cards

105

1  associated with the -- that you used to -- not furnish

2  but --

3          THE WITNESS:  Correct.

4  BY MS. MONTGOMERY:

5  Q    -- do the Bay --

6          THE COURT:  Well, let her finish the --

7          THE WITNESS:  I --

8          THE COURT:  Let her finish the question.

9  BY MS. MONTGOMERY:

10 Q    I'm not sure how you describe whether --

11 A    Decorate?  I don't --

12 Q    She describes it as remodel.

13         THE COURT:  Well, okay.  I don't want to -- I'm

14 going to stay out of this.

15 BY MS. MONTGOMERY:

16 Q    Okay.  You did not -- did you have an agreement with

17 your mother to repay her for any purchases you made with the

18 Pottery Barn gift cards?

19 A    No.

20 Q    And did you have an agreement with her to repay her for

21 any of the other gift cards that you received?

22 A    No.

23 Q    There's no agreement in writing?

24 A    Correct.

25 Q    No agreement -- no oral agreement?

106

1  A    Correct.

2  Q    Jasmin has testified in a declaration she submitted to

3  the Court that there was -- that an attorney, Laura

4  Whitfield, made representations that you would repay your

5  mother.  Do you know who -- who is Laura Whitfield?

6  A    She was an attorney -- or is an attorney.  She was my

7  aunt's neighbor, and I had to self-represent for the

8  majority of the family law case, and she agreed to help me.

9  That was really it.  I mean, I didn't know what I was doing

10 at the beginning of self-representing, and I had to learn.

11 And, as I did, she would -- she would help me.  She wasn't a

12 family law specialist, but she was an attorney -- she is an

13 attorney.

14 Q    And did she -- did you give her any authority to make

15 -- to negotiate with Jasmin about repayment of anything?

16 A    No.

17 Q    Did Jasmin send emails or letters to Laura Whitfield

18 demanding repayment to her of expenses on Bayview?

19 A    I know that Jasmin bombarded her with emails and phone

20 calls and texts regarding --

21        MR. WINFIELD:  Objection.  Nonresponsive.

22 BY MS. MONTGOMERY:

23 Q    Did Ms. Whitfield share with you emails or letters that

24 she received from Jasmin demanding payments on Bayview?

25 A    Yes.

107

1  Q    And did you ever authorize Ms. Whitfield to make an

2  agreement to repay Jasmin?

3  A    Absolutely not.  There was litigation going on in

4  Florida at the time.

5  Q    Okay.  When did you first learn -- or how did you learn

6  of the transfer of Todd's 25 percent interest in Bayview in

7  March of 2017?

8  A    I learned from Jasmin.  She sent me an email that said

9  it.

10 Q    And are these the January -- I mean, I'm sorry -- the

11 March 30, 2017 emails?

12 A    Yes.

13 Q    And these are the emails that were marked as Exhibit I

14 believe 104 and Rebuttal Exhibit 1, is that correct?

15 A    Yes.

16 Q    Did you hear Jasmin testify that, in fact, she learned

17 of the transfer Keith Grumer?

18 A    Yes, I heard her testimony.

19 Q    Who is Keith Grumer?

20 A    Keith Grumer was an attorney in Florida that was

21 retained by my former family law attorney here to enforce

22 the court order here.  So, Brott was my attorney here who

23 got the court order for the attorneys' fees and child

24 support to be taken out of Todd's 25 percent.  And, since it

25 was a property in Florida, he had to get that judgment

108

1  domesticated in Florida to enforce it in Florida, and Grumer

2  was that guy.

3  Q    And did you hear Jasmin testify that she learned of the

4  transfer -- of the transfer from Grumer?

5  A    Yes.

6  Q    Have you spoken to Grumer about the transfer?

7  A    Yes.

8  Q    Did you -- do you know how Grumer learned of the

9  transfer?

10 A    He found out from --

11         MR. WINFIELD:  Objection calls for hearsay.

12         THE COURT:  Sustained.

13 BY MS. MONTGOMERY:

14 Q    Did you tell Grumer about the transfer?

15 A    Yes.

16 Q    And when did you tell Grumer of the transfer?

17 A    As soon as I got the email from Jasmin.

18 Q    So, your -- you told him after Jasmin sent you an email

19 saying it had been transferred, correct?

20 A    Yes, immediately after.

21 Q    And was Grumer surprised when you told him that the

22 transfer had been made?

23 A    Yes.  Can I testify to that?  Yes.  His initial comment

24 was "There's no way in hell that happened."  It couldn't

25 have happened because there was litigation happening with

*Echo Reporting, Inc.*

109

1  the house, and then he looked it up while I was on the phone

2  and saw the transfer deed.

3  Q    Okay.  But you heard Jasmin testify on the 22nd that

4  she was not in Los Angeles on March 20th, 2017 when Todd

5  signed the warranty deed, is that correct?

6  A    Yes.

7  Q    Do you have knowledge as to whether or not that's an

8  accurate truthful statement?

9  A    It's not the truth.

10         MR. WINFIELD:  Objection.  Nonresponsive.

11         THE WITNESS:  Oh.

12         THE COURT:  It's a yes or no question.

13         THE WITNESS:  I'm sorry.

14         THE COURT:  So, the question is do you have

15  knowledge of whether it's true or not.

16         THE WITNESS:  Oh, yes.

17 BY MS. MONTGOMERY:

18  Q    Okay.  What is your knowledge?

19  A    My knowledge is that she was in Los Angeles on that day

20  and the day prior as well.

21  Q    What is the basis for your knowledge that she was

22  present in Los Angeles when this was signed?

23  A    I saw her, and also, in preparing for the trial, I

24  reviewed my old emails and messages from Todd.  We

25  communicate through court-mandated communication called Our

110

1   Family Wizard.  So, I looked at those messages, and that's

2   really -- I looked through my old stuff, and I have an email

3   from Jasmin saying that she was there.  I have -- oh, and my

4   aunt, an email from my aunt clarifying that she was there

5   and don't come back and --

6          MR. WINFIELD:  Objection.  Hearsay.

7          THE COURT:  Yeah.  You're getting into --

8          THE WITNESS:  Oh.

9          THE COURT:  Okay.  The -- the question was how do

10  you know.  I understand you --

11         MS. MONTGOMERY:  Well, it's the -- it's the basis

12  for the knowledge.

13         THE COURT:  You saw her.

14         THE WITNESS:  Yeah.

15  BY MS. MONTGOMERY:

16  Q    You saw her?

17         THE COURT:  Okay.  Where did you see her?

18         THE WITNESS:  I'm sorry.  The Sunday before, my

19  daughter had a monitored visitation.

20  BY MS. MONTGOMERY:

21  Q    Is that March 19th?

22  A    Yes.

23  Q    That's the day before.

24  A    Sorry.  On the date before, my daughter had a monitored

25  visit with her father, Todd Goldman.

111

1          THE COURT:  Where?

2          THE WITNESS:  At Topanga Village.

3          THE COURT:  Okay.  And you?

4          THE WITNESS:  And I had to drop my daughter off at

5  Topanga Village with the monitor, with the court monitor.

6          THE COURT:  Okay.  And did you see Ms. Ismail?

7          THE WITNESS:  And Ms. Ismail was present, yes.

8          THE COURT:  Okay.  All right.

9  BY MS. MONTGOMERY:

10 Q    And did you have discussions with the court monitor

11 regarding Ms. Ismail's presence?

12 A    Yes.

13 Q    And what were your -- what was that discussion?

14         MR. WINFIELD:  Objection.  Calls for hearsay.

15         THE COURT:  Sustained.  You can ask her what she

16 said.

17 BY MS. MONTGOMERY:

18 Q    What did you say to the court monitor?

19 A    My comments were regarding the -- there are rules that

20 the Court has for court-ordered visitations that state that

21 there are not allowed to be third parties present.  So,

22 those were my -- that was my end of the conversation with

23 the monitor.

24 Q    Okay.  And the following day, on the 20th, when -- the

25 date that the deed is -- the warranty deed is signed --

112

1  A    Yes.

2  Q    -- did you see Ms. Ismail in Los Angeles?

3  A    Yes.

4  Q    Where did you see her?

5  A    In my drive -- or in my aunt's driveway.

6  Q    And did you have any direct contact with Ms. Ismail at

7  that time?

8  A    No.  I only witnessed her interacting with my aunt.

9  Q    But you witnessed she was present in Los Angeles on

10 that day?

11 A    Yes.

12        THE COURT:  So, is that Tarzana or Woodland Hills?

13        THE WITNESS:  Woodland Hills.

14        THE COURT:  Woodland Hills.  Okay.  And, actually,

15 just so I keep everything straight, the aunt and uncle that

16 you went to live with in Woodland Hills --

17        THE WITNESS:  Um-hmm.

18        THE COURT:  -- are they on your mom's side or your

19 dad's side?

20        THE WITNESS:  My mom's sister.

21        THE COURT:  It's your mom's sister.  Okay.  Thank

22 you.

23        Go ahead.

24 BY MS. MONTGOMERY:

25 Q    And what is her name?

113

1  A    Rayna Kloor.  Should I spell it?  R-A-Y-N-A K-L-O-O-R,

2  and Harry, H-A-R-R-Y.

3  Q    Okay.  And you saw -- you saw Jasmin in the driveway

4  yelling at your aunt, correct?

5  A    Yes.

6         MR. WINFIELD:  Objection.  I think she said she

7  saw her in the driveway.

8  BY MS. MONTGOMERY:

9  Q    What was she doing in the driveway?

10 A    Yelling at my aunt.

11        MS. MONTGOMERY:  Okay.

12        THE COURT:  I don't -- hold on, Mr. Winfield.  I

13 don't see anything inconsistent.  She said she saw her in

14 the driveway.  That was the premise of the question.

15        MR. WINFIELD:  Okay.

16        THE COURT:  So, the Objection, in any event, is

17 overruled.  But I -- I don't -- the -- let's just keep

18 going.

19        MS. MONTGOMERY:  Okay.  We're just about finished.

20 BY MS. MONTGOMERY:

21 Q    Ms. Griffin, would you turn to Exhibit -- the new

22 exhibit, amended Exhibit 114.

23        MS. MONTGOMERY:  Does the Court have that?

24        THE WITNESS:  Is that already in the --

25        THE COURT:  Okay.  All right.  Hold on.  That --

114

1 okay.  So, I want to make sure, most of all, Mr. Winfield

2 has it.

3             MR. WINFIELD:  I received it this morning.

4             THE COURT:  Okay.

5             MS. MONTGOMERY:  Actually, you received it by

6 email several weeks ago.

7             MR. WINFIELD:  I think that's true, yes.

8             THE COURT:  Okay.  All right.  So, we -- there's

9 been -- there's a -- there's a 114 in the notebook.

10             MS. MONTGOMERY:  Yes.

11             THE COURT:  There's been no testimony about 114

12 yet.

13             MS. MONTGOMERY:  I believe that Mr. Kramer had

14 testified as to --

15             THE COURT:  Oh, did he?

16             MS. MONTGOMERY:  -- his bills.

17             THE COURT:  All right.

18             MS. MONTGOMERY:  And his bills in the new version

19 are at page -- begin at page --

20             THE COURT:  Oh, okay.  Then we're not going to

21 replace.

22             MS. MONTGOMERY:  Okay.

23             THE COURT:  We're going to call this thing that

24 you've handed up and that you copied Mr. Winfield on 114A.

25             MS. MONTGOMERY:  A.  Okay.

1          THE COURT:  Okay.

2          MS. MONTGOMERY:  And 114A includes the documents,

3  the bills from Mr. Kramer.

4          THE COURT:  Okay.

5          MS. MONTGOMERY:  Okay.  Through --

6          THE COURT:  But we don't have him here to say it's

7  the same thing or whatever?

8          MS. MONTGOMERY:  No, but you can -- but you can

9  look -- we just -- I just added the additional bills.

10         THE COURT:  All right.  Well, we'll deal with

11  114A.

12         MS. MONTGOMERY:  114 --

13         THE COURT:  Right now we're dealing with 114A.

14         MS. MONTGOMERY:  We're looking at 114A.

15         THE COURT:  Whatever the record was last time

16  around that refers to 114, that's 114.  Now you're talking

17  about 114A.

18  BY MS. MONTGOMERY:

19  Q    Okay.  Do you have 114A?

20  A    Yeah.

21         THE COURT:  Yeah.  Marked for identification,

22  12:47.

23  BY MS. MONTGOMERY:

24  Q    Okay.  Are -- can you identify what is included in

25  114A?

116

1          MR. WINFIELD:  Objection.  Foundation.

2   BY MS. MONTGOMERY:

3   Q    Did you receive the documents --

4          THE COURT:  Sustained.  Go ahead.

5   BY MS. MONTGOMERY:

6   Q    Did you receive the documents that have been -- that

7   are identified in 114A?

8   A    These exact documents?

9   Q    Uh --

10  A    I received them in preparation for this trial.

11  Q    Okay.  Did you receive monthly statements from me with

12  regard to fees?

13  A    Yes.

14  Q    And are the entries that are on these bills between

15  pages 3 and 32, are those bills or state -- are those

16  entries that you previously reviewed that I sent you on a

17  monthly basis?

18  A    Yes.

19  Q    And the format of these has slightly changed, is that

20  correct?

21  A    Right.

22  Q    Are the bills from Kramer Family Law beginning at page

23  33 in Exhibit 14A through the end, did you -- have you

24  received these bills?

25  A    Yes.

117

1  Q    And are these bills for work performed by Mr. Kramer's

2  office with regard to the Jasmin Ismail matter?

3           MR. WINFIELD:  Objection.  Leading.

4           THE COURT:  Sustained.

5  BY MS. MONTGOMERY:

6  Q    What are -- what do the bills included from Mr. Kramer

7  on page 33 through 44, what are those bills?

8           MR. WINFIELD:  Objection.  Foundation.  I'm not

9  sure that -- I'm not sure whether Nicole can establish

10 foundation for this exhibit.

11          THE COURT:  Okay.  Well, she's -- she's testified

12 that she received these from the lawyer.

13          MR. WINFIELD:  Yes.

14          THE COURT:  So, I think Ms. Montgomery can explore

15 what her understanding is of what  these are.  I think

16 that's appropriate.

17          Go ahead, Ms. Montgomery.  I mean, you got to be

18 careful how you ask it.  You don't know what's in Mr.

19 Kramer's head, but you can ask her what her understanding is

20 and what these are.

21 BY MS. MONTGOMERY:

22 Q    Is it your understanding that the pages that are marked

23 from 33 to 44 are bills generated by Mr. Kramer's office?

24          MR. WINFIELD:  Objection.  Leading.  She can ask

25 what her understanding is, but --

118

1          THE COURT:  Sustained.  It is leading.  Start by

2 asking her if she knows what they are.

3 BY MS. MONTGOMERY:

4 Q    Okay.  Do you know what the -- do you know what is on

5 the pages 33 to 44 --

6 A    Yes.

7 Q    -- in Exhibit 114A?

8 A    Yes.

9 Q    Okay.  What are those pages?

10 A    These are Brian Kramer's bills.

11 Q    And are these charges that you are required to pay?

12 A    Yes.

13 Q    And are these charges, do these detail charges for work

14 in this case?

15 A    Yes.

16          MR. WINFIELD:  Objection.  Foundation.

17          THE COURT:  Well, I think -- I -- actually, I have

18 an objection, and that is that the question was vague.  So,

19 when you say "this case", so, ask -- ask her again what her

20 -- if she has an understanding of what the charges are for

21 and what -- what is that understanding.

22 BY MS. MONTGOMERY:

23 Q    Did Mr. Kramer perform services for you in the Family

24 Law Court?

25 A    Yes.

*Echo Reporting, Inc.*

119

1  Q    And did Mr. Kramer perform services for you here in the

2  Bankruptcy Court?

3  A    Yes.

4  Q    Did Mr. Kramer assist in defending the action regarding

5  -- or prosecuting the action against Ms. Ismail first in the

6  Family Law Court and then here in the Bankruptcy Court?

7  A    Yes.

8  Q    And do the documents that are marked at pages 33 to 44

9  reflect time charges for work you asked him to provide?

10 A    Yes.

11 Q    And was the work that he has provided to you at your

12 request done in connection with the Jasmin Ismail adversary

13 proceeding and claim objection?

14         MR. WINFIELD:  Objection.  That's the -- the

15 foundation issue.

16         THE COURT:  Well, she -- she already testified it

17 was for work in this court.  So, I think there is

18 foundation.  I'm going to overrule it.

19         Go ahead.

20         THE WITNESS:  Yes, this is for all of his work

21 having to do with everything in this court, having to do

22 with Ms. Ismail, but also when this was initially brought in

23 the Family Law Court -- it started in the Family Law Court,

24 and that's where he initiated it.  So, these are also bills

25 from then, having to do with this.

120

1          THE COURT:  Okay.  That was painful, but I think

2  we got there.  What's the problem -- no, no, I'm not -- that

3  wasn't focused -- that wasn't directed at you.

4          Mr. Winfield, what now?

5          MR. WINFIELD:  It's still vague as to -- it gives

6  -- you know, it's a -- it's a -- it's a big case.  It's a

7  big court, and it's a big case, and within that there's

8  subcases.  So --

9  BY MS. MONTGOMERY:

10 Q    Did Mr. --

11         MR. WINFIELD:  But I guess that's not my problem.

12 BY MS. MONTGOMERY:

13 Q    Did Mr. Kramer --

14         THE COURT:  Now, stop for a second.

15         MS. MONTGOMERY:  Okay.

16         THE COURT:  She asked.  She's laid the foundation.

17 These are bills that Brian Kramer sent her for work that she

18 asked Brian Kramer to do.  What else do I need to know?

19         MR. WINFIELD:  Whether this is work in the main

20 case and in this adversary proceeding or some other part of

21 Goldman's case --

22         THE COURT:  Well, ask her on cross.  Ask her on

23 cross what she knows, if she knows.  It's not -- it's not an

24 evidentiary objection.

25         Go ahead.  Keep going.

121

1  BY MS. MONTGOMERY:

2  Q    Did Mr. Kramer provide services to you in the

3  bankruptcy case apart from the proof of claim objections?

4  A    Yes.

5  Q    He did provide -- and he provided services to you in

6  connection with the bankruptcy?

7  A    He provided -- well, this is the bankruptcy, right?

8  So, both things, the claim objections and then the stuff

9  with Bayview.  So, those are both.  Beyond that, no.

10 Q    Okay.  And he did not charge you for filing a -- for

11 instance, a nondischargeability complaint?  That's not

12 included in these bills?

13 A    No.

14 Q    No.  Okay.  And the bills that I provided to you that

15 are marked beginning at page 2 through page 32, did you

16 receive bills containing these work descriptions?

17 A    Yes.  They're -- but not these.  They were broken down

18 by month.

19 Q    And are you aware that there are redactions or blanks

20 on these bills for work not related to Jasmin?

21 A    Yes.

22 Q    So, looking at these -- at these bills, is all of the

23 time reflected on these bills related to work on the Jasmin

24 adversary or her proofs of claim?

25 A    Yes.

122

1          MR. WINFIELD:  Objection.  I don't know if she's

2    established that she knows that that's the case.

3          THE COURT:  I'm sorry?

4          MR. WINFIELD:  I don't think she's established the

5    foundation that she knows that this is only for the

6    adversary proceeding or only for the proof of claim, but I

7    -- I can ferret that on cross.

8          THE COURT:  Thank you.

9          MS. MONTGOMERY:  Your Honor, I would ask that

10   Exhibit --

11         THE COURT:  I'm deeming the objection withdrawn

12   based on the comment.

13         Go ahead.

14         MS. MONTGOMERY:  I'd ask that 114A be admitted

15   into evidence.

16         THE COURT:  Okay.  Any objection?  All right.

17   With that --

18         MR. WINFIELD:  Yeah, it is what it is.

19         THE COURT:  It is what it is.

20         MR. WINFIELD:  Yeah.

21         THE COURT:  It's just -- you can -- you want to

22   point out the holes in it, you can do that on cross and on

23   argument.

24         Okay.  It's admitted.  I find it was properly

25   authenticated -- adequately authenticated.

123

1      MS. MONTGOMERY:  I think that's it for direct,

2 your Honor.  I don't have anything further.

3      THE COURT:  All right.  Well, are you going to

4 need direct with respect to these documents that we talked

5 about that you're --

6      MS. MONTGOMERY:  Yeah.  I would -- I guess I would

7 like to clarify, because Ms. Ismail has suggested that these

8 are somehow doctored emails, and in response I simply want

9 to go ahead and provide the Court with the originals.

10      THE COURT:  All right.  So -- so, realistically,

11 you're not done.  We're just taking a break for lunch.

12      MS. MONTGOMERY:  Very short.  They'll be very

13 short with --

14      THE COURT:  Okay.

15      MS. MONTGOMERY:  -- regard to these documents.

16      THE COURT:  Now, let me try to find -- let me give

17 you the chambers email, which we use ever so rarely, but we

18 do.  I should have had you go to the public website.  All

19 right.

20    (Pause.)

21      THE COURT:  Okay.  Here it is.  It's chambers, C-

22 H-A-M-B-E-R-S --

23      MS. MONTGOMERY:  Um-hmm.

24      THE COURT:  Then underscore

25 mbarash@cacb.uscourts.gov.  Okay.  Send your document to Mr.

*Echo Reporting, Inc.*

124

1 Winfield and to that address simultaneously, please.

2          MS. MONTGOMERY:  Which documents did he -- is he

3 trying to claim were doctored?  I just want to make sure

4 that we send -- if here's two emails that --

5          THE COURT:  Well, I'll let him -- I have an

6 understanding, but I'll let him answer that first.  It

7 was --

8          MS. MONTGOMERY:  I know the rebuttal -- the

9 Rebuttal 3 that says "Happy Birthday, Princess" he's

10 claiming was --

11          THE COURT:  Right.  There was argument about that.

12 And then he has something he's going to offer as

13 impeachment, but the only reason I'm giving you the address

14 is you said --

15          MS. MONTGOMERY:  We have it and --

16          THE COURT:  -- there s something you --

17          MS. MONTGOMERY:  -- we're going to send it.

18          THE COURT:  -- have electronically that you don't

19 have copies of.

20          MS. MONTGOMERY:  We have this document from the --

21 directly from the Yahoo.com address --

22          THE COURT:  All right.

23          MS. MONTGOMERY:  -- which just shows this -- that

24 this is the same document.

25          THE COURT:  All right.

125

1          MS. MONTGOMERY:  There's nothing else.

2          THE COURT:  Well, we'll print it out for you, and

3 we can talk about it after lunch.  I'm not ruling on

4 anything.

5          MS. MONTGOMERY:  Okay.  Was there something -- was

6 there another one?

7          THE COURT:  If Ms. Ismail has her version of it.

8 I'm going to give them the same opportunity.

9          MR. WINFIELD:  Well, this -- yeah, well, this is

10 what we're talking about now.

11     (Pause to confer.)

12          THE COURT:  We will print out whatever people send

13 to the chamber's email for after lunch.  Okay.

14          MS. MONTGOMERY:  Okay.

15          THE COURT:  It's 1:00 o'clock now.  I think we

16 should reconvene at 2:00 and try to keep things moving and

17 try to get as much done today as we can.

18          MS. MONTGOMERY:  Are you take -- are you intending

19 to take any evidence on claim objections or is that being

20 done as a summary proceeding?

21          THE COURT:  No.  That's what I was trying to

22 explain.  If you -- if you want to present evidence on the

23 claims objections, you can -- you can do that because they

24 -- they already overlap, and I think I would be in an

25 untenable position if I heard things that were part of the

126

1  counterclaim and I have a claim objection over here and

2  because of some rigid procedural rule I'm -- I can't ignore

3  what I hear in court.  So, if you have evidence -- now, they

4  haven't presented their case on the counterclaim.

5          MS. MONTGOMERY:  Right.

6          THE COURT:  Right.  So, I'm not suggesting we go

7  out of order.  But, yes, during this trial, you will have

8  the opportunity to respond to the counterclaim, and you

9  should, and that -- that evidence -- the Court will consider

10  all of the evidence I've heard in connection with the claim

11  objection.

12          MS. MONTGOMERY:  I think you've already heard from

13  my client --

14          THE COURT:  Okay.

15          MS. MONTGOMERY:  -- on the -- on the counterclaim.

16          THE COURT:  Okay.

17          MS. MONTGOMERY:  I think that's basically done.

18          THE COURT:  All right.

19          MR. WINFIELD:  I'll talk to her off the record.

20          THE COURT:  Okay.  So, we're going to break for

21  lunch.  I know it may be not a lot of time if you've got to

22  shlep somewhere and come back, but let's --

23          MR. WINFIELD:  Forty-five minutes?

24          THE COURT:  Well, I was going to say let's

25  reconvene at 2:00.  Okay.  All right.  Court will be in

1   recess until then.

2        (Proceedings recessed to reconvene.)

128

1                    AFTERNOON SESSION

2                        --oOo--

3          THE COURT:  All right.  Let me see here.   Zoom is

4   on.  So, our observers can observe.

5          So, before the break, I gave a chambers email

6   address.  We got one email from nikihuey@yahoo.com, which my

7   law clerk copied and provided I understand to Ms. Montgomery

8   to do whatever it is that you're going to do with that.

9          We were -- Ms. Griffin was on the stand, and I

10  think we concluded before the break that Ms. Montgomery's

11  examination of her -- that there might be a little more

12  because -- because there were going to be some other of

13  these documents to deal with.

14         So, Ms. Griffin, why don't you take the stand

15  again.

16      (Pause.)

17       NICOLE GRIFFIN - PLAINTIFF - PREVIOUSLY SWORN

18      (Pause.)

19         MS. MONTGOMERY:  Your Honor, can I approach your

20  clerk?

21         THE COURT:  You may.

22      (Pause.)

23         THE COURT:  Thank you.  Okay.  So, I've been

24  handed one, two, three, four, five pages -- five pages

25  stapled together.  It says on the first page -- and these

129

1  are colored -- except for the last page is in black and

2  white -- colored documents.  The first page says "Tighty

3  Whitie Toys, in stock now."

4              For identification --

5              MS. MONTGOMERY:  Want to mark this as Rebuttal

6  Exhibit 6.

7              THE COURT:  Okay.  Or Impeachment 6.  Although

8  she's your witness.  It's kind of what we're -- yeah,

9  rebuttal, impeachment.  All right.

10             So, okay.  All right.  I think we're all on the

11 same page.

12                  DIRECT EXAMINATION   (RESUMED)

13 BY MS. MONTGOMERY:

14 Q    Ms. Griffin, before we went on a break, you had

15 discussed research that you had conducted online.  Do you

16 recall?

17 A    Yes.

18 Q    Okay.  The documents that I provided to you, are these

19 documents that you obtained through your research?

20 A    Yes, these are some of the documents that I obtained.

21 Q    And did you print out or download each of the documents

22 that are before you?

23 A    Yes.

24 Q    Can you describe the first page?  What is this

25 document?

130

1  A    The first page is the first page of a catalogue for

2  Tighty Whitie Toys.  It says 2015 on it.  The first --

3            MR. WINFIELD:  Your Honor, I -- I'm at a loss.

4  Which one is the first page?

5            MS. MONTGOMERY:  The one that says Tighty Whitie

6  Toys.

7            MR. WINFIELD:  Okay.  They're not numbered, so --

8  okay.  Is that the only one that says Tighty Whitie Toys?

9  Okay.

10 BY MS. MONTGOMERY:

11 Q    The second page is a color page that says "bear in

12 underwear."  Do you see that?

13 A    Yes.

14 Q    What is this document?

15 A    That was the second page of the Tighty Whitie Toys

16 catalog.

17 Q    Okay.  And if you look at the very bottom, it says

18 "Questions."  And what does it -- what does it say after

19 that?

20 A    Contact Todd at davidandgoliathtees.com.

21 Q    So, these are all -- are these all pictures of his

22 Tighty Whitie images?

23 A    These are plush toys that were made from his --

24            MR. WINFIELD:  Objection.  Foundation.

25            THE COURT:  Okay.  I'm going to sustain that, but

131

1  you can lay some foundation.

2  BY MS. MONTGOMERY:

3  Q    Were the Tighty -- were Tighty Whitie -- describe when

4  Tighty Whitie Toys were created?

5  A    They were created during marriage, probably 2013 I want

6  to say.

7  Q    And were you familiar with the images that Todd Golden

8  had created?

9  A    Yes.

10 Q    And are the first two pages of the documents Tighty

11 Whitie Toy images?

12 A    Yes.

13 Q    In the course of your research, did you -- what is

14 Underwearimals?  Is this something that you came up with in

15 your research?

16 A    Yes, it is.  Underwearimals is a trademark owned by

17 Ellezarine, LLC.

18 Q    Okay.  Let me -- let's back up.

19 A    Okay.

20 Q    Let me look at this page that is a color page, and it's

21 marked Underwearimals, and it says by Todd Goldman.

22           THE COURT:  Okay.  That's the third page of --

23           MS. MONTGOMERY:  The third page.

24           THE COURT:  -- of Rebuttal Impeachment 6.

25           MS. MONTGOMERY:  Right.

132

1 BY MS. MONTGOMERY:

2 Q    Can you describe what this page shows?

3 A    Those are the computer drawings by Todd.

4        MR. WINFIELD:  Objection.  Foundation.

5        THE WITNESS:  These are computer drawings that

6 were created --

7        THE COURT:  Stop, stop, stop.  If there's an

8 objection --

9        THE WITNESS:  Oh, I was trying to --

10        THE COURT:  -- just stop.

11        Okay.  Do you want to respond to the objection?

12        MS. MONTGOMERY:  I'd rather just rephrase the

13 question.

14        THE COURT:  Okay.

15 BY MS. MONTGOMERY:

16 Q    Where -- is this a document that you downloaded online?

17 A    Yes.

18 Q    What website did you go to in order to download this?

19 A    I did a search on Google, and there were several

20 different websites with this particular image.  I don't know

21 which specific website I --

22        THE COURT:  Okay.  Which page of the exhibit are

23 you referring to?

24        MS. MONTGOMERY:  Three.

25        THE WITNESS:  Page three.

133

1          THE COURT:  Page three.  Thank you.

2  BY MS. MONTGOMERY:

3  Q     Did you compare yourself, page three to the images on

4  pages one and two?

5  A     Yes.

6  Q     And were these the same -- most of them the same images

7  between the Tighty Whitie Toys, which are exhibits one --

8  which are pages one and two, and the Underwearimals on page

9  three?

10         MR. WINFIELD:  Objection.  Foundation.

11         MS. MONTGOMERY:  You can look at them.

12         THE COURT:  She's laid the foundation that she

13  downloaded them from the Internet.  And now she's asking if

14  -- as a non-expert witness, whether she looked and compared

15  at the images on pages one and two and compared them, to the

16  images on page three.

17         I think that's okay.

18         MR. WINFIELD:  I don't think she -- okay.

19         THE COURT:  No, no.  Go ahead.  Go ahead, Mr.

20  Winfield.

21         MR. WINFIELD:  I don't think there's foundation

22  where one and two came from.  I think she testified where

23  three came from, well, maybe.

24         THE COURT:  Okay.

25         MR. WINFIELD:  It's unclear to me which -- which

134

1  -- other than --

2           THE COURT:  She did not --

3           MR. WINFIELD:  -- other than they were from the

4  Internet.

5           THE COURT:  She did not name the website, but she

6  said she downloaded them.  You can explore that on -- on

7  cross.

8  BY MS. MONTGOMERY:

9  Q    Did you --

10          THE COURT:  So, I'm going to overrule it for now.

11          Go ahead.

12 BY MS. MONTGOMERY:

13 Q    Did you recently download pages one and two that say

14 Tighty Whitie Toys?

15 A    Yes.

16 Q    Based on your personal knowledge during the marriage

17 with Todd Goldman, are these copies of images that he

18 created during your marriage?

19 A    Yes.  I was present when the photographs were taken for

20 pages one and two of the exhibit.

21 Q    Looking at page two, at the bottom, there is a -- a

22 child holding two animals.  Do you recognize the child?

23 A    Yes.  it's my daughter, Elle.

24 Q    Okay.  And you said page three is the Underwearimals,

25 and did you download this document?

*Echo Reporting, Inc.*

135

1  A    Yes.

2  Q    And did you compare this document of Underwearimals to

3  the images on pages one and two which were Tighty Whitie

4  Toys?

5  A    Yes.

6  Q    Based on your knowledge, are these -- did the

7  Underanimals contain the same or similar images as those

8  that were Tighty Whitie Toys?

9  A    These are -- the images in page three are similar

10  images to the actually 3D plush animals on pages one and two

11  and are the same images that Todd submitted to the

12  manufacturer during marriage with me present to have these

13  prototypes --

14          MR. WINFIELD:  Objection.

15          THE WITNESS:  -- created.

16          MR. WINFIELD:  It's nonresponsive, exceeds the

17  scope of the question.

18          THE COURT:  Okay.  Go ahead and --

19          MS. MONTGOMERY:  I'm --

20          THE COURT:  Again, I'm going to give you the same

21  warning I gave Ms. Ismail.  Try to listen to the question

22  and just respond to the question.  I know there's an urge to

23  elaborate, but you can't -- you can't tell the story.  You

24  have to leave it up to the -- the questioning attorney to

25  ask you -- ask you a follow-up question.  Okay.  So, just

136

1    try to answer the question that you hear.

2          Very typical example is they teach us, you know,

3    if I ask you do you know what time it is, what's the answer

4          THE WITNESS:  Yes.

5          THE COURT:  Right.  That's -- that's it.  Okay.

6    But most people in conversation --

7          THE WITNESS:  Will tell you the time.

8          THE COURT:  -- will tell you the time.  So, it's a

9    little strange the way we do things in court.  It's a little

10   different than regular conversation.  So, I know neither of

11   you, even though you've -- I gather you've both been to

12   court before, it's not something you do on a regular basis.

13   So, this is not at all critical.  Just it will -- the flow

14   will go better if you kind of stick to answering the

15   question and let the -- let the lawyers ask you.  Okay.

16         All right.  Go ahead.

17         MS. MONTGOMERY:  Okay.  I don't know if these got

18   out of order.  The page four, is that marked copyright?

19         THE COURT:  My page four says record three out of

20   24.  It appears to be --

21         MS. MONTGOMERY:  Oh, okay.  All right.

22         THE COURT:  -- a printout from the USPTO.

23         MS. MONTGOMERY:  That appears to be trade -- all

24   right.  That's the trademark.  It says trademark electronic

25   search system.

137

BY MS. MONTGOMERY:

1  Q    Is this a document that you downloaded?

3  A    Yes.

4  Q    What is this document?

5  A    I --

6           MR. WINFIELD:  Objection.  Foundation.

7           THE COURT:  Overruled.  She downloaded it from the

8  Internet.  If she knows what it is, she'll say what she

9  thinks it is.

10           THE WITNESS:  I used the search system on the

11  USPTO website to do a -- run a search -- properties owned by

12  Ellezarine, LLC, and it gave me a list, and then you can

13  click on each title of the trademark, and this is the

14  specific trademark for Underwearimals.

15  BY MS. MONTGOMERY:

16  Q    So, it says Underwearimals and looking down at the

17  owner, towards the bottom of the page, who does it indicate

18  the owner is of this trademark?

19  A    Ellezarine, LLC.

20  Q    Turning to -- and tuning to the next page, is that 28

21  records?

22  A    Yes.

23  Q    Okay.  And where is the -- where did you -- did you

24  obtain this particular document with 28 lines?

25  A    Yes.

138

1  Q    And what does this -- where did you obtain this

2  document from?

3  A    This is from the USPTO search system.  So, this was the

4  initial page that it gives you, and then you can click on

5  each word mark, and that's how I got the previous page.

6  Q    So, what does this represent -- what does this page

7  represent?

8  A    These are all the trademarks registered to Ellezarine,

9  LLC.

10 Q    Looking at number six, could you state what is listed

11 as -- under trademark number six?

12 A    Underwearimals.

13 Q    Is this the same underwear animals that you identified

14 in page three of this exhibit as being by Todd Goldman?

15 A    Yes, to the best of my knowledge.

16 Q    And what -- what was your conclusion based on your --

17 based on your research and based on your downloading and

18 production of these documents?

19        MR. WINFIELD:  Objection to the extent it asks for

20 an expert opinion.

21        MS. MONTGOMERY:  Not an expert opinion.

22        THE COURT:  Okay.  Okay.  Okay.  First of all, you

23 need to lay some foundation, and you need to ask did she --

24 did her -- did she reach any conclusions as a result of her

25 search.  And then you can ask her if there were any

139

1  conclusions, what her conclusions are.  I'm not accepting

2  her as an expert witness.

3          MS. MONTGOMERY:  No.

4          THE COURT:  I'm accepting her as a percipient

5  witness, and I -- I think there's at least a reasonable

6  possibility that whatever her testimony is will be helpful

7  to the Court but in understanding what she found during her

8  research, but I don't -- I'm not treating it as expert

9  testimony.

10         MS. MONTGOMERY:  That's fine.  It's not intended

11  to be an expert testimony.

12  BY MS. MONTGOMERY:

13  Q    Did you reach any conclusions based on the research

14  that you performed and downloaded these five pages?

15  A    Yes.

16  Q    Can you describe what your conclusions were?

17  A    That Todd is continuing to engage in his businesses

18  through Ms. Ismail's LLC, and he's continuing to profit off

19  of many of these trademarks which were in his name

20  previously or in his David and Goliath company previously

21  but now under the umbrella of Ms. Ismail's LLC.

22  Q    And, so, is it your conclusion that Tighty Whitie Toys

23  continues to operate using different -- using the same

24  images but different names?

25  A    Yes.

140

1          MS. MONTGOMERY:  Your Honor, I'd move for

2   admission of Rebuttal Exhibit 5.

3          THE WITNESS:  6.

4          MS. MONTGOMERY:  Or 6, I'm sorry.

5          MR. WINFIELD:  I don't think we have enough

6   foundation to --

7          THE COURT:  All right.  Well, you can -- you can

8   cross -- I'm going to let you cross examine her on the

9   foundation issue right now.  Go ahead.

10          MS. MONTGOMERY:  And, lastly --

11          THE COURT:  No, I --

12          MS. MONTGOMERY:  I just want to go ahead, your

13   Honor, there was a question as to whether the email --

14          THE COURT:  No, no, no.  One document at a time.

15   And we're dealing with this exhibit.

16          MS. MONTGOMERY:  Okay.  We just --

17          THE COURT:  I'm letting him -- I'm letting him

18   basically voir dire her on the exhibit.

19          MS. MONTGOMERY:  Okay.

20          THE COURT:  Okay.

21                    VOIR DIRE

22   BY MR. WINFIELD:

23   Q   Ms. Ismail -- I'm sorry.  Ms. Griffin, you -- didn't

24   you just testify that with respect to page three, you don't

25   know which website you downloaded that from?

*Echo Reporting, Inc.*

141

1  A    I said I downloaded it from several websites, and I

2  don't know which one this was from.

3  Q    Okay.  And where it ways underwear animals at the top

4  and there's a TM, do you know whether that -- do you know

5  what TM stands for?

6  A    Trademark.

7  Q    And does that apply to this whole page or does that

8  apply to the word Underwear animals?

9  A    It would apply to the page -- these are properties

10  registered under Underwearimals, and based on what was found

11  on the USPTO website, it includes characters, avatars,

12  cartoons, et cetera, as well as plush toys.

13  Q    Okay.  Well, isn't it true that page three has to do

14  with a word mark, Underwearimals?

15  A    These are being sold as plush and T-shirts and mugs and

16  -- and I printed the heading page of the websites that are

17  selling those items.

18  Q    You don't know which website?

19  A    I have some printed in black and white if you'd like.

20  There's quid.com.  Most of them are --

21  Q    Thank you.

22  A    -- overseas.

23          THE COURT:  Okay.  You don't -- you don't know

24  which website this came from?

25          THE WITNESS:  I don't know -- I --

142

1           THE COURT:  This page three, you don't know where

2   it came from?

3           THE WITNESS:  I downloaded it from several

4   different websites.  So, I could say a website, but I don't

5   know where I printed this --

6           THE COURT:  Okay.

7           THE WITNESS:  -- particular --

8           THE COURT:  That's fine.

9           All right.  Anything else, and, again, just on the

10  -- just on the admission of the exhibit?

11          MR. WINFIELD:  Yes.

12  BY MR. WINFIELD:

13  Q    So, on page four, do you see where it says word mark

14  Underwearimals?

15  A    Yes.

16  Q    Do you know if there's a difference between a word mark

17  and a trademark?

18  A    These are trademarks.  This is from the trademark --

19  the U.S. trademark system.

20  Q    Okay.  But you don't have expertise to know what the

21  legal meaning of word mark is?

22  A    I do not.  Based on this it says --

23  Q    Okay.  Thank you.

24          THE COURT:  I'm sorry.  Where are you reading word

25  mark from, Mr. Winfield?

*Echo Reporting, Inc.*

143

1       MR. WINFIELD:  On the third page -- fourth page,

2  where it says Underwearimals, and then about in the middle

3  of the page, it says word mark, Underwearimals.

4       THE WITNESS:  Title of the property.

5       THE COURT:  Okay.  Hold on.  I see it says type of

6  mark, trademark on page three.

7       MR. WINFIELD:  Okay.  In the middle of the page

8  bold it says Underwearimals.

9       THE COURT:  In caps?

10       MR. WINFIELD:  Yes.  And directly under that, it

11  says word mark, Underwearimals.

12       THE COURT:  It says word mark there, yeah.  And

13  then below it says type of mark, trademark.

14       Anyway, this isn't -- this is neither here nor

15  there.  The objection's overruled.  The exhibit is admitted,

16  but I will note that, you know, it's not -- it's not of

17  tremendous probative value if I don't know, you know -- I'm

18  speaking out of page three.  I don't know what website it

19  came from.  I don't know what else is on that website.  The

20  testimony is is that it's a website that's selling plus

21  dolls similar to what were being sold in the catalog that's

22  shown on pages one and two, but I -- all I got is -- I got

23  the witness's testimony, but the -- the document itself, the

24  page three, doesn't substantiate everything that she's

25  saying.  It's just a two-dimensional image with looks like a

144

1 title page -- looks like a title page.  So, I don't know

2 what it is.  But it's in.  And the objection's overruled,

3 and it's admitted.

4          What?

5          MS. MONTGOMERY:  It indicates it's by Todd

6 Goldman.

7          THE COURT:  Yeah.  I got that part.  Yeah, that

8 there is a web page out there -- her testimony is probably

9 more important that, you know -- and, again, it's -- it's

10 subject to rebuttal, cross examination and potentially to

11 rebuttal, but she says that all these images are images that

12 she's familiar with from during the marriage that her

13 husband created.  So, I -- you know, whether he's -- whether

14 page three substantiates that -- how he's using them, I

15 don't know.  I don't know what website it came from.  She

16 says that it's a website where under a different name he's

17 selling similar -- similar characters, and that's her

18 testimony.  So, but the -- but the document doesn't --

19 without -- yeah, it doesn't tell me that -- how he's trying

20 to exploit the image, just that he's exploiting those images

21 under a different trademark.

22          MS. MONTGOMERY:  One of the things, your Honor,

23 for use of this as rebuttal was that Ms. Ismail said that

24 there was on connection between her company, Ellezarine,

25 which she said had no assets, and Todd Goldman.  And, so,

145

1  for purposes of this and for her credibility, the trademark

2  documents show that Underanimals, which was created by Todd

3  Goldman, the trademarks are owned by Ellezarine.  So, there

4  is a clear connection, current connection --

5           THE COURT:  Okay.

6           MS. MONTGOMERY:  -- between Ms. Ismail and Todd

7  Goldman.

8           THE COURT:  I understand the point you're making.

9  I understand.

10          MR. WINFIELD:  Is this the time to argue what it

11 means?

12          THE COURT:  Well --

13          MS. MONTGOMERY:  No, I'm just ask -- saying why

14 I'm putting this in and why it's a rebuttal.

15          THE COURT:  Okay.  It's in.

16          MS. MONTGOMERY:  Okay.  And then we -- there was

17 some question about the Yahoo account.

18          THE COURT:  Okay.  And, by the way, "it's in"

19 refers to Rebuttal Impeachment Number 6 from the Plaintiffs.

20          MS. MONTGOMERY:  Yes.

21          THE COURT:  All right.  So, now we've got the

22 email that was sent to chambers and we printed out as a

23 courtesy.

24          MS. MONTGOMERY:  Yes.

25          THE COURT:  And I'm going to mark that Rebuttal

146

1  Impeachment Number 7.  Right  And you can now address

2  yourself to that.

3  BY MS. MONTGOMERY:

4  Q    Ms. Griffin, the document that's been marked as Exhibit

5  7, did you produce -- email this document to chambers?

6  A    Yes.

7  Q    And can you describe what this -- where this came from?

8  A    My old Yahoo email address account.

9  Q    And why did you send it to chambers?

10  A    Because when you questioned Ms. Ismail about it, she

11  said that it was doctored because it had both of my emails

12  on it.  I don't recall why she said it was doctored, but we

13  put it as an exhibit because I forwarded it to myself.  I no

14  longer use that email address.  So, I forwarded it to my

15  Gmail address.  So, this is -- I was able to log into the

16  account that I don't use anymore.  So, I got the original

17  copy.

18  Q    Is this identical to the document that was previously

19  admitted as Rebuttal Exhibit 3?

20  A    Yes.

21          MR. WINFIELD:  Objection.

22          THE WITNESS:  I think, yes.

23          MR. WINFIELD:  I don't think she --

24          THE COURT:  Okay.  I'm sorry.  Go ahead, Mr. --

25          THE WITNESS:  Yes.

147

1           MR. WINFIELD:  Well, I --

2           THE COURT:  Stop.  Witness stop.  Attorney argue.

3  Go ahead.

4           When you hear an objection, stop, as the witness.

5           Okay.  Go ahead.

6           MR. WINFIELD:  I don't think that they're

7  suggesting that it's identical.  They're suggesting it's the

8  -- that this is the original email.

9           THE COURT:  Well --

10 BY MS. MONTGOMERY:

11 Q    Is the language that is reflected on what was marked as

12 Exhibit 6 the same as the Exhibit 3 ?

13 A    Yes.

14 Q    What -- do you know that -- if there is a difference

15 between the two?

16 A    Only that it wasn't forwarded to my Gmail account.

17 Q    So, the one that's Exhibit 3 has your Gmail account on

18 it, correct?

19 A    Yes.  Yes.

20 Q    There's no other changes?  There's no other deviation

21 between the two?

22 A    No.

23          MS. MONTGOMERY:  Thank you.

24          THE COURT:  Okay.  Are you moving it into

25 evidence?

*Echo Reporting, Inc.*

148

1          MS. MONTGOMERY:  I'm moving -- I think your Honor

2   had already moved -- already admitted it, but --

3          THE COURT:  Well, I admitted Impeach -- Rebuttal

4   Impeachment Number 3.  This is a different document.  Are

5   you moving this into evidence?

6          MS. MONTGOMERY:  I'm moving Exhibit 6, Rebuttal

7   Exhibit 6 into evidence.

8          THE COURT:  Well, this is 7.  6 is already in.  6

9   were the download printouts of the Tighty Whitie printouts.

10          MS. MONTGOMERY:  Okay.

11          THE COURT:  Okay?

12          MS. MONTGOMERY:  Yes.

13          THE COURT:  All right.  Any objection, Mr.

14   Winfield?

15          MR. WINFIELD:  No, your Honor.

16          THE COURT:  Okay.  All right.  So, Rebuttal

17   Impeachment 7 is in.

18          Okay.  All right.  Any more to your direct

19   examination?

20          MS. MONTGOMERY:  No, your Honor.

21          THE COURT:  Okay.  All right.  Cross examination,

22   Mr. Winfield?

23                    CROSS EXAMINATION

24   BY MR. WINFIELD:

25   Q   Ms. Ismail (sic), with respect to Impeachment Exhibit

149

1  7 --

2        MS. MONTGOMERY:  This is not -- excuse me.  This

3  is not --

4  BY MR. WINFIELD:

5  Q    I'm sorry.  Ms. Griffin, looking at Impeachment Exhibit

6  6, the printouts, the -- the last page, isn't it true that

7  none of that, of the works listed on the last page appear on

8  the second page that you downloaded from Tighty Whitie?

9  A    I don't understand the question.

10 Q    Okay.  The last page is a list of trademarks.  Page two

11 are some of the works that your ex-husband created, and they

12 have names to them.  For example, the one on top left-hand

13 corner says Patrick Panda.  Isn't it true that Patrick Panda

14 doesn't appear anywhere on the last page?

15 A    Correct, that Patrick Panda --

16 Q    Okay.  Now, let's look at the next one --

17 A    -- wasn't -- I'm sorry.

18        THE COURT:  Okay.  That's a yes or no question.

19        THE WITNESS:  Yes.

20        THE COURT:  Let your -- let your lawyer help, you

21 know, when it's her turn again.

22        Go ahead.

23 BY MR. WINFIELD:

24 Q    So, looking at page two, where it says Pete Penguin,

25 isn't it true that Pete Penguin doesn't appear anywhere on

150

1  the list of trademarks?

2  A    Yes.

3  Q    Okay.  How about Sebastian Shark?  Does Sebastian Shark

4  appear anywhere on the list of trademarks?

5  A    No.

6  Q    How about Henry Hippo?  Does Henry Hippo appear

7  anywhere on that list?

8  A    No.

9  Q    How about Fred Frog?

10  A    No.

11  Q    Well, then isn't it true that none of the -- the named

12  images on page two appear on the list of trademarks on page

13  five, or page -- yeah, five?

14  A    Yes.

15  Q    Ms. Ismail (sic), you testified that you never agreed

16  to pay --

17          THE COURT:  Stop.  Stop.  Stop.  Her name is Ms.

18  Griffin, and I know --

19          MR. WINFIELD:  I apologize.

20          THE COURT:  I know.  I know.  It's taken me a year

21  and a half to get the names straight myself.  Okay.  And

22  it's complicated because they are using different names than

23  -- some of them are using different names than are in the

24  complaint, but maybe write yourself a note maybe, Griffin,

25  because I -- what I don't want, in all seriousness, is I

151

1  don't want -- I don't want that to become a sort of micro

2  aggression that puts the -- the witness off center, okay.  I

3  think she's entitled to be addressed by her -- by the name

4  she chooses to be addressed by.

5          MR. WINFIELD:  It's certainly not intentional,

6  your Honor.

7          THE COURT:  I am confident it is not intentional.

8  BY MR. WINFIELD:

9  Q    Ms. Griffin, would it be okay if I call you Jasmin?

10          MS. MONTGOMERY:  Nicole.

11          THE COURT:  No.

12          MR. WINFIELD:  I guess that wouldn't be okay.

13          THE COURT:  I'm going to answer for her.

14  BY MR. WINFIELD:

15  Q    Would it be okay if I call you Nicole?

16  A    Yes.

17  Q    Okay.  Okay.  Nicole, you previously testified that you

18  never agreed to pay back any loans to Jasmin, is that

19  correct?

20  A    Yes.

21          MR. WINFIELD:  Okay.  Your Honor, may I approach?

22          THE COURT:  Who are you approaching?

23          MR. WINFIELD:  Well, I have a -- I have an -- it's

24  an impeachment exhibit that I'm marking as N.

25          THE COURT:  Okay.  All right.  We'll call it --

152

1   you have an N?  I don't know if I have an M.

2           MR. WINFIELD:  It's a letter -- well, we don't

3   yet.

4           THE COURT:  You don't.  Okay.  That's fine.  But

5   you want this one to be N?  That's okay.

6           MR. WINFIELD:  Yes.  And I -- so, I -- I have a

7   tab, and I have two copies here, one for the witness, one

8   for the Court, and then I've given one to Ms. Montgomery.

9           THE COURT:  Okay.  All right.  Yes, you may.

10       (Pause.)

11          MS. MONTGOMERY:  These are N?  My understanding is

12  that Exhibits I, J, K were all in connection with the claim

13  objection, not in connection with this trial.

14          MR. WINFIELD:  And this isn't I, J, K.  This is --

15  so, I decided to label my impeachment exhibits next in order

16  as I was using letters.

17          THE COURT:  Yeah.  That's okay.

18          MR. WINFIELD:  So, that's why I --

19          THE COURT:  I mean, there have been no -- no

20  defense exhibits have been -- have been offered yet because

21  the defense/counterclaim case has not been presented yet.

22  So, you're just avoiding confusion by going right to N.

23          MR. WINFIELD:  I'm trying to.

24          THE COURT:  Yeah, I get that.  Okay.  So, this

25  item that you handed up, with a -- complete with a tab --

153

1  thank you, Mr. Winfield -- is labeled Exhibit N, and that's

2  --  that's how it will be identified.

3         You have -- do you have N?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  Ms. Griffin.  All right.  Very

6  good.

7  BY MR. WINFIELD:

8  Q    So, Nicole, is that a copy of a check that you wrote?

9  A    Yes.

10 Q    And is that your signature?

11 A    Yes.

12 Q    And, so, isn't it true that you gave that to Jasmin as

13 a repayment of money that was owed to her?

14 A    I don't know what it was given to her for.

15 Q    All right.  Is there an -- can you read the notation?

16 A    Yes.  It says paid back.

17     (Pause.)

18         THE COURT:  You okay?

19         MR. WINFIELD:  I'm fine.  I'll have to find a

20 different way of doing this.  We have less room on the

21 podium thanks to all our new innovations up here.

22         THE COURT:  Also, may not be convenient, but

23 there's the table behind you also.

24         MR. WINFIELD:  Thank you, your Honor.

25     (Pause.)

*Echo Reporting, Inc.*

154

1  BY MS. MONTGOMERY:

2  Q    Nicole, isn't it true that -- that you had agreed to

3  pay back Jasmin for moneys she expended with respect to

4  Bayview?

5  A    I don't know what -- could you be more specific?

6  Q    Didn't you testify earlier today that you never agreed

7  to pay back Jasmin for anything that she spent for

8  maintenance or anything related to Bayview?

9         MS. MONTGOMERY:  Objection, your Honor.  That's

10 not her testimony.  Her testimony were no written agreements

11 or oral agreements that she had to pay back or had to pay

12 any of these expenses.

13        THE COURT:  How is that different from his

14 question, which is didn't you have an agreement?  I mean,

15 he's cross examining her.  He's asking her to admit that

16 there was some agreement, which is contrary to her

17 testimony, but that's pretty common in cross.

18        THE WITNESS:  I do -- I do want to clarify that

19 she was -- the money that she paid, the mortgage that she

20 got the 50 percent, that was always going to go back.

21        MR. WINFIELD:  Okay.  Your Honor, may I approach?

22        THE COURT:  I don't know which money that is.

23 So --

24        THE WITNESS:  Okay.  I just --

25        THE COURT:  I'm going to let the lawyers deal with

*Echo Reporting, Inc.*

155

1 this.

2          THE WITNESS:  Okay.

3          THE COURT:  Ms. Montgomery Can deal with it on

4 redirect.

5          MR. WINFIELD:  Your Honor, may I approach?

6          THE COURT:  Yes.

7     (Pause.)

8          MR. WINFIELD:  And before I ask my next question,

9 I'd like to move Exhibit N into evidence.

10          THE COURT:  Without objection, it's admitted.

11          All right.  And you've handed up an exhibit, and a

12 tab again, thank you, that's marked Defendant's Exhibit S.

13 What is this?  I assume you're offering this in rebuttal

14 or --

15          MR. WINFIELD:  Yes.

16          THE COURT:  -- impeachment.

17          MR. WINFIELD:  This will be an

18 impeachment/rebuttal exhibit.

19 BY MR. WINFIELD:

20 Q   Nicole, is this a declaration that you -- that you

21 signed?

22 A   Yes.

23 Q   Can you turn to page seven of that declaration.  First

24 of all, is that your signature at the bottom of page seven?

25 A   Yes.

156

1 Q    And, ma'am, would you look at paragraph 21.  Do you see

2 where it says "My mother" -- September -- from September

3 2014, the time the Bayview property was quitclaimed to

4 Respondent by my -- Respondent, my mother and I, my mother

5 paid $595,584 to pay off the preexisting loan on the Bayview

6 property.  Do you see that?

7 A    Yes.

8 Q    Was -- was $595,584 the amount that she paid for that

9 mortgage?

10 A    I don't recall as I sit here today.

11 Q    And then if you're looking at -- in the next paragraph,

12 did you ever agree that she would be entitled to get six

13 percent interest on the moneys she paid?

14 A    On the Bayview -- are you talking about the Bayview?

15 Q    Yes.

16 A    No, I don't believe so.  But she got 50 percent of the

17 house.

18 Q    Okay.  Then would you look at paragraph 22.

19 A    Yes.

20 Q    Where it says:

21         "There is no incumbrance on the

22         property.  Therefore, following

23         reimbursement to my mother of  $595,584,

24         she paid off the preexisting loan on

25         Bayview property, the net equity is

157

1          $734, 416, half of which is 377, the

2          loan's" --

3     Do you see that?

4  A    Yes.

5  Q    So, was the agreement that after -- well, isn't it true

6  that in earlier statements you said that the amount that

7  Jasmin paid on the mortgage for Lenore Goldman was 553?

8  A    I have -- I don't know.  I have no idea.

9     (Pause.)

10          MR. WINFIELD:  Your Honor, may I approach again?

11          THE COURT:  Yeah, but before you do, I just -- I

12  want to make sure I understand.

13          If you look at this paragraph 22 in the Exhibit S,

14  so the way it -- it sounds here that what you're testifying

15  to the State Court is that -- that your mother is entitled

16  to payment of this amount first and then she still gets --

17  she still keeps half the house.  Is that -- do I understand

18  that correctly?

19          THE WITNESS:  I don't -- I don't know.  I think

20  that sounds right.

21          THE COURT:  It says there's no incumbrance to --

22          THE WITNESS:  Based on what I'm reading.

23          THE COURT:  -- on the property.  Therefore,

24  following reimbursement to my mother of $595,584, she paid

25  off the preexisting loan -- that she paid to pay off the

158

1  preexisting loan on the Bayview property, the net equity

2  before closing costs is approximately $754,416, half of

3  which, or $377,208 belongs to Respondent and I jointly.

4          So, who owns the other half of the equity?  Who

5  did you think owned the other half of the equity?

6          THE WITNESS:  Well, the house was 50 percent her,

7  25 percent me, 25 percent Todd.

8          THE COURT:  Okay.

9          THE WITNESS:  I guess.

10         THE COURT:  All right.

11         THE WITNESS:  I think I answered your question.

12         THE COURT:  Yeah, no.  I think I --

13         THE WITNESS:  Okay.  Sorry.

14         THE COURT:  No, no, no.  That kind of confirms my

15 understanding of what you were saying here.

16         THE WITNESS:  Okay.

17         THE COURT:  Go ahead.

18         MR. WINFIELD:  May I approach, your Honor?

19         THE COURT:  Go ahead.

20     (Pause.)

21         MR. WINFIELD:  And I'd like to move Exhibit S into

22 evidence, her declaration.

23         THE COURT:  All right.  Hold on a second.  I need

24 to find the right page.  Let's see.  So, that's admitted.

25         And then you passed up an Exhibit P marked for

159

1  identification.  And this is also -- I assume this is a

2  rebuttal --

3          MR. WINFIELD:  This -- we're all --

4          THE COURT:  -- impeachment.

5          MR. WINFIELD:  -- rebuttal, yes.

6          THE COURT:  Okay.  Go ahead.

7  BY MR. WINFIELD:

8  Q    Nicole, would you please look at the first page of this

9  exhibit.  Is this an email from you to your mother?

10 A    Yes.

11 Q    And do you see in the subject line an attachment says

12 page 1715, Todd's INE, PDF?

13 A    Yes.

14 Q    Did you send this to your mother?

15 A    Yes.

16 Q    And did you send this to her to provide assurance to

17 her that she was going to be taken care of in the midst of

18 all the legal filings that were going on?

19 A    I forwarded everything to her, as I said earlier.  I

20 don't --

21 Q    Okay.  And would you turn to page -- so, this is Todd's

22 income and expense declaration.  Would you turn to

23 attachment 11.  So, that should be the -- 11, that is the

24 fourth -- the fifth page in.

25          MS. MONTGOMERY:  Your Honor, I would object to

160

1  this exhibit.  It lacks foundation.  It's clear that Ms.

2  Griffin did not prepare this document, and she's already

3  said that it's simply Todd's I and E that she forwarded it,

4  nothing more.

5          THE WITNESS:  I also -- this isn't a court stamped

6  copy.  So, I don't know if this is --

7          THE COURT:  Okay.  Okay.  Okay.  Well, it seems to

8  me that it's -- she's -- she's provided foundation that she

9  forwarded this document to her mother.  Okay.  So, the fact

10 of that is -- seems -- seems -- seems to be established.

11         If the -- if the follow-on questions are going to

12 be about the substance of the document, then, yeah, I don't

13 -- I think the document itself -- you know, the fact of its

14 filing is probably difficult to refute, although it's not a

15 file stamped copy.  I should say the fact that it's

16 forwarding.  But if the questions are going to be about the

17 substance, I guess you can use it to -- I think there's

18 enough foundation to use it potentially as the basis of a

19 question because she sent it to her mom.  But if the issues

20 relate to the truth of the matter asserted in here, I think

21 it's both hearsay and -- and lacks foundation.  Okay.

22         So, that's sort of a preliminary ruling to guide

23 your -- guide your questioning, and hopefully that helps.

24         MR. WINFIELD:  That does, your Honor.

25 //

161

1  BY MR. WINFIELD:

2  Q    On page one -- I'm sorry.  On page two, do you

3  recognize that as your ex-husband's signature?

4  A    Yes.

5  Q    Okay.  And then going back to that attachment 11, do

6  you see where it says 565 Bayview Drive, Belair?

7  A    Yes.

8  Q    Does -- is this description of the approximate value --

9  take a minute and look at that.  Is this consistent with

10 your understanding of the facts at the time?

11         MS. MONTGOMERY:  Objection, your Honor.  Lack of

12 foundation.  We don't know who prepared this.  We don't know

13 whether she had any information.

14         MR. WINFIELD:  She --

15         THE COURT:  All he's asking is is does she agree

16 with it, not is it true, not is the -- not -- not -- he's

17 not asking her about the -- the preparation of the document.

18 He's using it as a basis to ask do you agree with that

19 number or do you agree with those numbers.  She either does

20 or doesn't or doesn't have an opinion.  I don't know.

21         I'm going to overrule the objection.

22         THE WITNESS:  Could you ask the question again?

23 BY MR. WINFIELD:

24 Q    Okay.  So, you see the -- that little section in the

25 middle of that page where it's for 565 Bayview?

162

1  A     Yes.

2  Q     Are these number consistent with what your

3  understanding was in approximately 2015 as to the numbers

4  related to Bayview?

5  A     I don't think so based on what you showed me before.

6  Q     Okay.

7  A     But I don't recall.  Based on what you showed me as S,

8  I don't think so.

9         THE COURT:  This is not -- it's clear, this is not

10 -- nobody has suggested this is a document you prepared.

11 It's a document that -- that you forwarded your mom that

12 purports to be something that your ex-husband prepared for

13 the divorce.  And, so, the only question is, you know, is

14 this consistent with how you valued the property at the

15 time, and I think it's either a yes or a no or a I don't

16 know what I thought at the time.  I don't want to tell you

17 what to answer.

18        THE WITNESS:  I don't know what I thought at the

19 time.

20        THE COURT:  Okay.

21 BY MR. WINFIELD:

22 Q     Okay.  Nicole, do you see where it says "Amount paid

23 by/owed to Respondent mother Jasmin, and it says $553,330"?

24        THE COURT:  I'm sorry.  What page are you looking

25 at now?

163

1       MR. WINFIELD:  The same page, the middle of

2  attachment three.

3       THE COURT:  The middle of --

4       MR. WINFIELD:  Attachment 11.

5       THE COURT:  11.  Hold on.  I lost the page.  My

6  bad.  Okay.  Go ahead.  So, what's your question?

7       MR. WINFIELD:  I just wanted to draw her attention

8  to that part.

9  BY MR. WINFIELD:

10  Q    Do you have an understanding -- do you see where it

11  says $553,330?

12  A    Yes.

13  Q    Do you have an understanding of why that number is

14  different than the 595 number that appeared in your

15  declaration?

16  A    No, I don't.

17       MS. MONTGOMERY:  Your Honor, I'm going to object.

18  I don't understand how this is rebuttal.  This document

19  wasn't produced in discovery.  It's not a document that's

20  been marked as an exhibit, and there's nothing here in terms

21  of rebuttal.

22       THE COURT:  Well, he hasn't moved to admit it yet.

23       MS. MONTGOMERY:  It's certainly well beyond the

24  direct examination.

25  //

*Echo Reporting, Inc.*

1  BY MR. WINFIELD:

2  Q    Isn't it true that --

3           THE COURT:  Stop.  Are you going to move to admit

4  it?

5           MR. WINFIELD:  Yes.

6           THE COURT:  Okay.  Objection sustained.

7           MR. WINFIELD:  Okay.

8           THE COURT:  I'm not going to let you admit it.

9  And I -- you know, in the nature of a -- you know --

10          MR. WINFIELD:  That's fine.

11          THE COURT:  -- again, you establish -- you

12 establish that it's a document that was forwarded, but the

13 document itself, there's no foundation for it other than it

14 seems to bear -- I guess you established that it bears Mr.

15 Goldman's signature, but it doesn't -- I'm not -- I'm not

16 comfortable admitting it as an exhibit.  Mr. Goldman had a

17 different opinion as to value than Ms. Ismail did -- I mean

18 than Ms. Griffin did.  See, I made the same mistake.

19          MR. WINFIELD:  Yeah.  So --

20          THE COURT:  I don't know.  I just don't think

21 it's --

22 BY MR. WINFIELD:

23 Q   So, Nicole, do you think that Mr. Goldman believed that

24 less money was owed to your mother than --

25          MS. MONTGOMERY:  Objection.  Speculation.

165

1 BY MR. WINFIELD:

2 Q    -- you believed?

3        THE COURT:  I'm going to sustain the objection.  I

4 mean, well, hold on.  Let's think about that for a second.

5 I mean, we don't have a file stamp copy, but we do have a

6 signature on it.  So, you can --

7        MS. MONTGOMERY:  He's asking what Mr. Goldman's --

8        THE COURT:  Yeah.  I mean, the document speaks for

9 itself.  I don't think she has any way of knowing what's in

10 his mind.  I mean, it seems that he -- it appears that he

11 signed the document taking a different position on the

12 value.  I don't know how that's probative to an issue in

13 this case.

14        MR. WINFIELD:  I'm not --

15        THE COURT:  He's not an expert.  He took a

16 different --

17        MR. WINFIELD:  I'm not asking as to the value.

18 I'm asking as to the line about debt to -- to Jasmin.  But

19 that's okay.  We can handle this a different way.

20        THE COURT:  Okay.  Well, then, yeah, there's

21 probably a better way to deal with it.  I mean, you know,

22 this is a -- this is an out-of-court statement by Mr.

23 Goldman.

24        MR. WINFIELD:  Um-hmm.

25        THE COURT:  So, to that -- yeah, I just don't -- I

166

1  don't -- what's the -- what's the hearsay exception?  I

2  mean, you're trying to argue that Mr. Goldman in a piece of

3  paper said that there was a debt to Ms. Ismail, but Mr.

4  Goldman's not here testifying to that, and I -- I don't know

5  of a relevant hearsay exception.

6          MR. WINFIELD:  We can get back to that.

7          THE COURT:  Or -- all right.

8      (Pause.)

9  BY MR. WINFIELD:

10  Q    Nicole, you testified that at various times you

11  received money from Jasmin in various forms, correct?

12  A    Yes.

13  Q    And one of those forms was cashier's checks?

14          MS. MONTGOMERY:  Objection.  She never testified

15  to that.

16          THE WITNESS:  I didn't testify to that.

17          MS. MONTGOMERY:  Misstates her testimony.

18          THE COURT:  I'm going to sustain the objection,

19  unless -- I mean, we're at a disadvantage.  We don't -- we

20  don't have a transcript of today's proceedings or -- or

21  realtime, but you can -- if you think you heard differently,

22  you can --

23          MR. WINFIELD:  I'll rephrase it.

24          THE COURT:  Rephrase it, yeah.  Just for -- for

25  what it's worth, I don't remember anything about cashier's

167

1  checks either.

2  BY MR. WINFIELD:

3  Q    So, Nicole, did you receive any money from your mother

4  in the form of checks?

5  A    Yes.

6  Q    And did you ever receive cashier's checks from your

7  mother?

8  A    I don't recall.

9  Q    Did you ever receive cashier's checks to pay for car

10 payments?

11 A    I think those were her credit card.  I don't recall.

12      (Pause.)

13           THE COURT:  Yes, you may approach.

14           Thank you, Madam Deputy.  What do we have here?

15 This is marked R for identification.

16 BY MR. WINFIELD:

17 Q    Nicole, could you look at Exhibit R?

18 A    Yes.

19 Q    Are these copies of checks you received from your

20 mother?

21 A    I don't remember.

22 Q    Or I should say money orders?

23           MS. MONTGOMERY:  I'm going to object.  It appears

24 that -- are they separate?  I guess they have --

25           THE COURT:  They have different serial number on

*Echo Reporting, Inc.*

168

1  them, 225 and 226.  So, they appear to be separate money

2  orders.

3  BY MR. WINFIELD:

4  Q    Isn't it true that these are payments for your car

5  payment?

6  A    I don't know as I sit here, but they could be.  I said

7  that she paid for my car payments.  These say they were

8  purchased by N. Ismail, though.

9          MR. WINFIELD:  May I approach, your Honor?

10         THE COURT:  Yes.  Thank you.

11         All right.  So, I've received something called --

12  marked Q for identification.  Q comes after P, right?

13         THE WITNESS:  No -- yes.  Sorry.

14         MR. WINFIELD:  Yes.

15         THE COURT:  All right.

16  BY MR. WINFIELD:

17  Q    Nicole, is Exhibit Q, is this an email that you sent to

18  -- Nicole, is this an email that you sent to your mother,

19  Jasmin?

20         MS. MONTGOMERY:  Objection.  What portion of this

21  are we speaking of?

22  BY MR. WINFIELD:

23  Q    Okay.  Well, do you see in the middle where it says on

24  Friday, September 18th, 2015?

25  A    Yes.  At the top?  Yes.  I see September 18th, 2015

169

1  twice.

2  Q    Okay.

3  A    Or three times.

4  Q    So that the -- the bottom half of this, is this

5  something that you wrote to your mother?

6  A    I believe so, yes.

7  Q    And can you read number five?

8  A    Yes.  It says:

9            "I'll get the car payoff/payment

10           info, and we can sort that out.  I'll

11           start a spreadsheet for the cashier's

12           checks to keep track just in case."

13           MR. WINFIELD:  Your Honor, I'd like to move

14  Exhibits Q and R into evidence.

15           THE COURT:  Ms. Montgomery?

16           MS. MONTGOMERY:  I'm going to object, your Honor.

17  I don't see where these are rebuttal exhibits.  They weren't

18  produced.  They weren't marked as exhibits.  I'm looking at

19  R, and the fact that my client testified that her mother has

20  made car payments, there's nothing in rebuttal about this.

21           THE COURT:  All right.  Well --

22           MR. WINFIELD:  Your Honor, I can wait and call her

23  as part of --

24           THE COURT:  Yeah.  I mean, there's no --

25           MR. WINFIELD:  -- case in chief, but I thought

*Echo Reporting, Inc.*

170

1 that she wanted to try and get as much done today as

2 possible so that --

3           THE COURT:  I understand.

4           MR. WINFIELD:  -- her client didn't want to come

5 another day.

6           THE COURT:  Well, I didn't hear any foundation as

7 to R.  I mean, she disavowed it.  She said she didn't recall

8 seeing it.  So, that's an issue.

9           With respect to Q, I think it's -- it 's being

10 suggested that the language in here creates an inference as

11 to the arrangement.  I don't know how probative it is, but

12 it's -- you know, the -- I don't want to make Mr. Winfield's

13 argument for him, but I -- I sort of get -- I kind of get

14 what hie's trying to do.  I don't know that I'm -- I'm

15 bowled over by it, but that's not the standard.

16           The testimony earlier was that Ms. Griffin had no

17 agreement for, you know, repayment of any of the amounts --

18 with some exceptions, of any of the amounts that her mother

19 sent to her.

20           I think, Mr. Winfield, you're trying to create the

21 inference that this language suggests that, and I -- I don't

22 think it's particularly persuasive, but I don't think that

23 that's a bar to admission of it.  And I understand the

24 purpose -- the intended purpose of the exhibit.

25           MR. WINFIELD:  Yeah.  Let me ask a couple --

171

1          THE COURT:  I mean, yeah.

2          MR. WINFIELD:  -- a couple more questions, and I

3   think we'll be done with this.

4          THE COURT:  Yeah, why don't you ask a couple more

5   questions.

6   BY MR. WINFIELD:

7   Q    Nicole, was your car loan with Wells Fargo Dealer

8   Services?

9   A    Yes.  We're back on R, correct?

10         THE COURT:  I don't know.

11  BY MR. WINFIELD:

12  Q    Yes.

13         THE COURT:  It was just a question.  It wasn't in

14  reference to an exhibit.

15  BY MR. WINFIELD:

16  Q    And you don't have any reason to believe that those

17  payments in Exhibit R were not for your car payment?

18  A    No.  You asked me if I received them, and I said I

19  didn't recall.

20  Q    Do you recall receiving money to pay your car payment?

21  A    Yes.  I don't know if it was paid directly to me,

22  though, or if she paid directly to Wells Fargo.

23  Q    Okay.

24  A    That's where I'm not clear.

25  Q    So, did you request that your mother make the car

*Echo Reporting, Inc.*

172

1  payments directly to Wells Fargo?

2  A    Directly to Wells Fargo?

3  Q    To Wells Fargo Dealer Services, yes.

4  A    I don't know if I asked her to pay directly to Wells

5  Fargo or to me and then I paid it.  I don't recall.

6  Q    Isn't it true that on some -- in some instances, your

7  mother paid directly -- your bills directly, including the

8  car payment?

9  A    I --

10         MS. MONTGOMERY:  Objection.  That goes beyond --

11  that goes beyond the direct, and Ms. -- and Ms. Griffin

12  previously testified and you presented in your -- yourself

13  in your declarations that Todd Goldman was ordered to make

14  the car payments, and she's testified earlier that the --

15  that Todd failed to make the payments and her mother made

16  the payments in lieu.

17         THE COURT:  Right.

18         MS. MONTGOMERY:  So, I don't understand how this

19  is any kind of rebuttal or consistent with the testimony she

20  gave.

21         THE COURT:  It's overruled.  She testified that

22  her mom paid for stuff from time to time.  This is testimony

23  intended to suss out how exactly those payments were made.

24  It's well within the scope of the direct.  It's very much

25  overruled.

*Echo Reporting, Inc.*

173

1          Go ahead, Mr. Winfield.

2 BY MR. WINFIELD:

3 Q    And, Nicole, isn't it true that you were creating a --

4 a list of things that your mother had been paid -- paying

5 for you by -- by check and cashier's check?

6 A    No.  I created a spreadsheet of the things that my ex

7 was supposed to be paying but he did.  I kept track of how

8 it was eventually paid.

9 Q    And, so, why was it called cashier's checks?

10 A    What?

11 Q    A list of cashier's -- you said you were making a list

12 of cashier's checks.

13 A    I don't know.  I don't know.

14          MR. WINFIELD:  Okay.  Your Honor, I'd move Exhibit

15 R and Q into evidence.

16          THE COURT:  Okay.  At this point I'm not admitting

17 R.  There's still not enough evidence to -- foundational

18 evidence to authenticate it.  Every question you asked she

19 wasn't sure.  She didn't know.  That's not -- that's not

20 establishing a foundation.  You know, that's not

21 establishing them as authentic.  So, you can try to do that

22 with some other witness who has seen these.  But this

23 witness has never seen these or she doesn't remember seeing

24 them.  And the circumstantial evidence wasn't enough to

25 connect the dots for me.

1          On Q, Q's in.  And, I mean, it's not terribly

2   persuasive.  It just says she was creating a spreadsheet.

3   So far, she says the spreadsheet had to do with keeping

4   track of stuff that her husband was supposed to pay.  So, I

5   don't think -- I don't think it -- I don't -- I'm just --

6   this is commentary.  It doesn't persuade me that that's

7   evidence -- at least taken by itself that that's evidence

8   that there was a loan, in contradiction to her prior

9   testimony, a loan from her mom.  But that fact does not --

10  is not enough to keep it out.  It was offered in rebuttal

11  and impeachment.  I understand the spirit in which it was

12  offered.  And that's the spirit in which it's being

13  admitted, even though I don't find it terribly persuasive.

14         So, Q is in.  R is out for now.  But that's

15  subject to revisiting.

16         THE WITNESS:  If they're not admitted, did you

17  want me to put it somewhere else or just --

18         THE COURT:  No.  Just leave it up there.  It's

19  fine.  You don't need to do anything.

20     (Pause.)

21         MR. WINFIELD:  Your Honor, I'd like to approach

22  with another exhibit.

23         THE COURT:  Okay.  Go ahead.  Which one is this?

24         MR. WINFIELD:  This will be Exhibit T.

25         THE COURT:  All right.  Mr. Winfield says Exhibit

175

1 T.

2 BY MR. WINFIELD:

3 Q    Nicole, do you recall that Mr. Goldman filed bankruptcy

4 more than once, correct?

5 A    Yes.

6 Q    And isn't it true that you and you mother joined him

7 seeking a dismissal of his first bankruptcy?

8 A    Yes.

9 Q    And it would be true to -- and isn't it true that you

10 filed a declaration in support of a motion to dismiss?

11 A    Yes, I'm sure I did.

12 Q    Can you turn to page 39.  Do you recognize your

13 signature on page 39?

14 A    Yes.

15 Q    And, so, if you'd look at paragraph 27, starting on --

16 on page 38.  And you said:

17              "I'm informed and believe the

18         following creditors listed on the

19         Debtor's bankruptcy schedules are

20         connection to the dissolution

21         proceedings and Debtor's litigation

22         against my family."

23         Do you recall making this declaration?

24 A    Yes.

25 Q    And do you see where you've gone through and you've

*Echo Reporting, Inc.*

176

1  listed a number of debts that are listed in the Debtor's

2  schedules?  Do you see that?

3  A    Yes.

4  Q    And then if you go on the next page where it says:

5             "My priority domestic dispute

6             obligation is inaccurately scheduled in

7             the amount of $22,000."

8  A    Yes.

9  Q    So, with respect to that one item, you felt a need to

10 correct it?  Yes?

11 A    I -- I don't -- hold on.  Can I read the full thing?

12 Q    Yes.  Yes, please do.

13 A    The full sentence.

14            THE COURT:  I'm sorry.  What paragraph are you on

15 again?

16            MR. WINFIELD:  The last paragraph, paragraph 27.

17            THE COURT:  Thanks.

18 BY MR. WINFIELD:

19 Q    Why don't you just read out loud the last three

20 sentences, beginning with "My priority".

21 A    Okay.

22            "My priority domestic support

23            obligation is inaccurately scheduled in

24            the amount of $22,000.  The correct

25            amount of unpaid spousal support as of

177

1            the petition date exclusive of

2            attorneys' fees, totals $115,746.60."

3  Q    Okay.  Keep reading.

4  A    Okay.

5                "Ron Brott, my prior counsel, is

6            scheduled with a claim in the amount of

7            $65,000.  Jasmin Ismail, my mother, is

8            scheduled as a creditor with a $100,000

9            claim."

10 Q    Okay.  So, isn't it true that you felt a need to

11 correct the amount of unpaid spousal support because that

12 was inaccurately scheduled?

13 A    I don't recall what -- I don't recall if that was

14 something that I remedied or if there was an error or the

15 bankruptcy attorneys remedied because they didn't know -- I

16 don't recall, but it says that it's corrected.

17 Q    And but isn't it true you made no such correction with

18 the $100,000 scheduled debt to your mother, Jasmin?

19 A    I don't understand the question.

20 Q    Okay.  The last sentence says:

21                "Jasmin Ismail, my mother, is

22            scheduled as a creditor for a $100,000

23            claim."

24 A    Right.

25 Q    And it's also true that you didn't contest that or seek

*Echo Reporting, Inc.*

178

1  to correct it?

2          MS. MONTGOMERY:  Objection that that's her

3  statement.

4          THE WITNESS:  She -- she filed a claim --

5          THE COURT:  Stop.  Stop.  There was an objection.

6          THE WITNESS:  Oh, I'm sorry.

7          THE COURT:  And it was your lawyer that objected.

8  So, okay.  I couldn't hear the objection.

9          Go ahead, Ms. Montgomery.

10          MS. MONTGOMERY:  I objected that this is simply a

11  factual statement and he's trying to claim that my client

12  had some obligation or otherwise to make --

13          THE COURT:  Yeah, yeah.  Save it for argument.

14  Overruled.

15          Go ahead.  Ask the question.

16  BY MR. WINFIELD:

17  Q   So, the question was you didn't feel need a need to

18  correct that factual statement as to the $100,000 claim, did

19  you?

20  A   The claim that she filed in that bankruptcy was

21  $100,000, and I believe --

22  Q   Okay.

23  A   -- that you said that she and filed this -- this

24  document jointly.  So, she would have been privy to my

25  declaration.

179

1 Q    Thank you.  This has to do with scheduled claims.  But

2 okay.

3 A    Sorry.

4          MR. WINFIELD:  Your Honor, I'd move Exhibit T into

5 evidence.

6          MS. MONTGOMERY:  Objection, your Honor.  This is

7 not a rebuttal exhibit.

8          THE COURT:  It's being -- it -- yeah, it is to the

9 extent that it's being used to suggest -- and, again, this

10 is a -- I think of only limited persuasive value that she

11 made a statement to the Court correcting her own claim but

12 did not correct her mother's claim, which she now disputes

13 was an outstanding debt obligation.

14          MS. MONTGOMERY:  She hasn't -- she didn't object

15 and say that it was outstanding debt.

16          THE COURT:  She just said it was scheduled.  I'm

17 not -- again, I say it's of limited probative value, but for

18 purposes of admission, the objection's overruled, and the

19 exhibit's admitted.  I agree with you.  She just states

20 fact, which is that it was scheduled, and I -- I understand

21 what Mr. Winfield was trying to do, and I don't think he

22 scored any points, but I'm not going to exclude it.

23          MS. MONTGOMERY:  I thought the testimony was that

24 the $100,000 that was owed to Jasmin was, in fact, assigned

25 to Todd Goldman, which would be compatible with this

*Echo Reporting, Inc.*

180

1 statement.

2　　　　THE COURT:  You get to redirect.  You get to

3 argue.  It was just a question of admission, and we -- we've

4 already spent way too much time quibbling over admitting

5 exhibits that probably won't amount to a hill of beans.  So,

6 let's just keep moving, try to focus on what's important.

7 BY MR. WINFIELD:

8 Q    Nicole, isn't it true that you were in attendance at a

9 family law hearing on July 6, 2016?

10 A    Yes.

11　　　　MS. MONTGOMERY:  January?  Excuse me?

12　　　　MR. WINFIELD:  July 6, 2016.

13　　　　THE WITNESS:  Yes.

14 BY MR. WINFIELD:

15 Q    And at that hearing, did you hear the judge order Todd

16 Goldman to pay $46,000 forthwith to Ron Brott?

17 A    I know the judge made attorneys' fees orders, and they

18 were divided into two or three.  Some were for particular

19 things, and I don't remember what was to be paid forthwith

20 and what was to be paid upon the sale.  So, yes, there was

21 an amount to be paid forthwith I believe.

22 Q    So, at that hearing, didn't the Court also award

23 another $75,000 to be paid to Ron Brott for your attorneys'

24 fees?

25 A    Yeah.  That was probably the other -- how I said it was

*Echo Reporting, Inc.*

181

1  divided.  They allocated part of it for one thing, part of

2  it for another.

3  Q    And isn't it true that the Court ordered a sale of the

4  Palmetto Road property in order to pay the $46,000 that Todd

5  owed to you?

6  A    The Palmetto Road house was ordered to be sold.

7           THE COURT:  I'm sorry.  That was owed to her?  I

8  thought you just -- your lead-in questions were all about

9  what was owed to the attorney.  So, I'm lost.

10          MR. WINFIELD:  You're correct, your Honor.

11          THE COURT:  Okay.

12          MR. WINFIELD:  Seventy-five thousand was owed to

13  Ron Brott.

14          THE COURT:  I actually am listing.  Okay.

15          MR. WINFIELD:  I appreciate it, your Honor

16 BY MR. WINFIELD:

17 Q    And at that hearing, did the judge order the -- the

18 sale of the Bayview property?

19 A    The Court ordered that in the event of the sale of the

20 Bayview property that Todd's 25 percent would go to one of

21 those chunks of attorneys' fees and toward the child support

22 that he wasn't paying.  And the same thing with the

23 Palmetto, because some of it was supposed to go to child

24 support that he wasn't paying.

25          (Pause.)

182

1          MR. WINFIELD:  Your Honor, I'm going to circle

2   back to that.  I've been trying to go in chronological

3   order, but I'd like to return to that, and I think it will

4   be more clear.

5          Your Honor, may I approach?

6          THE COURT:  You may.

7     (Pause.)

8   BY MR. WINFIELD:

9   Q    Nicole, I'm showing you a document that's been marked

10  for identification as Exhibit W.  Is this a document you've

11  seen before?

12  A    Yes, I believe so.

13  Q    Is this a request for an order bifurcating the

14  marriage?

15  A    Yes.

16  Q    And on the lefthand corner, does it not indicate that

17  Laura Whitfield is the attorney for Nicole Goldman?

18  A    Yes.

19  Q    So, at the time, she was your attorney?

20  A    Yes.

21  Q    And was that bifurcation, was a hearing held on

22  November 23rd, 2016?

23  A    No, and this doesn't appear to be a complete copy.

24  There's -- there's a handwritten note in here, and it's not

25  -- it's not like from my declaration.  It's just

183

1  handwritten, says it's page three, but it's not on pleading

2  paper.

3  Q    Yeah, so --

4  A    Or --

5  Q    So, if you're referring to your declaration, there's

6  page three of the declaration --

7  A    This wasn't what was filed in court.

8          THE COURT:  I'm sorry.  You can't talk over each

9  other.  Otherwise we -- we can't understand either of you.

10         THE WITNESS:  I apologize.

11         THE COURT:  Okay.  Go ahead, Mr. Winfield.  Ask

12  your question.

13  BY MR. WINFIELD:

14  Q    Did you sign a declaration in support of this motion?

15  A    To bifurcate the marriage?

16  Q    Yes.

17  A    Yes.

18  Q    And it appears that on page three -- it's not on

19  pleading paper, but the numbers -- the paragraph numbers

20  carry on, but it isn't on pleading paper, correct?

21  A    Correct.

22  Q    That's what you were pointing out.

23  A    At the top it says -- it's got somebody else's writing.

24  It says this is page three of Nicole's declaration, which is

25  missing when I got a copy of the whole filing, I copied this

184

1  from a screenshot I had.

2  Q    Okay.  So, this wasn't -- clearly isn't -- that

3  parenthetical clearly is not something that you wrote?

4  A    Correct.  And then there's edits in here as well.

5  Q    Okay.  And then --

6        THE CLERK:  I'm sorry to interrupt, Judge.  May I

7  ask of each of them if they'll move their mic in front of

8  them.

9        THE COURT:  Or move themself in front of the mic,

10 yes.

11       MR. WINFIELD:  I'll move myself in front of the

12 mic.

13       THE COURT:  Everyone.

14       MR. WINFIELD:  Thank you for the reminder.

15       THE COURT:  Thanks.

16 BY MR. WINFIELD:

17 Q    Nicole, do you recognize the handwriting on top of that

18 -- page three?

19 A    Yes.

20 Q    And whose writing is that?

21 A    Ms. Ismail's.

22       MS. MONTGOMERY:  Who is it?

23       THE WITNESS:  Jasmin's handwriting.

24 //

25 //

185

1  BY MR. WINFIELD:

2  Q     And if you'll look at the end, is this a -- did you

3  ultimately sign this declaration?  At the end it says via

4  electronic signature.

5          MS. MONTGOMERY:  I'm going to object.  There's

6  nothing on page three that even indicates that this is an

7  accurate copy of the -- of the declaration.  There's no

8  filing --

9          THE COURT:  Yeah.  I understand that.  He hasn't

10 moved to admit it yet.  Okay.  Let him ask his questions.

11 Let him try to move, and then make your argument.

12         Go ahead, Mr. Winfield.

13 BY MR. WINFIELD:

14 Q     Did you ultimately end up signing the declaration in

15 support of this motion?

16 A     I ultimately ended up signing a declaration in support

17 of the motion to bifurcate.  I don't know if it was this

18 declaration.  And that's not my handwriting on the via

19 electronic signature.

20 Q     Okay.

21 A     So, I don't know that it was this, and it certainly

22 wasn't the page three.

23 Q     Okay.

24 A     But I did file a motion to bifurcate the marriage.

25         THE COURT:  I understand.  I got that part.

186

1          THE WITNESS:  Okay.

2      (Pause.)

3  BY MR. WINFIELD:

4  Q    Is it true that one of the reasons that you sought to

5  bifurcate the marriage was so that you could proceed with a

6  judicial sale of the Bayview property?

7  A    I think that was -- can I read the separation?

8  Q    Yes, you may.

9      (Pause.)

10  A    Yes, that was part of the reason.  I also remarried.

11     (Pause.)

12          MR. WINFIELD:  Let me go back to what we were

13  asking about like the July 6th of 2016 hearing.

14          May I approach, your Honor?

15          THE COURT:  Yes.

16     (Pause.)

17          THE COURT:  So, I have a document marked as

18  Exhibit AA.

19  BY MR. WINFIELD:

20  Q    Nicole, did you -- isn't it true that Keith Grumer was

21  an attorney that was added to -- in order to collect the

22  attorneys' fees that Todd Goldman was ordered to pay?

23          MS. MONTGOMERY:  Objection, your Honor.  Again,

24  this is beyond the scope of the direct, and her testimony

25  was that Keith Grumer was an attorney for Brott and Gross.

187

1        THE COURT:  Okay.  Why don't you rephrase your

2 question.

3        MR. WINFIELD:  Okay.

4        THE COURT:  Sustained.

5 BY MR. WINFIELD:

6 Q    Nicole, isn't it true that -- that Keith Grumer was an

7 attorney hired to collect the judgment owed to -- to other

8 attorneys?

9 A    Yes.  He was hired by Brott and Gross.

10 Q    Okay.

11 A    I think it was enforcement.  So I guess is that the

12 same thing?  To --

13        THE COURT:  Just -- don't guess.  Testify to what

14 you know.

15 BY MR. WINFIELD:

16 Q    So, you see this -- this document here, Exhibit AA.

17 Have you seen this document before?

18 A    Which page?  I'm sorry.

19 Q    Look at page -- well, on page one, it says Nicole

20 Goldman, Plaintiff, versus Todd Goldman, Defendant, correct?

21 A    Yes.

22        THE COURT:  He's asking you whether you recognize

23 the entire document.  So, take a -- take your time, and look

24 at the entire document.

25        (Pause.)

188

1          THE WITNESS:  I recognize parts of it.  There's

2  several different documents in here.

3  BY MR. WINFIELD:

4  Q    It has a lot of attachments.  So, let's take it piece

5  by piece.  Do you see that on page one, it says:

6               "Plaintiff/Judgment Creditor Nicole

7               Goldman, through undersigned counsel,

8               and pursuant to the terms and orders of

9               this Court's order"?

10     Do you see that part?

11 A    Yes, yes.

12 Q    And, so, was an undersigned counsel Keith Grumer?

13 A    Yes.

14 Q    So, in fact, wasn't Keith Grumer your attorney as the

15 judgment creditor?

16 A    No.

17 Q    Okay.  So, let's look at the next page here where it

18 says order canceling the sale.  Is this an order canceling

19 the judicial sale of the Bayview property?

20 A    Yes.

21 Q    Okay.  Let's look at the next document.  This is

22 Exhibit B to the same document.  And you see in the top

23 lefthand corner, it says Laura Whitfield?

24 A    Yes.

25 Q    And you see where it says "Attorney for Nicole

189

1  Goldman"?

2  A    Yes.

3  Q    And is this a notice of entry of judgment on your

4  bifurcation?

5  A    Of the marital status, yes.

6  Q    For the purpose of obtaining the bifurcation, was Laura

7  Whitfield your attorney?

8  A    Yes.

9  Q    And if you'd turn to the next document attached there.

10 Do you see a minute order from the Superior Court of Los

11 Angeles?

12 A    The next one is a judgment.

13 Q    Yeah, you're right.  So, this -- so, the judgment also

14 says that Laura Whitfield is your attorney, correct?

15 A    It's the same bifurcation.  It's just a -- it's the

16 same.  Yes, it's for the same thing.  It's filed the same

17 date.  It's part of the same.  One's an FL-190.  One's an

18 FL-180.

19 Q    And turn to the next document.  Is this a minute order

20 from the Superior Court of Los Angeles?

21 A    Yes.

22 Q    And does this show that the marriage is bifurcated?

23 A    Yes.

24 Q    So --

25          MS. MONTGOMERY:  I believe this is marital status

*Echo Reporting, Inc.*

190

1  is bifurcated.

2  BY MR. WINFIELD:

3  Q    Marital status is bifurcated?

4  A    Yes.

5  Q    And, so, the date of this document is February 16,

6  2017?

7  A    Yes -- or '17.  Sorry.  What did you say?

8  Q    That's what I intended to say is --

9  A    Yeah.

10 Q    I don't know what I said, but February 16, 2017, and

11 then in the first paragraph it says filed January 1, 2017.

12 So, did -- did Laura Whitfield refile the bifurcation again

13 on January 17th, 2017?

14 A    It doesn't say anything was filed on January 17th.

15 Q    Okay.  Okay.  And then look at the next document.  Is

16 the next document an affidavit to domesticate and enforce a

17 foreign judgment?

18 A    Yes.

19 Q    And do you see where it says:

20          "Before me, the undersigned

21       authority personally appeared Keith

22       Grumer on behalf of Plaintiff Nicole

23       Goldman"?

24 A    Yes.

25 Q    Does this refresh your recollection that Keith Grumer

*Echo Reporting, Inc.*

1   was your attorney in this matter?

2   A    Mr. Grumer was never my attorney.  The attorneys' fees

3   orders were made to my benefit, and in family law, since --

4   Q    Thank you.

5   A    -- I'm the beneficiary --

6          THE COURT:  Your lawyer can tease that out on

7   redirect.

8   BY MR. WINFIELD:

9   Q    And then look at the next document.  Is the next

10  document an abstract of judgment?

11  A    Yes.

12  Q    So, and you'll see in the lower left-hand corner

13  there's a stamp that says "abstract issued October 9th,

14  2015"?

15  A    Where?

16  Q    At the very bottom left-hand corner, do you see a stamp

17  there and a date October 9th, 2015?

18  A    No.  Maybe I'm on the wrong page.

19  Q    Well, that's okay.  It comes with -- let me break this

20  down.  So, the first document here says abstract of judgment

21  recorded 11/20/15, and there's a file stamp of the Superior

22  Court.  It's just like a cover page.

23  A    Yes.

24  Q    Okay.  And then the next one here is another cover

25  page, and this one has a barcode up there which I -- which

1  -- which may well be the recording stamp.  Do you see that?

2  A    I see that.  I don't know what it is, though.

3  Q    Okay.  And then the -- and then the next page after

4  that is the actual abstract of judgment.  Do you see that?

5  A    Yes.

6  Q    And on this one, number three indicates that the

7  judgment creditor is Brott and Gross, is that correct, in

8  the middle of the page?

9  A    Yes.

10  Q    Okay.  And then what I'd like to do is go to the next

11  document after that.  Is this an order from the July 6th,

12  2016 hearing?

13  A    How many pages forward did you just go?

14  Q    Three pages.

15  A    There's another abstract of judgment copy in here.

16  Q    True.  So, go after that one.

17  A    Okay.  So, both copies, go past those abstract of

18  judgments?

19  Q    Yeah.  And then you see a document entitled -- it's

20  "Order After Hearing on Petitioner's Request"?

21  A    Yes.

22  Q    Is this the order from the July 6, 2016 hearing?

23  A    I believe so, yes.  Let me --

24  Q    Now, isn't it true that at this time, the Court did not

25  order the sale of Bayview?

1 A    The Court ordered that in the event that Bayview was

2 sold, that Mr. Goldman's 25 percent was to go to pay the

3 attorneys' fees and the child support, and the Court

4 instructed Mr. Brott at the time of hearing that it was an

5 enforceable order if he went and pursued it in Florida,

6 which is what he did with Mr. Grumer.

7 Q    Isn't it true that the -- at the same time, the Court

8 said that she could -- that the Court couldn't order the

9 sale of Bayview because it was not joint?

10 A    No.  The Court said that they couldn't order the sale

11 because Ms. Ismail wasn't joined.  And, even though she

12 submitted an affidavit saying that she, like me at the time,

13 wanted the house sold, since she wasn't a joint party at

14 that time, that's why they couldn't.

15 Q    Okay.  Now, let's look at the next document.  Do you

16 see the document says "Affidavit to Domesticate and Enforce

17 Foreign Proceeding"?

18 A    Yes.

19 Q    And do you see where it says "Keith Grumer on behalf of

20 Plaintiff Nicole Goldman"?

21 A    Yes.

22 Q    And in paragraph two, it says:

23           "On September 13th, 2016, Plaintiff

24           Nicole Goldman obtained a judgment in

25           the amount of $121,000 in a favor

194

1          against Todd Goldman"?

2   A    Yes.

3   Q    So, was Keith Grumer representing you and is he your

4   attorney here, as he said?

5   A    No.  I was the beneficiary, as he said, of these court

6   orders.  And since I'm on the hook for attorneys' fees --

7   Family Court I think is 43/20 for need based fees -- it's

8   made to my benefit because I need the fees to be paid from

9   the out spouse they call it.

10  Q    Thank you.  And, so --

11  A    So, I benefitted from the order.  That's why my name

12  had to go on there.

13  Q    So, isn't it true that your -- Ron Brott was your

14  attorney?

15  A    Correct.

16  Q    And Ron Brott hired the attorney in Florida to collect

17  this award for your benefit?

18  A    Yes.

19          MR. WINFIELD:  Your Honor, I'd move Exhibit AA

20  into evidence.

21          MS. MONTGOMERY:  I'm going to object, your Honor.

22  There's nothing that establishes that all of these documents

23  together are protected together.  This looks like a group of

24  documents that Mr. Winfield has simply stapled together.

25  It's impossible to tell what this is.

*Echo Reporting, Inc.*

195

1        THE COURT:  He just walked your client through

2  every part of it, and she authenticated it, not to mention

3  the fact that most of them are self-authenticating.  So, do

4  you want him -- do you want him to separate them and give

5  them all little numbers?

6        MS. MONTGOMERY:  I don't think that they represent

7  -- they represent a single document, and if the argument is

8  that this is one document that's all -- that's all together,

9  I don't know whether it was or it wasn't.

10        THE COURT:  Okay.  Are you arguing that this is

11  all part of one document?

12        MR. WINFIELD:  Your Honor, I only know that it's

13  a --

14        THE COURT:  I mean, that -- that you didn't

15  establish.  I mean --

16        MR. WINFIELD:  I don't --

17        THE COURT:  -- you asked about the motion, and she

18  recognized the motion, and then she said, but there's a

19  bunch of stuff in here that's not part of the motion.  So,

20  it's -- I understand it's not part of a single document.  We

21  could break it up all into little pieces, because each of

22  them independently I think is probably -- they're probably

23  admissible.

24        MR. WINFIELD:  Would you like me to break it up,

25  your Honor?  I can.

196

1       MS. MONTGOMERY:  This is so far beyond the scope

2 of the direct.  I don't understand what the purpose of this

3 document is.  It's certainly not rebuttal.  It's certainly

4 not within the scope of the direct that was done for --

5       THE COURT:  Okay.  So, now she's arguing relevance

6 and scope of the -- scope of -- it's outside the scope of

7 the direct.  So, you want to connect some dots for us.

8       MR. WINFIELD:  Yes.  Each -- each document here

9 relates to something that was either testified to by Nicole

10 or by her prior attorney whose name has slipped my mind

11 right now, that testified at the first hearing.  There was

12 testimony about each one of these items.

13       The --

14       THE COURT:  Okay.

15       MR. WINFIELD:  She testified today about Ron --

16 about, you know, about who Ron Brott and Keith were and

17 Laura Whitfield, and there was testimony in the prior

18 hearing about the July 6th hearing.  In fact, there was

19 reference to it again today in her direct I believe.

20       THE COURT:  All right.

21       MR. WINFIELD:  We could --

22       THE COURT:  Yeah.  I'm going to -- well, we need

23 to do a couple of things here.  I mean, it would help if

24 these things were numbered, and -- and I have to agree with

25 MS. Montgomery to the extent that these are all different

1 things.  I don't know why they are presented as one exhibit.

2 They really should have been separate.

3          But I'm going to -- I mean, I -- either, you know,

4 you've established, you know, they certainly relate to the

5 conduct of the divorce proceedings, and I have heard

6 testimony today about efforts to enforce -- I mean, I -- I

7 don't know what they're probative of.  They don't -- they

8 haven't persuaded me about anything.  But they don't appear

9 to be outside -- they don't appear to be outside the scope.

10          There's been no testimony establishing that each

11 of these separate legal documents together are a thing.  I'm

12 not going to go through the exercise at this point of -- of

13 giving them separate numbers.  So, maybe I can be persuaded

14 otherwise later, but provisionally, they're in.  If I've

15 made an error, you can -- and you feel strongly, you can

16 raise it -- you can still raise it in argument.  I've yet to

17 understand what -- what these do for anybody, other than

18 they establish -- they appear to establish things that

19 happened in the divorce proceeding.  Doesn't -- I --

20 reminiscent of most things today, I'm not really -- I

21 haven't heard a lot that's probative of the claim or the

22 counterclaim.  So, anyway.  It's -- AA is in as separate

23 documents.  And, again, if you feel strongly and I got it

24 wrong in terms of whether it's appropriate to admit them,

25 you can address it in your closing argument briefs.

198

1        I mean, they're all file stamped.  They're all

2   things that I have to take -- I would have to take judicial

3   notice of.  I don't understand the point of quibbling over

4   putting them in.

5        Go ahead.

6     (Pause.)

7        MR. WINFIELD:  Your Honor, might I approach?

8        THE COURT:  Yeah.  Thanks.  All right.  I've got

9   something that's been marked as BB.

10  BY MR. WINFIELD:

11  Q    Nicole, did -- after the -- I'm sorry.  I gave all

12  three to the Court.

13       THE COURT:  I've got two copies here.  Madam

14  Deputy, why don't you hand one of these back.  Thanks.

15  Okay.

16       MR. WINFIELD:  I think --

17       THE WITNESS:  I have one.

18       MR. WINFIELD:  Ms. Montgomery needs one.  My

19  mistake.

20  BY MR. WINFIELD:

21  Q    So, Nicole, then after your marriage was bifurcated,

22  did Todd Goldman seek a reconsideration of the bifurcation

23  order?

24  A    I don't recall as I sit here today, but, yes, I believe

25  so.

199

1  Q    And did Laura Whitfield file an -- an opposition to

2  that on your behalf?

3  A    I believe at this point I was filing everything.

4  Q    I'm sorry.  You --

5  A    As far as filing.  I was writing and filing at this

6  point in time.

7  Q    Even though it had Laura Whitfield's name up above, you

8  were the one who wrote this?

9  A    She would attend court with me and argue in court, but

10 I was filing.  She wasn't the one that was filing or writing

11 these.

12        THE COURT:  Is that your lawyer's signature on the

13 last page?

14        THE WITNESS:  Yes.

15        THE COURT:  Okay.  So, she signed it?

16        THE WITNESS:  Yes.

17        THE COURT:  Okay.  When you say filing, do you

18 mean took it down to the window?

19        THE WITNESS:  I mean, I -- isn't that what you

20 meant?

21        THE COURT:  It was -- it was not clear to me.

22 So --

23 BY MR. WINFIELD:

24 Q    But -- but this is your lawyer's signature, correct?

25 A    Yes.

200

1  Q    And, so, these are the arguments that you made opposing

2  Mr. Goldman's unsuccessful efforts to get the bifurcation

3  undone?

4  A    Yes, that sounds correct.

5  Q    And then if you look at page two, do you see where it

6  says:

7              "Moreover, the matter is now moot

8         as Respondent transferred all his

9         proportionate interest in the property

10        in question to a third party"?

11 A    Yes.

12        THE CLERK:  I'm sorry to interrupt again, but I'm

13 having a real hard time hearing Mr. Winfield.

14        THE COURT:  Okay.

15        THE CLERK:  In through the -- the device.

16        THE COURT:  Yeah.  If you're going to stand off

17 center, move the microphones off center.

18        MR. WINFIELD:  Thank you, your Honor.

19        THE COURT:  Yeah, yeah.  No problem.

20 BY MR. WINFIELD:

21 Q    Okay.  Let me ask this again.  So, on page two, do you

22 see where it says:

23              "Respondent transferred all his

24         proportionate interest in the property

25         in question to a third party.  Thus, he

*Echo Reporting, Inc.*

201

1            requires no protection from the Court as

2            to the real property that he claims he

3            needs protection for"?

4  A    Yes.

5  Q    And was that pertaining to the Bayview property?

6  A    Yes.

7  Q    Isn't it true that one of the reasons that you wanted

8  the property -- or the marriage bifurcated was so that you

9  could also receive your 25 percent interest in the Bayview

10 property?

11 A    No, I don't think that was a factor in my head.  It was

12 about getting money to pay the attorneys and pay my child

13 support.

14 Q    Okay.  And the attorneys were going to be paid from

15 Todd's 25 percent interest?

16 A    Correct.

17 Q    And any from your 25 percent interest?

18 A    None was ordered.  Is that the question?  Sorry.  I

19 shouldn't have answered.  I don't understand the question.

20 Q    Were any of the attorneys' fees to be paid from your 25

21 percent interest?

22 A    Pursuant to court order?

23        THE COURT:  I think -- I think you have to ask if

24 she has an understanding of the issue.  She may not -- she

25 may or may not.  I mean, she's communicating back to you she

*Echo Reporting, Inc.*

202

1  doesn't understand the question.  I think it's a fair

2  response.

3          MR. WINFIELD:  I'll come back.  There's other

4  documents that cover that.  I'll move Exhibit BB into

5  evidence.

6          THE WITNESS:  Would it be possible to take a

7  restroom break actually?

8          THE COURT:  Yes.

9          THE WITNESS:  Thank you.

10          THE COURT:  Any objection -- without objection,

11  that's admitted.

12          Okay.  Yeah.  Let's take a brief recess.  We're

13  going to go off the record.  I'm going to stay here because

14  I don't need to go, and I'll just slow things down.

15          THE WITNESS:  I'll be two --

16          THE COURT:  No, no, no.  Take your time.

17          THE WITNESS:  Okay.

18          THE COURT:  But if I go back --

19          THE WITNESS:  Okay.

20          THE COURT:  -- you know, I get -- I'm going to get

21  distracted by other things.  So, I'm going to sit here.

22  Nobody try to talk to me.  And keep in mind I can hear you.

23  So, don't try to talk to me by talking to each other.

24          MR. WINFIELD:  And, your Honor, I'm going to take

25  a restroom break also.

203

1          THE COURT:  Okay.  Fine.  All right.  Let's just

2   go off the record.  We'll be in recess.

3       (Proceedings recessed briefly.)

4          THE COURT:  All right.  Ms. Griffin's still on the

5   stand, and she's still under oath, and she is still being

6   cross examined by Mr. Winfield.

7          Go ahead.

8   BY MR. WINFIELD:

9   Q    Nicole, isn't it true that -- that Keith Grumer

10  represented you in filing a partition action in Florida in

11  court with respect to the Bayview property?

12  A    A partition action?  Is that the same as we were

13  talking about before?

14  Q    No.  It's the same property.  It's the same court,

15  different -- different action.

16  A    No.

17  Q    Okay.

18  A    Mr. Grumer never -- I never retained or hired Mr.

19  Grumer to represent me for anything.

20  Q    Did he just say that he was representing you without

21  your permission?

22  A    No.  The way the court orders are ordered in Family

23  Law, was for my benefit.  So, I had to be listed as a

24  plaintiff because Brott and Gross, Attorney Ron Brott is not

25  a party to the family law action.

*Echo Reporting, Inc.*

204

1  Q    Okay.

2  A    So, they had to use my name as the plaintiff.  And that

3  was explained to Ms. Ismail and myself --

4  Q    Thank you.

5  A    -- more than once.

6         MR. WINFIELD:  We'll come back to that.

7         Your Honor, may I approach?

8         THE COURT:  Yes.

9         THE CLERK:  This one is marked as N, but it's L,

10 right?  The sticker says N.  I think I'll make it L.  Is

11 that okay, Judge?

12        THE COURT:  Okay.

13        MR. WINFIELD:  Yes, it's supposed to be L.

14        THE COURT:  What is it supposed to be?

15     (Pause.)

16        THE COURT:  Okay.  So, what  the courtroom

17 deputy's referring to is the blue stickler on the back.  The

18 -- the copy that's going to the witness said N, but the

19 exhibit itself has a cover page that says L.  So, she's

20 corrected the blue tab to say L, and the one that I have,

21 the blue tab says L, and that matches what's on the front.

22 So, marked for identification at 4:26.

23        Okay.  Go ahead.

24 BY MR. WINFIELD:

25 Q    And, Nicole, you testified earlier that you were

205

1   present in a -- in a meeting between your first divorce

2   attorney, Mr. McGuire, and -- and Jasmin, is that correct?

3   A    Yes.

4   Q    Thank you.  And at that meeting there was a discussion

5   of the FLRPL, correct?

6   A    Yes.

7   Q    And isn't it true that your attorney then sent a

8   followup email to you about the FLRPL?

9   A    We shared a lot of emails and conversations.

10  Q    Okay.  Would you look at Exhibit L and see if this

11  refreshes your recollection.

12       (Pause.)

13  A    Okay.

14  Q    So, does Debra Tilton work for Mr. McGuire?

15  A    Yes.

16  Q    And, so, did you receive this email and forward it to

17  your mother?

18  A    I don't recall.

19  Q    Okay.  At the very top, that is your email address,

20  Nikihuey@gmail, correct?

21  A    Yes.

22  Q    And -- and that is your mother's Yahoo email address,

23  correct?

24  A    Yes.

25  Q    And -- and doesn't this email explain the FLRPL lien?

1  A    Well, I'm reading this, and this is completely

2  different from the conversations that we had.  So, I don't

3  know that I received this email.  And in one of the exhibits

4  been admitted, even Ms. Ismail had the same understanding of

5  a FLRPL as I did, where she said that my attorney asked her

6  to put a lien on her portion of the property.  What you're

7  showing me says something completely different.  So, she and

8  I had the same understanding, that the lien was to be put on

9  her portion of the property.  Ms. Ismail and I is what I

10 mean by "she", but now this says something completely

11 different.

12 Q    Can you show me where this letter discusses ATRS at

13 all?

14 A    This email?  I don't know that it does.

15 Q    Isn't it true that the purpose of the meeting with Mr.

16 McGuire was to discuss whether Jasmin would help pay your

17 attorneys' fees by granting a lien on her portion of the

18 property?

19 A    Can you say that again?

20 Q    Isn't it true that the purpose of meeting with Mr.

21 McGuire was to discuss whether your mother would pay for

22 attorneys' fees by granting a lien on her portion of the

23 Bayview property?

24      MS. MONTGOMERY:  Objection.  What time are we

25 talking about a --

207

1          THE COURT:  Sustained.  Rephrase the question.

2  BY MR. WINFIELD:

3  Q    Okay.  At the time of this email, wasn't -- this email

4  was March the 10th, 2015, correct?

5  A    Yes.

6  Q    And that was shortly after you hired Mr. McGuire,

7  correct?

8  A    That was about almost six months after.

9  Q    Okay.  And when was the meeting between Mr. McGuire and

10  you and Jasmin?

11  A    Oh, I couldn't tell you.  I would -- my best estimate

12  would be in January or February of 2015.

13  Q    Was a FLRPL lien ever applied to -- to your mother's

14  interest?

15  A    No.

16          MR. WINFIELD:  Your Honor, I'd like to move

17  Exhibit L into evidence.

18          MS. MONTGOMERY:  Objection, your Honor.  Lack of

19  foundation.  Ms. Griffin has testified she doesn't even

20  remember receiving this email, and there is no relevance,

21  and it does not appear to be, in fact, a rebuttal exhibit.

22          THE COURT:  I'm going to -- I'm going to sustain

23  the objection.  She didn't -- she didn't authenticate it.

24  So --

25          MR. WINFIELD:  Well, she did recognize the email

208

1  from -- coming from her attorney, and it came to her email.

2        THE WITNESS:  I don't recognize that email from my

3  attorney.

4  BY MR. WINFIELD:

5  Q    Okay.  Debra Tilton didn't work for your attorney?

6  A    That's her email address.  I don't recognize the body

7  of the email, and it contradicts what we were told --

8        THE COURT:  Okay.  There's no question to you,

9  okay.  You don't get to just argue, all right.  You just --

10 you wait your turn.  When you're asked a question, you

11 answer it.  Otherwise, please say nothing.

12       Mr. Winfield, it seems to me that if you have a

13 way to authenticate -- you -- you possibly have a way to

14 authenticate this, but this witness is not authenticating

15 it, okay.  You can make whatever arguments you want about,

16 you know, whether I ought to believe her or not, but from a

17 question purely of authentication, there is -- yeah, and I

18 understand your argument, which is it's a piece of paper

19 that has emails that people recognize.  I'm not persuaded

20 based on that that it's authentic yet.  Maybe if I hear from

21 your client and your client provides foundation, but I'm not

22 -- I don't get a warm and fuzzy feeling from this witness's

23 testimony on the authentication issue.

24       MR. WINFIELD:  Thank you.

25       THE COURT:  So, it's out for now.

1        (Pause.)

2            THE COURT:  Let me put it this way.  I'm -- I'm

3    reserving judgment.  I'm not prepared to admit it yet.

4            MR. WINFIELD:  Thank you, your Honor.

5            THE COURT:  Okay.

6            MR. WINFIELD:  May I approach?

7            THE COURT:  Yes.

8            MR. WINFIELD:  I did the same thing.  I forgot to

9    give one to Ms. Montgomery.

10       (Pause.)

11           MR. WINFIELD:  Thank you.

12   BY MR. WINFIELD:

13   Q    Nicole, could you look at Exhibit M.  Is one of these

14   phone numbers -- do you recognize of the phone numbers on

15   this text chain?

16   A    Yes.

17   Q    Is one of those numbers yours?

18   A    Yes.

19   Q    Which number?

20   A    There's only one number on this text change, and it's

21   mine.

22   Q    Okay.  Do these appear to be texts that you received

23   from Jasmin?

24   A    It doesn't show the other phone number.

25   Q    Okay.  Would you look at page three.  Actually, why

210

1  don't you review it and tell me if you recall any of this

2  conversation.

3      (Pause.)

4  A    I don't remember the specific conversation, but this

5  is --

6  Q    Okay.  Can I draw your attention to the last -- the

7  last line there.  She says:

8              "And send me that thousand dollars

9          I gave you for swimming."

10     Does this refresh your recollection that Jasmin asked

11 you to send her back a thousand dollars for swimming

12 lessons?

13 A    No, because Elle didn't take swimming lessons in 2015.

14 Q    Okay.  Do you know what that would have been referring

15 to?

16 A    No, I don't.

17             MR. WINFIELD:  Okay.  Thank you.

18             May I approach, your Honor?

19             THE COURT:  Yes.

20     (Pause.)

21 BY MR. WINFIELD:

22 Q    Nicole, does this also appear to be your phone number?

23 A    Yes.

24 Q    And are these text messages that you sent to Jasmin?'

25 A    There's absolutely no context on this page.

211

1  Q    Okay.  Did Rayna give you money?

2  A    I don't know.

3  Q    Okay.  And then where it says, "Can you put a thousand

4  into my Chase account to pay the lawyer?  I won't have

5  enough to cover the credit card bill otherwise," is that a

6  text message you sent to Jasmin?

7  A    It may have been.  We were jointly represented by our

8  attorney fighting his first bankruptcy at that point.

9  So --

10  Q    Which attorney would that have been?

11  A    Either Lisa Torres, John Carmichael, Gary Barr.  In

12  2015, we, as I said were all fighting lawsuits that my ex-

13  husband was filing against all of us.  But I don't have

14  context as to the specifics, but --

15       (Pause.)

16            MR. WINFIELD:  May I approach?

17            THE COURT:  Yes.

18       (Pause.)

19            THE COURT:  Thank you, Madam Deputy.  All right.

20  So, I've been handed something marked as Exhibit U.  And the

21  witness has a copy of it also.

22  BY MR. WINFIELD:

23  Q    Jasmin, is this a minute order from the --

24            THE COURT:  Stop.  The witness is not Jasmin.

25  //

212

BY MR. WINFIELD:

Q    Nicole, is this a -- a minute order from the Superior
Court?

A    Yeah.  Yes.

Q    And do you see there at the -- and is this from the
July 6, 2016 hearing?

A    Yes.

Q    And do you see in the right-hand portion on the top
where it says "Counsel for Petitioner, Ronald Brott, Laura
Whitfield, and Nicole Goldman"?

A    Yes.

Q    So, they were -- so, at this point, Ron Brott and Laura
Whitfield are representing you, and you're also representing
yourself?

A    Yes.

Q    Okay.  And then do you see the first line where it
says:

            "Any requests for an order to join

        any third party are to be made by August

        19th, 2016"?

A    Yes, I see that.

Q    And, in fact, did you join any third party by August
19th, 2016?

A    Did I join a third -- no.

            MR. WINFIELD:  Your Honor, I'd like to move

213

1  Exhibit U into evidence.

2          THE COURT:  Ms. Montgomery?

3          MS. MONTGOMERY:  The copy that I have is cut off

4  from the top, your Honor.  And I don't -- it says it's page

5  three of three.  So, I don't -- it doesn't appear to be a

6  complete document.  I don't know what the basis for this is.

7  It's certainly -- if this is --

8          THE COURT:  Yeah, I don't know what -- well, this

9  wasn't an exhibit that was identified in advance of trial.

10 What is -- in what way does it impeach Ms. Griffin's

11 testimony or rebut it?

12         MR. WINFIELD:  Well, in two ways.  One, it --

13 first of all, there's been considerable discussion about the

14 necessity for a joinder, and there was testimony about this

15 at the July 6th hearing, and then she testified today that

16 Laura Whitfield wasn't her attorney, and --

17         THE COURT:  What was her --

18         MR. WINFIELD:  -- then we have another document

19 that says counsel for Petitioner, Laura Whitfield.

20         THE COURT:  Okay.  You're going to have to help

21 me.  When did she testify that Laura Whitfield was not her

22 lawyer?

23         MR. WINFIELD:  Today.

24         MS. MONTGOMERY:  I think that misstates the

25 testimony.

214

1          THE COURT:  Yeah.  I don't think that that -- I

2    don't think that that's right.  I mean, you showed her

3    another pleading and asked her, Did you file it, but it was

4    clear that the lawyer had signed it.  I don't know -- I

5    don't know what -- what testimony on the record you're

6    rebutting.  What did she say?

7          MR. WINFIELD:  Well, she said that Laura Whitfield

8    was not her attorney, that she was only her neighbor that

9    was helping her out.

10         THE COURT:  Okay.  I don't recall that testimony.

11   So, I'll -- I'll take it under submission, and you can point

12   out when you do argument, you can cite me the page and line

13   number.

14         MR. WINFIELD:  All right.

15         THE COURT:  But I don't remember that at all.

16         MR. WINFIELD:  Okay.  Thank you, your Honor.

17         THE COURT:  I remember during your cross you tried

18   to ask her about the attorney, and I'm not even sure what

19   the point of that was, but I don't -- what's your second

20   argument?  What -- what is it that she said that you're

21   impeaching or rebutting?  Is there something else?

22         MR. WINFIELD:  No.  It's -- it's all sort of

23   confirmed -- let me ask her one question.

24   BY MR. WINFIELD:

25   Q    Jasmin, do you --

215

1        MS. MONTGOMERY:  Nicole.

2  BY MR. WINFIELD:

3  Q    Nicole, do you recall being ordered by the Court to

4  join parties by August 19th, 2016?

5  A    I don't recall that, but it's in the minute order.

6        THE COURT:  Okay.  So, you refreshed her non-

7  recollection?  It's out.  You can argue to me.  It's -- you

8  can argue to me later that -- and point me to the testimony

9  it impeaches or rebuts, but that's not my recollection.  So,

10  it's out.

11      (Pause.)

12        MR. WINFIELD:  Your Honor,  may I approach?

13        THE COURT:  Yeah.

14      (Pause.)

15        THE COURT:  Thanks.  All right.  I've been handed

16  a document labeled Exhibit V, identified as Exhibit V.

17        MS. MONTGOMERY:  Your Honor, this is already

18  marked as Exhibit 101.

19        MR. WINFIELD:  Yes, that's correct.

20        MS. MONTGOMERY:  Plaintiff's exhibit.  I don't

21  know why you've got multiple -- multiple exhibits.

22        MR. WINFIELD:  This is the same as 101.

23        THE COURT:  Okay.  And --

24        MR. WINFIELD:  And has 101 been admitted?

25        THE COURT:  I don't think 101's been admitted.

*Echo Reporting, Inc.*

216

1          MR. WINFIELD:  Okay.

2  BY MR. WINFIELD:

3  Q    So, Nicole, looking at this document, is this an order

4  after the July 6, 2016 hearing?

5  A    Yes.

6  Q    And have you seen -- you've seen this before, correct?

7  A    Yes.

8  Q    And do you see in paragraph two that the Petitioner's

9  request for order of sale of the Bayview property has been

10 denied based on lack of joinder of the co-owner?

11 A    Yes.

12 Q    And after that hearing, you were given a deadline to

13 join the order, correct?

14 A    What was that?

15 Q    I'm sorry.  You were given a deadline in which to joint

16 the third parties --

17         THE COURT:  Oh.  Okay.  The courtroom deputy tells

18 me that, although I don't see it on the transcript index of

19 admitted exhibits, that I took judicial notice of it.

20         MR. WINFIELD:  Okay.

21         THE COURT:  Of 101.

22         MR. WINFIELD:  So, we don't need this as an

23 additional exhibit.

24         THE COURT:  Yeah.  Hold on.  Let me just look.  It

25 should be at page 176 of the transcript, but let me look at

217

1  it myself.  Okay.  Okay.

2          "THE CLERK:  Sir, you admitted 101, 105.

3          THE COURT:  Yes, I have 105 having been

4          admitted."

5          Hold on.  Ah:

6          "THE COURT:  Mr. Winfield, any objection

7          to the Court taking judicial notice of

8          Exhibit 101 or Exhibit 105?

9          MR. WINFIELD:  No, your Honor.  I would

10         just like to argue about one of them

11         because I think -- about the effect of

12         one of them because one of them happened

13         after the bankruptcy.

14         THE CLERK:  I'm sorry, your Honor.  I

15         cannot hear Mr. --

16         THE COURT:  You've got to get closer to

17         a microphone, please.

18         MR. WINFIELD:  I apologize, your Honor.

19         No objection to their admission.  I

20         reserve the right to argue about the

21         relevance.  It is one of those I think

22         happened after bankruptcy was filed and

23         without relief from the stay."

24         Okay.  All right.  It didn't get picked up by the

25  transcribing service in the index of exhibits, but it's

218

1  there, both 101 and 105.  So, I'm -- you know, if -- if

2  everybody agrees that V is the same, then 101 and V are in.

3          Okay?  Anybody disagree?

4          MR. WINFIELD:  No.  And did we previously admit

5  Exhibit W?

6          THE COURT:  There was no motion to admit Exhibit

7  W.

8          MR. WINFIELD:  I know.  That was the one with

9  the --

10          THE COURT:  So, to answer your question --

11          MR. WINFIELD:  -- with the strange page three in

12  between.

13          THE COURT:  Yeah, I mean, I --

14          MR. WINFIELD:  Okay.

15          MS. MONTGOMERY:  I have not -- have it as not

16  admitted.  There was an objection as to W.

17          MR. WINFIELD:  Yeah, I think I didn't move to

18  admit it, but -- but I think she did raise concerns.

19          THE COURT:  I think you raised the issue.  I think

20  I thought it was premature at the time, and then he never

21  moved to admit it.

22          MR. WINFIELD:  That's right.  Thank you.

23          THE COURT:  So, W is not admitted, and your

24  objection back when you made it is -- is, of course, noted

25  for the record.  I had assumed that your objection was well

219

1  taken, and Mr. Winfield decided not to move to admit it.

2  But -- but V is in.  That's the same as 101.

3          Okay.  All right.  What's next?

4          MR. WINFIELD:  May I approach, your Honor?

5          THE COURT:  Yeah.

6      (Pause.)

7          THE COURT:  Okay.  This is marked as Exhibit X.

8  It's been handed up to me.

9          Ms. Griffin, do you have Exhibit X there?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  All right, Mr. Winfield.

12          MS. MONTGOMERY:  Your Honor, I'm going to object

13  again that this is irrelevant.  This is a bankruptcy court,

14  and all he's doing is putting forth the family law documents

15  that have absolutely no relevance to either our claim or to

16  the cross-claims.

17          THE COURT:  Okay.  Well, he hasn't moved to admit

18  it.  Maybe he's using it to refresh her recollection.  I

19  don't know.  So, let's see how he uses it.

20      (Pause.)

21          THE COURT:  I gather because it's Exhibit X, it

22  wasn't identified in advance, which --

23          MR. WINFIELD:  That is correct.

24          THE COURT:  -- means you are going to have to --

25  you're not only going to have to lay foundation to establish

220

1  its -- because you know the -- you now know the objection's

2  coming.  Why is it relevant?  How is -- you know, what

3  testimony of Ms. Griffin's does it impeach or rebut?  I

4  mean, that -- there's a -- I'm sensing a pattern here.

5          MR. WINFIELD:  Okay.

6          THE COURT:  I mean, and it's a -- you know, it's

7  not like a -- I think I've said it in the past.  I'm not

8  comfortable sort of, you know, ignoring an order from a

9  State Court, especially when it's self-authenticating.  On

10 the other hand, there's an issue of fairness in terms of

11 producing in advance of trial what's going to be discussed

12 at trial.

13         So, you're going to have to -- I realize you

14 haven't moved to admit it --

15         MR. WINFIELD:  Well, and it's --

16         THE COURT:  -- and maybe you won't move to admit

17 it.  But if you're going to move to admit it, you're going

18 to be prepared to --

19         MR. WINFIELD:  Okay.  Well --

20         THE COURT:  -- explain again what it rebuts or

21 impeaches.

22         MR. WINFIELD:  Well, and I understand your

23 comments, but -- and when -- and documents have been

24 admitted on their side that weren't identified.  That was

25 the -- on the first day.  And, but this -- let me first lay

*Echo Reporting, Inc.*

221

1  some foundation.

2           THE COURT:  Okay.

3  BY MR. WINFIELD:

4  Q    All right.  Nicole, is this your handwriting?

5  A    Yes.

6  Q    Okay.  On page three, is this your income and expense

7  declaration for the Family Law Court?

8  A    Yes.

9  Q    And on page three, item 14, don't you acknowledge

10 personal loans for living expenses?

11 A    Yes.

12 Q    And isn't it true some of those personal loans include

13 money owed to Jasmin?

14 A    No.

15          THE COURT:  I'm sorry.  What are you -- what were

16 you referring to?  What --

17          MR. WINFIELD:  Page three, item 14.

18          THE COURT:  Page three?  Does that include the

19 page that says Exhibit X?

20          MR. WINFIELD:  It's in Exhibit X.

21          THE COURT:  Or is it page three as printed on the

22 Judicial Council Form?

23          MR. WINFIELD:  In this case, it would be page

24 four, but it's page three of the Judicial Council Form.

25          THE COURT:  Okay.  So, what -- you're just moving

*Echo Reporting, Inc.*

222

1  too fast for me.  What -- what were you asking about?  Are

2  you asking about something that's here or something that's

3  not here?

4           MR. WINFIELD:  Yes, number 14, personal loans,

5  living expenses.

6  BY MR. WINFIELD:

7  Q    Did anyone else loan you money for personal living

8  expenses other than Jasmin?

9  A    Yes.

10 Q    Who?

11 A    I was living with my aunt and uncle, as well as friends

12 also loaned me money.

13 Q    And are you going to repay that money?

14 A    I hope to if I ever get what was due to me.

15 Q    And then item 11 on here is -- is assets, and it says

16 here -- and then there's an attachment here, 11C.  Do you

17 see where it says:

18           "I own 25 percent of a property at

19           565 Bayview in Florida"?

20 A    Are you on the attachment?  I'm sorry.

21 Q    Yes, on the attachment.

22 A    Yes.

23 Q    And -- and do you see here where it says:

24           "While I received no documentation,

25           in fact, of any claims, I'm informed and

223

1           belief that Respondent and Ms. Ismail

2           claim that I owe money for costs

3           associated with this house"?

4 A    Yes.

5 Q    And isn't it true that at the time you had already

6 received a list of claims from Ms. Ismail related to the

7 Bayview house?

8 A    Are you referring to these text messages?

9 Q    Well, I think --

10 A    I don't --

11 Q    I didn't say --

12 A    I don't understand what you're referring to.

13 Q    That's because I didn't.

14 A    I'm sorry.

15 Q    Did you -- but isn't it true that you had been informed

16 that Ms. Ismail was claiming reimbursement for money

17 associated with Bayview?

18 A    At this point in time, she was always claiming

19 reimbursement for the mortgage to Bayview.

20 Q    But earlier today, didn't you say that she hadn't told

21 you that she was entitled to reimbursement from Bayview?

22 A    I don't understand if you're asking about the mortgage

23 or are you asking about --

24 Q    Cost associated to the house.

25           MS. MONTGOMERY:  What page are you on?

224

1           THE WITNESS:  He's on the fourth to the last, one,

2    two, three, five.

3    BY MR. WINFIELD:

4    Q    So, you see where it says:

5                "I have received no documentation

6            to back up any claims"?

7    A    Yes.

8    Q    Okay.  And, surely, that doesn't mean that you hadn't

9    received documentation about the mortgage being paid off,

10   correct?

11   A    Can you state that one more time?

12   Q    Had you received documentation that the mortgage had

13   been paid off?

14   A    I'm sure I saw documentation at some point in the

15   mortgage being paid off throughout the litigation.

16   Q    Okay.  So -- so, when you say that you hadn't received

17   information about the claims, you didn't -- you weren't

18   referring to Lenore Goldman mortgage that Jasmin paid off,

19   were you?

20   A    No.

21   Q    Okay.  So, this -- you were referring to the other

22   expenses for maintenance and repair of Bayview, correct?

23   A    I'm sure I was referring to whatever they were claiming

24   at the time.  So, yes.

25   Q    Okay.  So, you were aware of claims?

225

1 A    I don't know.  This is right before trial.  So, this

2 was probably in response to Mr. Goldman's trial brief.

3 Actually, I know this was in response.  What was the date on

4 this?  Yes, this was part of our trial briefs before our

5 long cause trial.  So, this is a part of a document that

6 addressed everything going on.

7 Q    Okay.  So -- so, you acknowledge then Ms. Ismail had

8 requested repayment?

9 A    Of -- I'm sorry.  Of the mortgage?  She was always

10 going to get paid when the house was sold.  If you're saying

11 costs associated to whatever she was doing at  the house,

12 no.

13 Q    Okay.

14 A    Anything that I received would have been after the

15 court was trying to sell the house.

16     (Pause.)

17         MR. WINFIELD:  May I approach?

18         THE COURT:  Yes.  Okay.  I've been handed up a

19 document.  It's labeled Exhibit FF.

20         So far, I have AA, BB, and FF, just in terms of

21 what's been identified.

22     (Pause.)

23 BY MR. WINFIELD:

24 Q    Nicole, have you see this email before?

25 A    Possibly.  It looks similar to other emails that she

226

1 writes.

2 Q    Okay.  Do you see in the second paragraph it says:

3              "You asked to borrow  $5,000 and

4          $15,000 in 2012 and another $200,000 in

5          2013 because you wanted to start your

6          own company with Todd called The Plush,

7          and I gave you and Todd $200,000."

8      Do you see that?

9 A    Yes, I see that.

10 Q    Okay.  Now, who is Rayna Kloor?

11 A    That's my aunt.

12 Q    And Tinoy (phonetic)?

13 A    That's Ms. Ismail, who's present in court today.

14 Q    And then in the middle of the next page, do you see

15 there a list of the -- the copy of the email to Ms.

16 Whitehead (sic) about -- have you seen this before?

17         THE COURT:  My goodness.  What was that?  Oh, the

18 notebook.  Are you okay?

19         MR. WINFIELD:  Oh, I'm fine.

20         THE COURT:  All right.

21         MR. WINFIELD:  Thank you for asking.  The

22 notebook, even the exhibits are mostly good here.

23         THE WITNESS:  Sorry.  What was the question?

24 BY MR. WINFIELD:

25 Q    Okay.  Does this refresh your recollection that -- that

1  Jasmin had sent requests to your attorney and that you were

2  copied?

3  A    I was not copied on this email?

4  Q    So, you didn't receive this -- this chain email here?

5  A    Is this one chain?  This looks like separate emails.

6  Q    Um-hmm.

7  A    This email to Laura Whitfield I was not copied on.

8  Q    Okay.  So --

9  A    But it's a -- it's a list of -- of numbers that Ms.

10  Ismail apparently sent to -- to Laura Whitfield.  Yes, she

11  sent -- apparently, she sent some amounts.

12  Q    But you didn't receive this -- a copy of -- along with

13  this one on October 17th?

14  A    I -- I don't know.

15  Q    Okay.

16  A    I don't know if it was -- I don't know.  I don't know

17  when -- I know I've seen this first one.  I don't know if

18  this was one big email chain.

19  Q    So, were you aware that Jasmin was seeking

20  reimbursement of $37,208.89 for real estate taxes?

21  A    No, because the taxes on the house weren't paid.

22  Q    And how about for insurance?

23  A    Well, no, because she testified the other day that she

24  didn't have insurance on the house.  So, none of this is

25  possible.

228

1  Q    There was on -- no casualty insurance on the property,

2  no fire insurance?

3  A    That's Ms. Ismail testified to on October 22nd.

4  Q    Okay.  Well, the question was were you aware that she

5  was asking for reimbursement of that amount?

6  A    I don't know if this is reimbursement is my answer.

7  None of the taxes and insurance was paid.  The taxes were

8  paid by the Trustee upon the sale of the house because they

9  hadn't been paid.

10 Q    And were you aware that she was asking to be reimbursed

11 for roof repair?

12 A    No.

13 Q    I'm sorry.  I'm -- the -- you said earlier that Jasmin

14 was bombarding your Attorney Whitehead with emails regarding

15 requests.  How did you know that?

16         THE COURT:  Stop.  The lawyer's name is Whitehead?

17         THE WITNESS:  Whitfield.

18         MR. WINFIELD:  Whitfield.

19         THE COURT:  Okay.  Ask your question again,

20 please.

21 BY MR. WINFIELD:

22 Q    Okay.  You testified earlier that your attorney, Laura

23 Whitfield, was bombarded with requests from Jasmin for

24 reimbursement regarding Bayview.  How did you know this?

25 A    I said that she bombarded her regarding various

229

1 requests, primarily about my daughter, but also regarding

2 the litigation, yes.  And I know this because Ms. Whitfield

3 told me.  We had many conversations about Jasmin's phone

4 calls, et cetera.

5 Q    And isn't it true that Ms. Whitfield told you that

6 Jasmin was seeking reimbursement of various expenses?

7 A    I can't testify as to what my attorney told me.

8 Q    So, when you said here the Exhibit -- the prior

9 exhibit, that you had no knowledge of the claims --

10          THE COURT:  Which -- do me a favor.  Can you be

11 specific?

12     (Pause.)

13 BY MR. WINFIELD:

14 Q    So, was it true when you said "I'm informed and belief

15 that Respondent and Ms. Ismail are claiming I owe money for

16 costs associate with the house"?  Is that true?

17          MS. MONTGOMERY:  Excuse me.  Where are you reading

18 from?

19          THE WITNESS:  Where are you?

20          MR. WINFIELD:  I'm reviewing paragraph 11C, the

21 attachment on Exhibit X.

22          THE COURT:  Okay.

23     (Pause.)

24          THE COURT:  Okay.  Go ahead.  What are your --

25 //

*Echo Reporting, Inc.*

230

1 BY MR. WINFIELD:

2 Q    What is your basis for saying you are informed and

3 believe that Ms. Ismail is claiming money for costs

4 associated with the house?

5 A    Because Ms. Ismail was then litigating with the

6 attorneys in Florida.  I knew all this was going on.

7 Q    How did you know?

8 A    How did I know that she was litigating with the

9 attorneys in Florida?

10 Q    How did you know that Ms. Ismail was -- was requesting

11 reimbursement for expenses related to Bayview?

12 A    You keep calling them reimbursements, but there was

13 never any documentation provided, which is what I said.  I

14 didn't receive any documentation.  You've given me a

15 compilation of self-serving emails with random numbers and

16 amounts that weren't paid.

17 Q    So, you were seeking these?

18 A    No.  I said that's what you've shown me.

19 Q    Okay.  So, is your testimony that you were never

20 informed by Ms. Whitfield that -- that Jasmin was requesting

21 reimbursement?

22 A    As to the specifics, no.  Ms. Whitfield, yes, said that

23 Jasmin was having conversations with her regarding the

24 Bayview property, as well as every thing else under the sun,

25 and I --

231

1  Q    Thank you.

2  A    -- was not going to respond to self-serving emails with

3  no documentation.

4  Q    How could you respond if you hadn't received it

5  before?

6  A    Well, I said I received the first email that you showed

7  me on page one.

8  Q    But you were aware of these claims, right?

9  A    These specific claims, no.  I knew she was causing

10  issues with Bayview.  She was avoiding service of the

11  actions in Bayview.  They had to serve her by publication.

12  She was making claim --

13           MR. WINFIELD:  Objection.  This is beyond the

14  scope of the question.

15           THE WITNESS:  I'm --

16           THE COURT:  No.  Your -- your lawyer can deal with

17  it on redirect.

18           MR. WINFIELD:  Okay.  Your Honor, I'm about

19  halfway through with my -- with my redirect.  The -- how

20  long can we go to?

21           THE COURT:  Your cross.

22           MR. WINFIELD:  My cross.

23           THE COURT:  Sir, how late -- are you guys usually

24  here till 6:30 or is that in the olden days?

25           DEPUTY:  5:30.

232

1          THE COURT:  5:30.  And do -- do we have any
2    ability to get you -- get somebody on overtime?  Okay.
3       (Pause.)
4          THE COURT:  Okay.  All right.  Well, we can keep
5    going.  I don't know what the outside time is, but we -- as
6    I -- as my chambers let everybody know sometime ago, I --
7    unfortunately, I don't have tomorrow available, but I have
8    the 17th and the 18th.  Ms. Griffin is here.  I know she --
9    where did you fly from?
10          THE WITNESS:  I flew from Nashville.
11          THE COURT:  From Nashville.  So, we should try to
12   make the most of it.
13          MR. WINFIELD:  That's what I am trying to do.
14          THE COURT:  Okay.  Thank you for letting me know.
15          MR. WINFIELD:  I have an issue on the 17th.
16          THE WITNESS:  I can't come back on the --
17          THE COURT:  Well, we can -- we can find another
18   time to finish, but let's try to finish with Ms. Griffin
19   today in this capacity.
20          MR. WINFIELD:  Because this --
21          THE COURT:  I don't presuppose to know whether Ms.
22   Montgomery would want her back to rebut the -- the testimony
23   of -- the direct testimony of Ms. Ismail by the Defense, but
24   we'll -- we can't decide that now.  But let's try to
25   complete this today if we can.

233

1          MR. WINFIELD:  Okay.  So, with respect to these

2    exhibits, your Honor, we spent a lot of time this morning

3    rehashing a lot of issues having to do with the family law

4    proceedings and, in particular, the domestic restraining

5    order and so forth.  And, so, the -- the documents that I'm

6    asking about are having to do with the financial documents

7    because those are the debts that -- those are the documents

8    that list debts.

9          THE COURT:  Okay.  I'm sorry.  Are you making a

10   motion or what are you --

11         MR. WINFIELD:  Yeah, I'm moving to admit the last

12   two exhibits, which were --

13         THE COURT:  X and FF.

14         MR. WINFIELD:  -- X and FF.

15         THE COURT:  Okay.  Let's see if there's an

16   objection first and what the objection is.

17         MS. MONTGOMERY:  X and FF?

18         THE COURT:  Uh-huh.

19         MS. MONTGOMERY:  Yes, there are objections.  The

20   first is these weren't produced.  Second, they're

21   irrelevant.

22         THE COURT:  Okay.  Let's talk about them one at a

23   time.  Let's talk about X, which is a pleading filed in the

24   State Court.

25         MS. MONTGOMERY:  That has no relevance to this

234

1  case, to this bankruptcy and to either the affirmative claim

2  or the cross-claim.

3          THE COURT:  All right.  Mr. Winfield, why don't we

4  start with that?  How is it relevant?

5          MR. WINFIELD:  It's relevant because of its

6  discussion.  It's got an entire paragraph discussing the

7  Bayview property, her ownership in the Bayview property and

8  her -- and the claims that are associated with that

9  property.

10         THE COURT:  What does it rebut?  You were supposed

11 to -- if you had a case to make, if you had relevant

12 documents, you had to identify them before trial.  The only

13 exception to that is impeachment or rebuttal.  So, what

14 does it rebut?

15         MR. WINFIELD:  Well, it's rebutting her testimony

16 earlier today that she'd never been asked -- never agreed to

17 pay claims and never asked to pay claims.

18         THE COURT:  Her testimony was there was no

19 agreement that amounts paid by her mother were a loan.  That

20 was her testimony.  They say it wasn't a loan.  You say it

21 was a loan.  I mean, or at least that's the argument in the

22 -- in the complaint, right.  So, how does this contradict

23 that?

24         MR. WINFIELD:  Well, it -- the -- it  acknowledges

25 that there's a -- there's a claim for money associated with

235

1  that house, and then -- and then I also --

2        THE COURT:  After the fact.  So, it establishes

3  that Ms. Ismail, after the fact, was insisting on being

4  repaid.  No, you can't -- you want to go talk to him

5  privately, go talk to him.  Okay.  But don't -- but don't

6  speak.  You have a lawyer here.  Okay.

7        So, this says:

8              "I am informed and believe

9              Respondent and Ms. Ismail are claiming

10             that I owe money for costs associated to

11             this house as of November 28, 2017."

12       Okay.  Although it's -- it's signed -- yeah, it's

13 signed November 27th.  Okay.  It's not -- it's not very

14 persuasive.

15       MR. WINFIELD:  And it -- and it has to do with

16 her --

17       THE COURT:  It's -- it's after the fact.  I mean,

18 Ms. Ismail is claiming she's entitled to be repaid now.

19       MR. WINFIELD:  After the --

20       THE COURT:  How's that -- you know, it's not

21 particularly persuasive that there was an agreement at the

22 time the money was advanced, but --

23       MR. WINFIELD:  It is related to the claim and --

24       THE COURT:  That's the -- that's -- don't keep

25 saying it's related to the claim.  Okay.  I'm going to burst

236

1  if you say that one more time.  The standard is not whether

2  it's related to the claim.  The claim is part of that -- you

3  had an obligation to produce documents in support of your

4  claim and in support of your defense to the Plaintiff's

5  claim in advance of the trial.  Okay.  You are now asking me

6  to admit this as impeachment and rebuttal.  So, the only

7  relevant question is whether it impeaches or rebuts

8  anything.  So, stick to that.  Don't keep saying it relates

9  to the claim.  That's not good enough.

10        MR. WINFIELD:  Okay.  Well --

11        THE COURT:  If what your argument is that after

12  the fact, Ms. Ismail was claiming that it was a loan, then I

13  suppose -- I suppose it's admissible for that purpose.  I

14  don't think it's terribly persuasive.  In fact, I can tell

15  you now I think it's entirely unpersuasive, but I'll admit

16  it because that is -- that proposition is a rebuttal to --

17  to the testimony we heard today.  Okay.

18        Let's talk about FF.  It's the same thing, unless

19  -- unless Ms. Montgomery has got something else.  I mean --

20        MS. MONTGOMERY:  No.  The only additional thing is

21  that Ms. Griffin stated that this email that goes from jhuey

22  to Whitfield on the second page, she does not -- she's not

23  listed.  She doesn't have any knowledge.  This whole the

24  rest of this email does not indicate that she's been -- that

25  she was --

237

```
 1            THE COURT:  Okay.  Well, let's -- look, I'm not a
 2  jury.  I'm a judge.  It's admitted -- it's admitted subject
 3  to that testimony.  I mean, it's not admitted for the truth
 4  asserted.  But it's -- it's a -- it's a document, and a -- I
 5  mean, the first -- the first half of it, the -- up until
 6  that point where it looks like it's forwarded from her
 7  lawyer -- okay.  I guess I'm not admitting that, to put a
 8  fine point on it.  Okay.  Not yet.
 9            MS. MONTGOMERY:  Your Honor --
10            THE COURT:  I haven't heard testimony -- I -- You
11  know, maybe -- maybe Ms. Ismail's going to testify that she
12  sent the whole thing, and then I'm going to have to make a
13  credibility determination.  But, you know, she acknowledged
14  it in the email from her mother, the first two emails from
15  her mother.  So, those emails are in, and I -- and -- and
16  they do -- again, I think I -- I agree with the witness's
17  comments.  They are self-serving statements after the fact
18  in October about money that she allegedly lent her daughter
19  in 2012.  Do I think that that's terribly persuasive that
20  the money was a loan?  No.  But I -- I'm going to wait until
21  the end of the trial to decide where this piece of the
22  puzzle fits in.
23            So, FF is partially admitted, up until where it
24  says "On Tuesday, July 25th, 2017, Jasminhuey@yahoo.com
25  wrote the following."
```

238

1          MR. WINFIELD:  No, she has acknowledged that

2     Whitfield was her agent, her attorney.

3          THE COURT:  I'm going to withhold judgment on the

4     issue.  For now, the only part that's in is the first page

5     and a half.

6          MS. MONTGOMERY:  Your Honor, I want to renew my

7     objection that these were not identified as exhibits

8     pretrial, and these are not being -- do not properly rebut

9     any statements.

10         THE COURT:  Your objection's noted for the record.

11    Hold on a second.

12       (Pause.)

13         THE COURT:  Okay.  All right.  You can go ahead.

14    Keep going.

15         MR. WINFIELD:  May I approach, your Honor?

16         THE COURT:  Yeah.  All right.  I've been handed

17    something called Y, Exhibit Y.

18    BY MR. WINFIELD:

19    Q    Okay.  Nicole, you testified earlier that you'd

20    attempted to get Jasmin to agree to sell the Bayview

21    property but she wasn't agreeable?

22    A    Initially she was agreeable, and then she was not

23    agreeable.  First she and I wanted the house sold, and Todd

24    did not.  And then that changed.

25    Q    So, do you agree that if the property had been -- if

*Echo Reporting, Inc.*

239

1 the property had been sold when she had first asked for it

2 to be sold, that Mr. Brott's lien would have been paid?

3 A    If she -- when she first wanted it sold?  She and I

4 wanted it sold way early on.

5           THE COURT:  Okay.  Answer his question, ma'am.

6           THE WITNESS:  Oh.  So, when she first wanted it

7 sold?  Can you give me a year?

8           THE COURT:  Go ahead and repeat the question or

9 rephrase it.

10 BY MR. WINFIELD:

11 Q    Yeah, let me -- let me clarify my question.  So, do you

12 recall that in August of 2016, Jasmin sought to have the

13 Bayview property sold?

14 A    Yes.

15 Q    And if it had been sold at that point, the Brott lien

16 could have been paid, correct?

17 A    Yes.

18 Q    Okay.  And then if you look at this document, do you

19 see this second half here, the -- or the bottom here,

20 there's an email from J. Huey to Todd Harris Goldman and

21 Niki Huey?  Do you -- is this an email that you received?

22           THE COURT:  I'm sorry.  I must be looking at

23 something different.

24           MR. WINFIELD:  At the very bottom of --

25           THE COURT:  Oh, at the very bottom of the first

240

1 page on --

2         MR. WINFIELD:  Of the first page and turning over

3 to the second.

4         THE COURT:  I see.  Okay.

5         THE WITNESS:  Yeah.

6 BY MR. WINFIELD:

7 Q    And, so, you understand that on January 27th, she was

8 asking you and Todd to agree to sell the Bayview property,

9 correct?

10 A    That is what this email says.

11 Q    And if -- and if it had sold in January of 2017, the

12 Brott lien would have been paid, correct?

13 A    We couldn't because Todd wouldn't sell the house.

14 That's why the litigation was continuing in Florida.  He was

15 fighting.

16 Q    Okay.  But if it had been sold, the Brott lien would

17 have been paid, correct?

18 A    I imagine so, yes.

19         MS. MONTGOMERY:  Speculation.

20         THE COURT:  Sustained.

21         MR. WINFIELD:  I'd like to move Exhibit Y into

22 evidence.

23         MS. MONTGOMERY:  Objection, your Honor.

24         THE COURT:  Okay.  What's your objection?

25         MS. MONTGOMERY:  Well, the whole first -- almost

241

1  the entire first page of this is between Jasmin and Keith

2  Grumer.  It's not been authenticated.  It's not involving

3  Ms. Griffin, and you're talking about the last line when she

4  signed a listing agreement.  I think this is certainly not

5  a --

6        THE COURT:  Not the -- you mean the last -- the

7  last email in the chain?

8        MS. MONTGOMERY:  Yeah, and the last line on page

9  one and then the paragraph that follows on page two.  And,

10  again, it's not a document that is offered for rebuttal.

11  There's nothing it's rebutting or impeaching.

12        THE COURT:  What is it rebutting or impeaching?

13        MR. WINFIELD:  Well, she's at various times said

14  that the property couldn't sell because of Jasmin.  And, so,

15  this is an instance where it would have sold, and if it had

16  -- if it had sold, that it would -- there was a time when

17  the lien was in place.

18        THE COURT:  Okay.  That's a lot of -- that's a lot

19  of inferences, but I think if what you're arguing is simply

20  it shows that at some point in time Ms. Ismail was willing

21  to sell it at some point in time, then that's -- that's a

22  colorable argument because she -- I hear her -- I heard her

23  caveat just now that at some point her mother was -- was

24  willing to sell it and then she wasn't.  But I don't

25  remember that from earlier.  I think it's close enough that

242

1  it's appropriate -- that it's appropriate rebuttal.  I don't

2  think it does much.  I mean, at some point in time, and she

3  now admits it.  So, I'm going to -- I'm going to strike the

4  first page of it except for the -- except for the email that

5  begins at the bottom, and I'll admit it, but I fail to see

6  -- again, it's -- it's just close enough to being rebuttal

7  that I'll let it in, but I don't -- I just don't understand

8  how this helps you.  I don't understand how most of this

9  helps you, Mr. Winfield, to tell you the truth.

10       (Pause.)

11           THE COURT:  For the record -- for the record, the

12  lights went out.  The lights are now back on.  Hold on.

13       (Pause.)

14           THE COURT:  Okay.  We get two hours at a time.

15  All right.  Keep going.

16       (Pause.)

17           THE COURT:  Okay.  I've been handed something

18  called Exhibit CC, labeled CC.

19  BY MR. WINFIELD:

20  Q    Nicole, is this a copy of an email that you were copied

21  on?

22  A    Yes.

23  Q    Is this an email from your attorney Laura Whitehead to

24  Jasmin?

25           MS. MONTGOMERY:  Whitfield.

243

BY MR. WINFIELD:

Q    I'm sorry.  Whitfield.  It's close enough to my name.
I should be able to get it right.

A    From -- the top one is.  It's a chain between Laura and
Jasmin.

Q    Yes.  So, the -- do you see where it says:

            "As you know, Niki has no money to

            pay her share at the moment, but it will

            be deducted from her share of the one-

            fourth net proceeds"?

A    Yes, I see that.

Q    Did you ever instruct Laura Whitehead (sic) to rescind
that statement?

A    To rescind that statement?  Laura Whitfield had nothing
to do with the Florida property.

Q    Okay.  Is that a no?

A    I guess -- well, she was responding to the text -- to
the email below, is that correct?  So, "Let me know, and I
can expect payment of 25 percent of the real estate taxers
that were paid," and if she doesn't pay, she's going to
charge 10 percent interest.  I guess that's what she was
referring to, the taxes that weren't paid, but it appears
that Jasmin was asking for reimbursement for taxes that were
never paid, saying that --

            MR. WINFIELD:  Objection, your Honor.

244

1          THE WITNESS:  -- they were paid.

2          MR. WINFIELD:  Move to strike.  That's -- that's

3   assuming facts not in evidence.  We can have -- Jasmin

4   hasn't testified yet about the taxes she did pay.

5          THE COURT:  Okay.

6          MR. WINFIELD:  So, that's not -- it's not a

7   response to the question I asked.  She's already answered

8   the question, that she didn't -- she didn't instruct her

9   attorney to send this.

10          THE COURT:  Yeah, that was the only question.  You

11  got to answer only the question that's been asked.  That

12  motion to strike is granted.  The prior testimony, with the

13  exception of the negative answer to the question is

14  stricken.

15          MR. WINFIELD:  Your Honor, I'd move to admit

16  Exhibit CC.

17          THE COURT:  Okay.  Ms. Montgomery?

18          MS. MONTGOMERY:  I'm looking at that exhibit.

19          THE COURT:  Okay.

20          MS. MONTGOMERY:  The whole third page -- the whole

21  second page, there's no indication that it's been copied to

22  Ms. Griffin and should not be included.  There's no

23  foundation for it.

24          THE COURT:  Okay.

25          MS. MONTGOMERY:  In fact, the second -- the

*Echo Reporting, Inc.*

245

1  original message --

2          THE COURT:  She said this looks like an email

3  chain.

4          MS. MONTGOMERY:  So, she has indicated that she

5  was CC'd on the top.  She hasn't been asked if she saw any

6  of the -- any of the other portion.

7          MR. WINFIELD:  Well, she did say it looked like it

8  was a response.  That Was -- but that was -- that wasn't

9  part of the answer that was --

10          THE COURT:  I mean, I don't -- okay.  I'm going to

11  let you -- I'm going to let both sides voir dire the witness

12  further.  I mean, this is getting old, but go ahead.

13          MS. MONTGOMERY:  I just -- it's getting late.

14  Just admit it.

15          THE COURT:  Okay.  All right then.  CC is

16  admitted.  All right.

17          What else do you have?

18          MR. WINFIELD:  I've got about 20 more.

19          MS. MONTGOMERY:  And all of these are rebuttal

20  exhibits?  Couldn't they be -- be put on the exhibit list?

21          MR. WINFIELD:  These are all rebuttal.  Rebuttal

22  and/or impeachment.

23          THE COURT:  Okay.  Let's try to pick up the pace,

24  though, huh.

25          MR. WINFIELD:  I will do my best, your Honor.

246

1      (Pause.)

2            MR. WINFIELD:  May I approach, your Honor?

3            THE COURT:  Yes.

4      (Pause.)

5   BY MR. WINFIELD:

6   Q    Nicole, is this a copy of your -- of the settlement

7   agreement in your divorce case?

8   A    Can I have a moment to look this over?

9   Q    Okay.

10     (Pause.)

11  Q    So, Nicole, this is your signature on that last page,

12  correct?

13  A    Yes.

14  Q    And if you can take a look at page four.  Isn't it true

15  that you agreed to reserve issues as to the Bayview property

16  and -- and all credits and reimbursement claims related to

17  Bayview property?

18  A    I see the Bayview property.

19  Q    And then the handwritten portion down the middle.

20  A    As to all -- it doesn't say to the Bayview property.

21  Q    Well, it says as to property listed here and above at

22  paragraph 600.

23  A    Oh, sorry.

24  Q    And my hole is right in the middle of the 600C.

25  A    Got it.

247

1  Q     You may not be able to see the six.

2  A     Okay.  The parties reserve the rights to all credits

3  and reimbursements -- credits, reimbursement and claims.

4  Right.

5  Q     So, isn't this an agreement that at least you

6  acknowledge there was an issue as to the reimbursement with

7  respect to Bayview?

8  A     Well, these are issues that we couldn't -- this was a

9  stipulation, and these were issues that we couldn't agree --

10 agree to.  So, these are issues that --

11       THE COURT:  Okay.  What does this rebut?  I'm

12 making the objection now, and I'm losing my patience with

13 this, okay.  What does this rebut?

14       MR. WINFIELD:  Well, she said there was never a

15 written acknowledgment --

16       THE COURT:  No.

17       MR. WINFIELD:  -- that there --

18       THE COURT:  She said she --

19       MR. WINFIELD:  -- was a debt here.

20       THE COURT:  -- didn't have an agreement for a

21 loan.  This just says that in the -- in the course of the

22 litigation, Ms. Ismail was contending that she's owed money.

23 That's not evidence of a loan.

24       MS. MONTGOMERY:  This is between -- between Todd

25 Goldman and Ms. Griffin, and it has nothing to do with Ms.

248

1 Ismail.  It has nothing to do with any claims one way or the

2 other.

3          THE COURT:  What am I missing?  It's excluded.

4 Move on.

5          MR. WINFIELD:  Thank you, your Honor.

6     (Pause.)

7          MR. WINFIELD:  May I approach, your Honor?

8          THE COURT:  Yes.

9     (Pause.)

10          THE COURT:  Thanks.

11 BY MR. WINFIELD:

12 Q    So, Nicole, you said a few minutes ago that you were

13 informed of everything that was going on in the litigation

14 in Florida, is that correct?

15 A    Yes.

16 Q    And you testified earlier that -- that Keith Grumer was

17 not your attorney?

18 A    Correct.

19 Q    Okay.  Isn't this complaint -- a copy of the complaint

20 where Mr. Grumer is acting as your counsel?

21 A    This is for the same order.  He was representing my

22 attorney to try to collect the order from the Bayview

23 property for the attorneys' fees that were ordered for my

24 benefit.  So, in order to do that, in family law, he had to

25 put my name as a plaintiff because the order was made for me

249

1 to Brott and Gross, and that's just the way they had to

2 caption things.

3 Q    So, he was your attorney?

4 A    No, he was not.

5        MS. MONTGOMERY:  It misstates her testimony.

6    (Pause.)

7        MR. WINFIELD:  Well, she's clearly a plaintiff,

8 and this is an attorney, and she knew -- and she said she

9 knew what was going on down in Florida with the action.  So,

10 this rebuts her earlier testimony.  I would move to admit

11 Exhibit GG.

12        THE COURT:  Ms. Montgomery?

13        MS. MONTGOMERY:  I -- I object.  I think it's

14 irrelevant.  I'm looking at page six, and there's

15 handwriting, and I don't know whose handwriting this is.

16 And the testimony has repeatedly been by Ms. Griffin that

17 she was not represented and did not have the attorney

18 relationship with Keith Grumer, and this --

19        THE COURT:  Yeah, that's her testimony, but it's

20 self-authenticating, and --

21        MS. MONTGOMERY:  Not the portion on page five

22 that's underlined, page six which is a bunch of handwritten

23 comments.

24        THE COURT:  That's true.

25        MR. WINFIELD:  I agree with that latter comment

250

1    about the handwritten comments.  Those are -- shouldn't be

2    part of the document.

3            MS. MONTGOMERY:  There's handwritten comments on

4    page four too where it says lies.

5            THE COURT:  Yeah.

6            MS. MONTGOMERY:  I don't think this is

7    appropriate.

8            THE COURT:  Yeah.  I --

9            MR. WINFIELD:  Well, let me reserve the right to

10   seek admission by other means with a cleaner copy.

11           THE COURT:  Yeah, the -- on the issue of rebuttal

12   or impeachment, I think it -- it does -- I mean, it may or

13   may not be persuasive.  It does tend to rebut her testimony.

14   But the document -- I mean, it's got writing all over it.

15   This is not -- and you've conceded this is not the version

16   that was E-filed.  So, even though there's a stamp on it and

17   it's -- might have been self-authenticating, this version of

18   it is not authenticated.  So, for now, it's out.

19       (Pause.)

20           THE COURT:  All right.  I've been handed Exhibit

21   II.

22   BY MR. WINFIELD:

23   Q    Nicole, is this a -- a schedule of assets and -- and

24   debts that you filed with the Superior Court?

25           MS. MONTGOMERY:  Objection.  The front top page

251

1  says this form shall not be filed with the Court.

2           MR. WINFIELD:  Thank you.

3  BY MR. WINFIELD:

4  Q    Nicole, is that your signature at the last page of this

5  document?

6  A    Yes.

7  Q    Okay.  Do you see on number 24, other debts?

8  A    Yes.

9  Q    Okay.  So, there -- there's a -- the items -- did you

10 prepare this document?

11 A    Yes.

12 Q    So, the -- the -- the items under 24 that -- there's

13 six of them, and there's six of them in the two columns

14 there to the right.  And, so, they don't line up exactly,

15 but, so, is the -- where it -- so, is the first -- first

16 item the Unitride (phonetic) judgment, unknown, premarital?

17 A    Yes.

18 Q    And the second item is various personal loans

19 Respondent has taken, unknown, post-separation?

20 A    Yes.

21 Q    Are any of those for a loan?  Aren't those for any

22 loans that you took from Jasmin?

23 A    I'm not going to respond --

24           MS. MONTGOMERY:  Objection, your Honor.  All of

25 these indicate that -- that these are for Respondent, which

*Echo Reporting, Inc.*

252

1  is Todd Goldman.  There's nothing on here other than loans

2  from --

3           THE COURT:  I'm going to sustain the -- I'm going

4  to sustain the objection, but I'm going to give you a chance

5  to rephrase it.

6           MR. WINFIELD:  Yes.

7           THE COURT:  I mean, she's acknowledged she signed

8  this document.

9  BY MR. WINFIELD:

10  Q    And -- and then the column where it says separate

11  property, that's where you -- you're indicating who should

12  pay these items, correct?

13  A    No.  That's who owns that debt I think is what the --

14  it just says that's a property.  I think that's who owns it.

15  Yes, it's who it -- who --

16  Q    So, that's your opinion of who -- who should pay these,

17  correct?

18  A    Well, some of them are opinion but also some of them

19  were I think already adjudicated by that point.  Yeah.  Some

20  of this was already adjudicated.  So, some of it we each

21  would have put down what we believed or some of it had

22  already been adjudicated.  So, I would have put based on

23  that.

24  Q    And so the last item, where it says loans from friends

25  and family, Petitioner, $100,000, 216 to 17, doesn't --

*Echo Reporting, Inc.*

1  doesn't that include debts to Jasmin?

2  A    No.

3  Q    Who is that owed to?

4  A    Friends and family.  Jasmin has her own separate line

5  if you look two above that, and it says Respondent.

6  Q    And, so, you didn't know the -- the amount at that

7  time?

8  A    That Mr. Goldman owed to Ms. Ismail?  No.  I had no

9  knowledge of what the total was.  They were living together

10  at that point.

11 Q    Excuse me?

12 A    They were living together at that point.  So, I didn't

13 know what their financial arrangements were.

14 Q    It's your contention that Mr. Goldman was living with

15 your mother?

16 A    Yes.  He currently resides in one of her other

17 properties where she stays with him.

18 Q    Isn't that part of the Ostrich claim that was dismissed

19 in this case?

20 A    What do you mean isn't that part of the Ostrich claim?

21 I'm sorry.  I don't understand.

22 Q    The Tennessee condominium that you alleged --

23 A    Where my ex-husband lives with her?  I don't think that

24 was part of the claim.  I think that's more of the family

25 law, but the family law is hearing about their cohabitation.

1 Q    So, you're seriously suggesting that they were

2 cohabitating?

3 A    Well, Ms. Ismail still lives partially in Nashville

4 with Mr. Goldman part time.  So, yes.

5 Q    You mean when she's visiting Elle?

6 A    Yes.

7 Q    And, so, the -- the debt that you contend is the

8 Respondent's unknown debt to Jasmin, that doesn't have

9 anything to do with the -- the loan for Tighty Whitie or the

10 loans for Bayview?

11 A    I put an unknown amount.  I'm sure that I would

12 encompass those within that, yes.

13           MR. WINFIELD:  Thank you.

14           Your Honor, I'd move to admit Exhibit II for --

15           MS. MONTGOMERY:  I object, your Honor.  This,

16 again, is not rebut -- this is not rebuttal.  It's not

17 impeachment.  It wasn't previously marked as an exhibit.  It

18 is irrelevant.  It wasn't filed with the Court.  So, it's

19 not self-authenticating, and it's -- it's irrelevant to this

20 litigation.

21           THE COURT:  Okay.  She authenticated the document.

22 It's relevant.  It lists loans to friends and family.  It

23 was fair game to ask her whether that includes her mother.

24 So, your objections are overruled, and it's in.  Move on.

25           I -- I don't think Mr. Winfield got the testimony

255

1  he wanted, but I think it was fair game.

2       (Pause.)

3           MR. WINFIELD:  May I approach, your Honor?

4           THE COURT:  Yes.

5       (Pause.)

6           THE COURT:  Okay.  I've been handed about a half

7  an inch of paper identified as Exhibit JJ.

8  BY MR. WINFIELD:

9  Q    So, Nicole, during the period that you were self-

10 represented, did you prepare this trial brief?

11 A    Yes.  Your Honor, I'm sorry.  I don't know how to --

12 there's a sealed document that they've attached to this

13 regarding child custody evaluation which is not supposed to

14 be anywhere.

15          THE COURT:  All right.  Ms. Montgomery, why don't

16 you --

17          MS. MONTGOMERY:  I don't -- these -- these are all

18 Superior Court family law documents, and I've never seen

19 this document before, and I'm not aware.

20          THE COURT:  Okay.  Your -- your client -- okay.

21          MS. MONTGOMERY:  My client said that there is a

22 document here regarding a --

23          THE COURT:  So, take a few minutes.  Take a look.

24 Okay.  And then advocate for her.  All right.  Let's take a

25 recess.  I need a break.

*Echo Reporting, Inc.*

256

1        (Proceedings recessed.)

2            THE COURT:  All right.  We're back on the record?

3            THE CLERK:  Yes, Judge.  Please remain seated and

4  come to order.  Court is again in session.

5            THE COURT:  Okay.  We were talking about JJ.

6  Where were we on JJ?

7            MR. WINFIELD:  Your Honor, I'll withdraw JJ.

8            THE COURT:  Oh, what a relief.  All right.  Okay.

9  What else?

10       (Pause.)

11           MR. WINFIELD:  May I approach, your Honor?

12           THE COURT:  Yes.

13       (Pause.)

14           THE COURT:  Okay.  I've been handed Exhibit KK.

15  BY MR. WINFIELD:

16  Q    Okay.  Nicole, are you aware that in August of 2018,

17  that Jasmin filed a motion with the Court to ask that the

18  property be listed -- the Bayview property be listed for

19  sale?

20  A    Which court are you talking about?

21  Q    The Sixth Judicial Circuit.

22  A    Oh, this document in front of me?

23  Q    Yes.

24  A    Oh, this was filed by --

25  Q    By Jasmin.

257

1  A    Oh, sorry.  Can I have one minute?

2  Q    Absolutely.

3       (Pause.)

4           MS. MONTGOMERY:  While she's reviewing this, can

5  you please state why this is a rebuttal or an impeachment

6  exhibit and was it produced and was it part of your exhibit

7  list?

8           MR. WINFIELD:  This is further evidence of -- of

9  Jasmin's efforts to sell the property and -- which were I

10  think persistent.

11          THE COURT:  Which is relevant -- which is -- okay.

12  Hold on.  Don't -- don't argue with each other.  Just

13  address the Court.

14          So, why -- number one, why is that relevant?  And,

15  number two, what statement of -- of Ms. Griffin's does that

16  rebut or impeach?

17          MR. WINFIELD:  Well, she's saying at times that

18  Jasmin wasn't trying to sell the property, and I think that

19  this is evidence that Jasmin was consistently trying to get

20  the property sold.  This is -- in fact, she filed an -- went

21  to the --

22          THE COURT:  Again --

23          MR. WINFIELD:  -- effort of filing a motion to get

24  it sold.

25          THE COURT:  -- politely, the way the professor

*Echo Reporting, Inc.*

258

1 asked in law school, so what?  Who cares?  What does that

2 have to do with anything?

3         MR. WINFIELD:  It's another make weight.  Adds

4 emphasize -- emphasizes points we've already made in other

5 exhibits.  It's cumulative.

6         THE COURT:  Oh, you admit it's cumulative?

7         MR. WINFIELD:  I do.

8         THE COURT:  Then it's out.

9         MR. WINFIELD:  Okay.

10         THE COURT:  Move on.

11         MR. WINFIELD:  I'll have to -- she can testify to

12 this fact.

13 BY MR. WINFIELD:

14 Q    So, Nicole, did Brott already have a lien in August of

15 2018?

16 A    Yes, I believe so.

17         MR. WINFIELD:  Okay.

18     (Pause.)

19         MR. WINFIELD:  May I approach, your Honor?

20         THE COURT:  Yes.

21     (Pause.)

22         THE COURT:  Thank you.

23     (Pause.)

24         MS. MONTGOMERY:  Your Honor, again, this is not a

25 -- this is not an impeachment or rebuttal exhibit and could

259

1  have been listed as an exhibit.  It doesn't have

2  significance or relevance, but it wasn't.

3          THE COURT:  Okay.  How do you plan to use this,

4  Mr. Winfield?

5          MR. WINFIELD:  This is more evidence of Nicole

6  requesting money from Jasmin.

7          THE COURT:  What does that rebut?  It rebuts

8  nothing.  You should have produced this for trial.  I mean,

9  there's no -- she did not say she didn't ask her mother for

10 money.  In fact, she testified that she -- she got all sorts

11 of support from her mother.  What she testified to is that

12 there was no agreement that any of it was a loan.  Where

13 does it say that on this piece of paper?  Come on.  Am I

14 missing -- am I missing something?  It was pretty quick.  I

15 read it quickly.

16         MR. WINFIELD:  I can -- I can address everything

17 in closing argument, but -- but what this has to do with

18 under some accounts requesting money creates a -- creates an

19 account.

20         THE COURT:  Then maybe you should have submitted

21 it before trial in support of your counterclaim.  That's not

22 my problem.  I didn't do that.  I know it may not be your

23 problem either because you weren't given -- you probably

24 weren't given enough time to do it.  So, I'm not blaming

25 you, but don't make it my problem.  Okay.  That was -- that

260

1  was the Defendant/Counter-Claimant's duty was to identify

2  exhibits in support of her claim in advance of trial, by the

3  deadline.  And the only exception to that Rule is rebuttal

4  or impeachment.  This is neither rebuttal nor impeachment.

5  It is excluded.

6          Move on.

7      (Pause.)

8  BY MR. WINFIELD:

9  Q   Nicole, in December of 2016, did you ask your mother to

10  provide you with -- with receipts for -- for bills that she

11  had paid on your behalf?

12  A   I don't recall.

13          MR. WINFIELD:  Okay.  Your Honor, may I approach?

14          THE COURT:  Yes.

15      (Pause.)

16          MR. WINFIELD:  This one will be labeled as QQ,

17  your Honor.

18          THE COURT:  Okay.  QQ.  Give me a second here.

19      (Pause.)

20          THE COURT:  Okay.  Go ahead.

21  BY MR. WINFIELD:

22  Q   Jasmin, is this an email --

23          MS. MONTGOMERY:  No, it's not Jasmin.

24  BY MR. WINFIELD:

25  Q   Nicole, is this --

*Echo Reporting, Inc.*

261

1          THE COURT:  Her name is Nicole.

2   BY MR. WINFIELD:

3   Q    Is this an email to Jasmin requesting that she give you

4   copies of receipts for bills that she paid on your behalf?

5   A    Yes.

6   Q    And isn't it true that this was done because you

7   intended to repay her some day?

8   A    No.  I was filing contempt against my ex-husband, and

9   it said in the email that Keith needed it too I think.

10         MR. WINFIELD:  Move to strike, your Honor.  That's

11  a yes or no.

12         THE WITNESS:  Oh.  No.  Sorry.

13         THE COURT:  I'm going to -- I'm going to sustain

14  the objection because I'm tired of the narratives.  I expect

15  Ms. Montgomery will draw that out on redirect.

16         MR. WINFIELD:  Your Honor, I'd move QQ into

17  evidence.

18         THE COURT:  All right.  It's in.

19         All right.  Go ahead.

20         MR. WINFIELD:  Your Honor, may I approach?

21         THE COURT:  Yes.

22      (Pause.)

23  BY MR. WINFIELD:

24  Q    Nicole, you testified earlier today that Ms. Whitehead

25  (sic) had nothing to do with what Keith Grumer was doing in

262

1  Florida.

2          THE COURT:  Stop.  There's no Ms. White.

3          MR. WINFIELD:  I'm sorry, your Honor.  I'm getting

4  -- I'm getting worse as I get more tired.

5          THE COURT:  I know.  I know.  So, try again.  I

6  just want a clean record.

7          MR. WINFIELD:  Thank you.

8  BY MR. WINFIELD:

9  Q    You testified that Ms. Whitfield had nothing to do with

10 what was going on in Florida.  Can you explain to me why

11 Keith Grumer sent an email to you and to -- to Ms. Whitfield

12 about the -- the strategy to break the Tennessee and

13 Florida?

14 A    Because that's what needed to happen for whatever they

15 were doing in Florida, and I didn't know how to file those

16 things on my own or which judicial forms.

17 Q    Okay.  Did you receive this email?

18 A    Yes.

19         MR. WINFIELD:  I move Exhibit RR into evidence,

20 your Honor.

21         THE COURT:  Ms. Montgomery?

22         MS. MONTGOMERY:  I renew the objection that it is

23 not impeachment.  It is not rebuttal.  And it wasn't -- and

24 it wasn't produced or listed as an exhibit.

25         THE COURT:  Okay.  What does this -- how is this

263

1    impeachment or rebuttal?

2          MR. WINFIELD:  It impeaches her statement that Ms.

3    Whitfield had nothing to do with what was going on in

4    Florida and that Mr. -- and that Keith was not her attorney.

5          MS. MONTGOMERY:  There's nothing in here that

6    indicates that Keith Grumer is her attorney.

7          THE COURT:  So -- so --

8          MS. MONTGOMERY:  This is --

9          THE COURT:  Yeah, why -- how does that prove your

10   point?

11         MR. WINFIELD:  Just she said that it wasn't her

12   attorney and that -- and that Whitfield had nothing to do

13   with what was going on there.  This suggests that she was

14   very much involved with what was going on here and that

15   Keith was very much her attorney.

16         THE COURT:  What was this -- this was marked as

17   RR.  Okay.  I think, again, it's -- this falls in the

18   category of, you know, the purpose for which it's offered,

19   there's a colorable purpose.  But it's entirely

20   unpersuasive.  I'm going to admit it, but it's a waste of

21   our time.

22         What else?

23         MR. WINFIELD:  That's all I have on -- on cross at

24   this time, and I reserve the right to recross and --

25         THE COURT:  Thank goodness.

264

1          MR. WINFIELD:  -- possibly --

2          THE COURT:  How much redirect do you have?

3          MS. MONTGOMERY:  Not -- not very much.

4          THE COURT:  Okay.

5          MS. MONTGOMERY:  But I need -- I need about two

6  minutes to go --

7          THE COURT:  All right.  Take a few minutes.  We'll

8  go off the record.  If anyone needs a bathroom break, why

9  don't you take advantage of the opportunity.

10     (Proceedings recessed briefly.)

11          THE CLERK:  We're back on the record, Judge.

12          THE COURT:  All right.

13          MR. WINFIELD:  Your Honor, I have a point of

14  order.

15          THE COURT:  Yeah.  Okay.

16          MR. WINFIELD:  I believe we took a -- a break in

17  place to allow Ms. Montgomery to gather her thoughts, and

18  this is the fourth time that she's used this as an

19  opportunity to meet with her witness that was under oath in

20  the witness room to prepare her, and I believe that's

21  inappropriate.

22          MS. MONTGOMERY:  I'm not -- I'm trying to go

23  through my notes to do the redirect.

24          THE COURT:  Okay.  All right.  Let's -- let's just

25  get it done.

265

1          MR. WINFIELD:  I would like to state my objection

2   to that on the record, and they had confirmed that they were

3   -- that they were meeting together in the witness room.

4          THE COURT:  Okay.

5                    REDIRECT EXAMINATION

6   BY MS. MONTGOMERY:

7   Q    Ms. Griffin, first off, you were asked to identify

8   Exhibit R, which were two checks for $1,000 to Wells Fargo

9   Dealer Services.  Do you recall that?

10  A    Yes.

11  Q    And you said you had not seen these actual checks, is

12  that correct?

13  A    Correct.  I didn't remember seeing them.

14  Q    But the -- were the payments on your car supposed to be

15  made by your ex-husband, Todd Goldman?

16  A    Yes.

17  Q    So, is it your understanding that your mother went

18  ahead and made payments for your car?

19  A    Yes.

20  Q    And was there any agreement with your mother to -- to

21  repay those payments?

22  A    No.

23  Q    On any of these documents that have been produced as

24  "rebuttal or impeachment", was there -- to pay -- to pay

25  expenses, did you have any written agreement with Jasmin

*Echo Reporting, Inc.*

266

1  that you would repay those loans?

2            MR. WINFIELD:  Objection.  Leading.

3            THE COURT:  Why don't you rephrase it.

4  BY MS. MONTGOMERY:

5  Q    Was there any written agreement to repay any of the

6  money advanced to you?

7  A    No.

8  Q    Was there any oral agreement to repay those -- the

9  moneys advanced to you?

10  A    No.

11  Q    You previously described Ms. Whitfield as an attorney

12  who's not a family law specialist, is that correct?

13  A    Yes.

14  Q    What -- what did Ms. Whitfield do for you?

15  A    She helped me with the family law.  She did sign

16  papers, and she attended court with me for, I don't know,

17  several months.  I was still doing the legwork I guess you

18  would say, but, yeah, she -- she is an attorney, and she

19  assisted me.

20  Q    Did you authorize her to negotiate on any subject with

21  Jasmin?

22  A    No.

23  Q    When Jasmin or any other person, Keith Grumer, sent

24  copies of emails to Laura Whitfield, was she -- was she

25  authorized to accept them on your behalf?

267

1  A    To accept the emails from people?  I never explicitly

2  authorized her, no.  But since she was -- she was who was

3  helping me here and things needed to happen here to aid what

4  they were doing in Florida, so she was occasionally I guess

5  on emails.

6  Q    Can you confirm did you ever have a retainer agreement

7  with Mr. Grumer?

8  A    No.

9  Q    Was he ever your attorney?

10 A    No.

11 Q    There was discussion regarding bifurcation of the

12 status of your divorce.  Do you recall that discussion?

13 A    Yes.

14 Q    What was the purpose of the bifurcation?

15 A    To bifurcate the marital status.  So, nothing else was

16 determined, just the marital status.

17 Q    And what did it mean to be -- to bifurcate the marital

18 status?

19          MR. WINFIELD:  Objection.  Calls for a legal

20 conclusion.

21          MS. MONTGOMERY:  I think he knows --

22          THE COURT:  You can ask --

23          MS. MONTGOMERY:  He can --

24          THE COURT:  You can inquire of her understanding.

25 Go ahead. Rephrase it.

*Echo Reporting, Inc.*

268

1  BY MS. MONTGOMERY:

2  Q    Do you have an understanding as to the purpose for the

3  bifurcation of the marital status?

4  A    Yes.

5  Q    Did you request that it be -- what was your

6  understanding?

7  A    That that meant that Mr. Goldman and I were no longer

8  legally married.

9  Q    And did you request that that occur?

10 A    Yes.

11 Q    Why did you request that?

12 A    Mr. Grumer made something easier as far as forcing the

13 sale in Florida, and he recommended that we do it.  I think

14 that was on the email, and also I was getting remarried.

15 Q    And you couldn't get remarried until you had gotten the

16 bifurcation of the marital status?

17 A    Correct.

18 Q    The text messages that were sent to you, I believe

19 Exhibit O you were shown, and Exhibit O asked -- you asked

20 for money to be put into your Chase account.  Do you recall

21 that?

22 A    Yes.

23 Q    Was that what you -- I think you testified that you

24 thought it was for a bankruptcy lawyer?

25 A    Yes.

*Echo Reporting, Inc.*

269

1  Q    Who was that bankruptcy lawyer representing?

2  A    She was representing Jasmin, my grandparents, and

3  myself.

4  Q    And did you ever have an agreement with Jasmin that

5  that was a loan?

6  A    No.

7  Q    Did you have any agreement that it was to be repaid?

8  A    No.

9  Q    When you looked through the text messages that have

10 been provided -- produced to you as part of these rebuttal

11 exhibits, were they complete text messages to your under --

12 was it your understanding they were complete text messages?

13 A    No, they're not.

14 Q    So, could you actually understand the context of these

15 text messages without receiving them in full?

16 A    No, just based on her handwritten notes and what

17 little she's given me.  That's what we're going on.

18 Q    You've asked for copies of receipts from Jasmin

19 regarding the various claims that she made, is that correct?

20 A    Could you say that again?  I'm sorry.

21 Q    Yeah.  Did you -- I believe that you asked for receipts

22 regarding amounts that Jasmin claimed were owed.  Is that

23 correct?

24        MR. WINFIELD:  I believe that misstates the -- her

25 answer, your Honor.

270

1          THE COURT:  No.  Actually, it's overruled.  She

2 didn't characterize the evidence.  She characterized the

3 question, and she was indeed asked about the receipts.

4 There was an email.  She was presented with a copy of an

5 email, and -- and you asked her why would you need -- you

6 know, you were asking for receipts.  Why did you need

7 receipts.

8          MR. WINFIELD:  I guess I was thinking about --

9          THE COURT:  So, I think it's fair.

10          MR. WINFIELD:  -- a different part of her

11 testimony.  Okay.

12          THE COURT:  Okay.  Yeah, so, it's overruled.  Go

13 ahead.

14 BY MS. MONTGOMERY:

15 Q    Did you receive receipts?

16 A    I think she provided me -- the receipts that I was

17 requesting for the spreadsheet that I said I was doing?  I

18 don't think I'm clear on the receipts that you're talking

19 about.

20 Q    Okay.  Well, when she asked you for -- she asked you

21 for money regarding payment of amounts due on Bayview.

22 A    Oh, that --

23 Q    Did you ask -- did you ask her to provide you with

24 receipts?

25 A    I don't think I engaged with her about that at all.  I

271

1  think in this action or recently we've asked to see things

2  and haven't been provided with things.

3  Q    Did she ever provide you with copies of receipts

4  showing checks for payments that she made with regards to

5  Bayview?

6  A    No.

7  Q    So, when she asked for taxes, for instance, payments --

8  or your share of taxes, did you -- did she ever provide you

9  with copies of checks showing she made the payments?

10 A    No.

11 Q    Looking back at Exhibit CC, which is an email -- or a

12 message from Laura -- there's one from Laura Whitfield to

13 Jasmin, and going -- if you're going down, it's Jasmin to

14 Laura Whitfield asking -- the one -- the second one on this,

15 page one of three.  It's from Jasmin to Laura Whitfield.  It

16 says, "Please let your -- let me know if your client has

17 made any decision regarding the house and when can I expect

18 payment of the 25 percent of my -- of the real estate taxes

19 that were paid."  Do you see that?

20 A    Yes.

21 Q    Was she -- was Jasmin asking for payment of anything

22 other than real estate taxes?

23 A    No.

24 Q    So, when Ms. Whitfield responded that you didn't have

25 sufficient money and that it would be deducted from your

272

1 share, were you refer -- what were you referring to or what

2 was she referring to?

3 A    I assume she was responding -- that's assuming.  It was

4 in response to her -- to Jasmin's request for 25 percent of

5 the real estate taxes.

6 Q    And did you ever receive any kind of confirmation

7 showing that Jasmin had paid those real estate taxes?

8 A    No.

9 Q    Or the amount of the real estate taxes?

10 A    No.

11 Q    And, as to all of these, was there ever an agreement,

12 written agreement to repay any of these?

13 A    No.

14 Q    When Jasmin demanded a 10 percent interest charge, did

15 you -- for taxes if you didn't pay them, did you ever agree

16 to that?

17 A    No.

18 Q    So, that was a statement after the fact?

19 A    Yes.

20         MS. MONTGOMERY:  That's all, your Honor.

21         THE COURT:  Okay.  Thanks.

22         All right.  Mr. Winfield?

23    (Pause.)

24         MR. WINFIELD:  No, your Honor.

25         THE COURT:  Okay.

273

1          MR. WINFIELD:  I don't know what will happen the

2  rest of the trial.  I'd like to reserve the opportunity to

3  recall her.

4          THE COURT:  For what?  I mean --

5          MR. WINFIELD:  Well --

6          THE COURT:  -- she's not your witness.

7          MR. WINFIELD:  She's not my witness, but if --

8          THE COURT:  You can't recall someone else's

9  witness.

10          MR. WINFIELD:  Not unless she testifies in

11  rebuttal.

12          THE COURT:  Okay.  So, all right.  There's no

13  further questions -- there are no further questions.  You

14  can step down.  Thank you for your testimony.

15          All right.  So, now, let's talk about what else

16  needs to happen.

17          Ms. Montgomery, do you have any other witnesses?

18          MS. MONTGOMERY:  No, your Honor.

19          THE COURT:  Okay.  All right.  So, the Plaintiff

20  as Plaintiff is done.  The next thing that needs to happen

21  in the trial is the Defense is going to put on its case in

22  chief in defense of the claim and in support of its

23  counterclaim.  And, after that, you know, we'll ask Ms.

24  Montgomery whether she has any rebuttal witnesses to call in

25  response to -- in response to your -- the Defense's case,

274

1  right?

2          MR. WINFIELD:  Yes.  And we've indicated also one

3  potential rebuttal witness at least, and we'll see if that's

4  going to be necessary, your Honor.

5          MS. MONTGOMERY:  Who is that?

6          MR. WINFIELD:  I believe the only other one we --

7          THE COURT:  Rebuttal to their case.

8          MR. WINFIELD:  Yeah.

9          THE COURT:  So, that's part of your defense,

10  arguably.  If it's appropriate rebuttal -- if it's a -- see,

11  what you're saying is you may have a witness that you didn't

12  previously identify.

13          MR. WINFIELD:  We did identify -- I believe we

14  identified Todd Goldman as a -- as a rebuttal witness.

15          THE COURT:  Okay.  Well, then he can be part of

16  your defense if you identified him.  You don't have --

17          MS. MONTGOMERY:  Is it possible, your Honor, for

18  Ms. Griffin, if she had to make any further statements, to

19  appear by Zoom as opposed to having to try to come back out

20  to Los Angeles?

21          THE COURT:  Well, that's -- that is a complicated

22  question because we -- we decided to do this trial in

23  person.  The logistics that go into having testimony by

24  remote get complicated because you need exhibit books, and

25  you need the ability to -- potentially to present

275

1  impeachment or rebuttal exhibits.  So, that -- that makes it

2  complicated.

3          Let me ask you, Mr. Winfield, how -- how much time

4  do you need to make the Defense's case do you think?

5          MR. WINFIELD:  I would expect we're talking about

6  half a day, maybe a full day, but more likely a half a day.

7          THE COURT:  Okay.  Well, I mean, what we could do

8  is -- is take that day of testimony and then see where we

9  are, Ms. Montgomery?

10         MS. MONTGOMERY:  The only thing that she would

11  really -- I can conceive of is on the claim objections, that

12  it would -- which is really a motion, that it could be a

13  minor amount of testimony.

14         THE COURT:  Well, there is a motion, but it's also

15  a counterclaim.  The counterclaim is that your client owes a

16  bunch of money for a bunch of stuff.  It's a lot of it's the

17  same stuff that's part of the claim.  So --

18         MS. MONTGOMERY:  I think the counter -- I think

19  the claim is significantly different in part because the

20  claim is being asserted as a community property claim, which

21  means it's limited to amounts to -- well, first of all, it's

22  limited by the agreement they had with the Trustee.  Second,

23  it has to be a community -- a community property debt.  It

24  has to be during the period of marriage.  So --

25         THE COURT:  Yeah.  Of course, if they don't meet

276

1 their burden to prove that there is a debt, then we never

2 get to that.

3          MS. MONTGOMERY:  Right.

4          THE COURT:  So, and they need -- let me finish.

5 And they need to prove that the debts exist as part of this.

6 So, you know, six of one, half a dozen of the other.  All

7 right.

8          MS. MONTGOMERY:  Maybe I should let you do the

9 half a day --

10          THE COURT:  Well, I -- I don't believe it's half a

11 day because you're going to have your own cross.  It's going

12 to be at least a day, and then we'll see where we are.  You

13 can then assess whether you want to present rebuttal

14 testimony from -- form Ms. Griffin, and then we can talk

15 about the logistics.

16          But for our next day of trial, I hear November

17 17th may not work, but for our next day of trial, I think

18 it's the Defense's case.  We can arrange for Ms. Griffin to

19 observe by Zoom, but I'm not going to make any -- you

20 haven't decided yet whether you want to put her on in

21 rebuttal, and I'm not going to make you promises about

22 whether that can be done over zoom or not.  Let's -- let's

23 see what --

24          MS. MONTGOMERY:  Okay.  I'm just concerned that

25 we've got the holidays coming up, and the fees and the

277

1  flights are expensive and very difficult to --

2         THE COURT:  Yes.

3         MS. MONTGOMERY:  -- to get.

4         THE COURT:  I get it.  Let's see where we are

5  after you hear the counterclaim -- the Defendant/Counter-

6  Claimant's case and how much there is and whether it's going

7  to involve exhibits or not.

8         All right.  So, November 17th doesn't work for

9  you, Mr. Winfield?

10        MR. WINFIELD:  It does not.  Multiple conflicts.

11 I have other court hearings, and then it turns out my wife's

12 having a procedure that day, and --

13        THE COURT:  Okay.

14        MR. WINFIELD:  -- I suggested possibly me not

15 picking her up, and that didn't go well.

16        THE COURT:  No.  I can imagine.  All right.

17        MR. WINFIELD:  The 18th is available for me.

18        THE COURT:  Okay.

19        MS. MONTGOMERY:  I can't.

20        THE COURT:  That's -- that's unfortunate.  Okay.

21 And then we have the week of Thanksgiving.

22        MS. MONTGOMERY:  I could do the 22nd.

23        THE COURT:  Yeah.  I'm not available the 22nd.

24        MS. MONTGOMERY:  The 23rd?

25        THE COURT:  I'm even less available on the 23rd.

278

1  So, let me just -- hold on.  Let me just look at this for a

2  second.  I'm available the 28th and 29th.  Do either of

3  those days work?

4        MS. MONTGOMERY:  The 29th would be better.

5        THE COURT:  And if -- if Ms. Ismail is traveling,

6  it will avoid -- at least, yeah, she won't be trying to fly

7  on a -- the busiest day of the year, which is the 27th.

8        MR. WINFIELD:  I have a hearing on the 28th.  That

9  week, right after Thanksgiving is inconvenient for my client

10  to come back.  She's already been out here for a month.

11  Would (indiscernible).

12        MS. MONTGOMERY:  Flights are going to be cheaper

13  after Thanksgiving and before Christmas.

14        MR. WINFIELD:  December 1st or 2nd?

15        THE COURT:  I'm not available those dates.  I

16  think I could be -- I think the Court could be available on

17  the 5th.

18        MR. WINFIELD:  December 5th is okay with me. your

19  Honor.

20        MS. MONTGOMERY:  (Indiscernible.)

21        THE COURT:  I'm sorry, Ms. Montgomery.  I didn't

22  hear you.

23        MS. MONTGOMERY:  I said we're a go.

24        THE COURT:  Okay.  Madam Deputy, is that okay?

25  This -- there's a note on here about Judge Tighe being in

279

1  courtroom 302.  I don't know how that affects us.

2          THE CLERK:  It doesn't, Judge.  We just -- I don't

3  know why we have that on there.

4          THE COURT:  Just extra information.

5          Okay.  Let me just -- let me just check -- let me

6  check out one other calendar.

7          MR. WINFIELD:  It's nice to have her back in this

8  courthouse, though.

9          THE COURT:  Yeah, but don't blink.  She'll be --

10  she'll be back on a road trip before you know it.  She's,

11  after all, you know, it's -- it's sort of semi retirement.

12          Okay.  All right.

13          MS. MONTGOMERY:  I want to just as a point of

14  procedure --

15          THE COURT:  Yeah.

16          MS. MONTGOMERY:  -- just make sure that the

17  exhibits and so forth that are being used by Mr. Winfield

18  are only those exhibits that he's marked so far as his

19  defense.

20          THE COURT:  Right.  With the exclusion of the

21  thing that he just filed.

22          MR. WINFIELD:  Yeah.  The Court gave a limited

23  opportunity for us to augment the record on the claim.

24          THE COURT:  Right.

25          MR. WINFIELD:  Is all.

280

1          THE COURT:  Because I'm basically sort of merging
2     them into the trial.  So, where is it?
3          MS. MONTGOMERY:  Well, if you've got that, we've
4     already put in Exhibit K.  We've already agreed on that one.
5          THE COURT:  Hold on.  Hold on.  Exhibit K?
6          MS. MONTGOMERY:  He used it as a rebuttal exhibit.
7     It was -- I think it's like --
8          MR. WINFIELD:  Yeah, that was one of my -- one of
9     my augmentations that's already been admitted.
10         THE COURT:  Oh, okay.
11         MS. MONTGOMERY:  It's already been admitted.  And
12    the other two, I'm happy to submit evidentiary objections.
13         THE COURT:  Okay.
14         MS. MONTGOMERY:  Because they're not proper.
15         THE COURT:  The other two?  I don't know what
16    you're talking about?
17         MS. MONTGOMERY:  I -- he put in I, J, and K last
18    Thursday, and I --
19         THE COURT:  Okay.  I have a thing that just says
20    J.  So, I didn't get --
21         MS. MONTGOMERY:  That was -- there's one before
22    that.  He -- he refiled that because it wasn't readable when
23    he filed.
24         THE COURT:  All right.  You can -- okay.  So, I
25    haven't seen -- then I guess I haven't seen everything he's

281

1  seeking to admit.

2      When do you want to file your written evidentiary

3  objection?  Do you want 10 days?

4      MS. MONTGOMERY:  Yeah.

5      THE COURT:  Or two weeks?

6      MS. MONTGOMERY:  Yes.

7      THE COURT:  What's today, the 7th?  All right.

8  So, have your evidentiary objection in by the 21st, and any

9  written response, Mr. Winfield, by December 1st, and I'll

10 deal with it on -- on -- at the hearing on December 5th.

11     MS. MONTGOMERY:  Do you want any kind of written

12 response apart from the evidentiary objection?

13     THE COURT:  No.

14     MS. MONTGOMERY:  Okay.

15     THE COURT:  No.  All that will get folded into the

16 post-trial briefs.

17     MS. MONTGOMERY:  We're trying to put in a

18 declaration in response to that, and it -- it might --

19     THE COURT:  In response to what?  In response to

20 this?

21     MS. MONTGOMERY:  Yes, I and J.  I mean, we have

22 evidentiary objections, but if you want --

23     THE COURT:  No.  I mean, we're -- we're doing a

24 trial at this point.  So, you're going to want -- you're

25 going to want her to rebut anything, you have to bring her

282

1  back.

2          MS. MONTGOMERY:  Okay.

3          THE COURT:  Okay.  So -- hold on.  So, December

4  5th --

5          MS. MONTGOMERY:  Can the clerk see if they can

6  locate the -- the document that I did file in response to

7  that?  I think you're -- you're missing his original --

8          THE COURT:  Yeah.

9          MS. MONTGOMERY:  -- augmentation, and I filed a

10 response --

11         THE COURT:  Oh.

12         MS. MONTGOMERY:  -- and/or objection.  It wasn't

13 full evidentiary objections, but --

14         THE COURT:  Okay.  Apparently we have it, but it

15 didn't make it to me.  Ah, Docket 217, objections to Jasmin

16 Ismail's augmentation.  All right.

17         So, why don't you restate your objections as an

18 evidentiary objection.

19         MS. MONTGOMERY:  Yes.

20         THE COURT:  And I'll get a chance to --

21         MS. MONTGOMERY:  By the 21st?

22         THE COURT:  By the 21st, and Mr. Winfield gets to

23 respond by December 1st.  I'm --

24         MS. MONTGOMERY:  What day do is the trial then?

25         THE COURT:  It is December 5th, and we start at

*Echo Reporting, Inc.*

283

1   10:00 a.m..  I -- Madam Deputy, you know what, I didn't --

2   you can reach out to -- do you email with the lawyers?

3            THE CLERK:  I can.

4            THE COURT:  Okay.  Why don't you email the lawyers

5   the -- the Zoom information for December 5th for anyone that

6   wants to monitor, including Ms. Griffin, and I've already

7   created the Zoom.  So, just now.  Okay.

8            THE CLERK:  Would you like me to just send it to

9   Ms. Montgomery and Mr. Winfield or --

10            THE COURT:  Yes.

11            THE CLERK:  Okay.  Will do.

12            THE COURT:  That's exactly what I had in mind.

13            THE CLERK:  Got it.

14            THE COURT:  Okay.  All right.  Anything else I

15   need to do?

16            MR. WINFIELD:  You've done enough for this one

17   long day.  We appreciate it.

18            THE COURT:  Okay.  But, so, I got testy.  It's

19   late.  I know that the lawyers are trying to zealously

20   advocate for their clients, and I appreciate that, and I

21   think 7:00 o'clock is a good time to -- to stop.

22            So, we'll stop for the day, and on December 5th,

23   we'll take up the Defendant/Counter-Claimant's case.  Okay.

24            Do I want to keep the last thing I copied?  No.

25   All right.

284

1          Court's adjourned.

2       (Proceedings recessed.)

3

4

5          I certify that the foregoing is a correct

6   transcript from the electronic sound recording of the

7   proceedings in the above-entitled matter.

8

9   /s/Jordan Keilty              12/02/2022
    Transcriber                   Date
10

11  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

12

13  /s/L.L. Francisco
    L.L. Francisco, President
14  Echo Reporting, Inc.

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*