FILED

NOV 09 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

ENTERED

NOV 14 2023

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:                    Deputy Clerk

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>TODD HARRIS GOLDMAN,<br><br>        Debtor. | Case No.:  1:18-bk-12979-MB<br><br>Chapter 7<br><br>Adv. No.:  1:19-ap-01048-MB |
| NICOLE GOLDMAN,<br><br>        Plaintiff<br><br>v.<br><br>TODD GOLDMAN; JASMIN ISMAIL, an individual who also goes by the alias JASMIN HUEY; OSTRICH HOUSE, LLC, an Ohio corporation,<br><br>        Defendants. | **MEMORANDUM OF DECISION FOLLOWING TRIAL** |

On September 22, November 7, and December 5, 2022, the Court conducted an in-person trial in this adversary proceeding.  Susan I. Montgomery represented plaintiff Nicole Goldman ("Nicole" or "Plaintiff").[1]  William E. Winfield represented defendant Jasmin Ismail ("Jasmin" or "Defendant").  Nicole is Jasmin's daughter.  Todd Harris Goldman, the debtor in this chapter 7 case ("Todd" or "Debtor") is Nicole's former spouse.  This memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).  Venue is proper pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding contains both core and non-core claims.  As to the core claims, the Court has constitutional authority to enter a final judgment.  *Stern v. Marshall*, 564 U.S. 462, 474 (2011).  As to non-core claims, the parties have conferred such authority on the Court by consent. Adv. Dkt. 95; *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 671 (2015).

## II. PROCEDURAL HISTORY

On December 11, 2018, Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  David Seror ("Trustee") was appointed chapter 7 trustee for the Debtor's estate.  At the time Debtor commenced his chapter 7 case, he was embroiled in a contentious marital dissolution proceeding ("Dissolution Proceeding") with Plaintiff in the Superior Court of California for Los Angeles County ("Superior Court").

Plaintiff commenced the Dissolution Proceeding in 2014.  Four years later, but several months before the bankruptcy case was commenced, Plaintiff filed a Complaint for Joinder (the "Complaint"), joining Defendant and Ostrich House, LLC ("Ostrich House"), an entity owned by Defendant, to the Dissolution Proceeding.  The Complaint sought relief against Debtor, Defendant and Ostrich House in connection with the transfer of an interest in certain real property made

---

[1] The Court refers to the parties by their first names, at various points in this memorandum, for clarity and convenience; no disrespect is intended.

1  during the pendency of the Dissolution Proceeding.  The Plaintiff alleged five causes of action: (1)

2  declaratory relief; (2) fraudulent conveyance under Cal. Civ. Code §§ 3439.04 and 3493.05; (3)

3  civil conspiracy or aiding and abetting a fraudulent conveyance; (4) imposition of constructive

4  trust; and (5) injunctive relief.

5      On April 24, 2019, the Defendant filed a Notice of Removal in the bankruptcy case,

6  removing the Complaint to this Court.  Adv. Dkt. 1.  On May 9, 2019, the Defendant filed her

7  answer to the Complaint and counterclaims (the "Counterclaims").  Adv. Dkt. 9.  The

8  Counterclaims asserted Plaintiff was liable to Defendant for (1) breach of contract, (2) unjust

9  enrichment and (3) a common count for money allegedly loaned to Plaintiff.

10     Plaintiff thereafter sought remand of the proceeding to the Superior Court, but the Court

11  denied that request.  Adv. Dkts. 12, 25.

12     On May 14, 2021, Defendant filed a motion for partial summary judgment.  Adv. Dkt. 60.

13  The Court granted the motion in part, dismissing the first, second, fourth and fifth causes of action

14  in the Complaint, with prejudice (the "Partial Summary Judgment Order").  Adv. Dkt. 85, at ¶ 1.

15  The Court limited the third cause of action in the Complaint to a claim against Defendant for aiding

16  and abetting a breach of fiduciary duty by Debtor, in connection with the subject property transfer.[2]

17  The Court also dismissed Ostrich House from the adversary proceeding.  *Id*. at ¶ 2.

18     Meanwhile, in the Debtor's bankruptcy case, Defendant filed proofs of claim for:

19  (i) "reimbursable expenses attributable to [the subject property]" in the amount of $114,199.22

20  ("Claim No. 16"), Tr. Ex. SS; and (ii) "[m]oney loaned - in event transfer of [the subject property]

21  is set aside" in the amount of $326,177 ("Claim No. 17").  Tr. Ex. TT.  In connection with the

22  settlement of a separate adversary proceeding,[3] Defendant later stipulated with Trustee to a

23  reduction of these claims.

24

25  _____

26     [2] Although not explicit, the Court's ruling effectively dismissed the Debtor from the third
cause of action.

27     [3] *Seror v. Ismail (In re Todd Harris Goldman),* Case No. 18-12979-MB, Adv. No. 19-

28  01120-MB (Bankr. C.D. Cal. 2022).

3

1    Specifically, Claim No. 16 was allowed as a nonpriority unsecured claim in the amount of

2 $7,169.16, to be "treated as a community property claim for purposes of a Chapter 7 distribution.

3 Case Dkt. 84 at 23. Claim No. 17 was allowed as an unsecured claim in the amount of $100,000,

4 also to be treated as a community property claim. *Id.* at 23-24. The rights of all other parties in

5 interest, including Plaintiff, to further object to the allowance of Claim No. 16 and Claim No. 17

6 were preserved. *Id.* at 24.

7    On May 18, 2022, Plaintiff filed a motion objecting to both Claim No. 16 and Claim No. 17

8 (the "Claim Objection"). Case Dkt. 155. Plaintiff contends that these claims should be disallowed

9 in their entirety or, if allowed, treated as the separate debts of Debtor for distribution purposes, not

10 community property debts. The Court subsequently determined that the trial on the Claim

11 Objection would be consolidated with the trial on the Complaint and Counterclaims.

12    At that trial, Plaintiff called Brian Kramer, herself, and Defendant as witnesses. Defendant

13 testified on her own behalf. Both parties had the opportunity to cross-examine each other's

14 witnesses and did so. The Court had the opportunity to observe each of the witnesses, evaluate

15 their demeanor, consider their testimony, and assess their credibility.

16    The Court admitted the following exhibits offered by Plaintiff in her case-in-chief: 100,

17 101, 102, 103, 104, 105, 107, 110A, 111, 112, 114-A, 115, 116, 117, 118. The Court also admitted

18 the following exhibits offered by Plaintiff as rebuttal or impeachment exhibits: R/I/1, R/I/3, R/I/4,

19 R/I/5, R/I/6, R/I/7.

20    The Court admitted the following exhibits offered by Defendant: F, L, AA, BB, CC, FF, II,

21 QQ, RR, SS, TT. The Court also admitted the following exhibits offered by Defendant as rebuttal

22 or impeachment exhibits: N, Q, S, T, V, X, Y (partially admitted, first email on page 1 excluded),

23 and GG.

24                                   **III. THE COMPLAINT**

25    **A. Background**

26    In April 2011, Nicole married Todd. On October 28, 2014, Nicole initiated the Dissolution

27 Proceeding. Upon the commencement of the Dissolution Proceeding, Todd was served with a

28 summons that included, pursuant to California Family Code § 2040, the so-called Standard Family

1  Law Restraining Orders ("ATROs").  Among other things, the ATROs legally restrained Todd

2  from:

3  > [T]ransferring, encumbering, hypothecating, concealing, or in any way disposing of,

4  > any property, real or personal, whether community, quasi-community, or separate,

5  > without the written consent of the other party or an order of the court, except in the

6  > usual course of business or for the necessities of life, . . .

7  Tr. Ex. 100; CAL. FAM. CODE § 2040(a)(2)(A).[4]

8      One of the properties in which Todd had an interest was certain real property located at 565

9  Bayview Drive, Belleair, Florida 33757 (the "Bayview Property").  At the time the Dissolution

10  Proceeding commenced, Todd and Nicole each owned a 25% interest in the Bayview Property;

11  Jasmin owned the remaining 50% interest.  *See* Tr. Ex. 102.

12      On July 6, 2016, at a hearing on a request by Nicole (the "Fee Hearing"), the Superior Court

13  Judge ordered (i) Todd was obligated to pay Nicole's family law attorneys, Brot and Gross, fees in

14  the amount of $75,000, and (ii) in the event of a sale of the Bayview Property (or a separate

15  property in Tarzana, California), these fees would be paid from Todd's share of the proceeds (i.e.,

16  his 25% interest).  This order was memorialized in writing on September 13, 2016 (the "Fee

17  Order").  Tr. Ex. 101.

18      Notwithstanding the ATROs and the Fee Order, pursuant to a warranty deed ("Warranty

19  Deed") Todd transferred his 25% interest in the Bayview Property to Jasmin on March 20, 2017.

20  Tr. Ex. 103.

21      At a hearing on January 26, 2018, the Superior Court concluded that Todd had violated the

22  ATROs multiple times, including when he transferred his interest in the Bayview Property to

23  Jasmin.  The California Court of Appeal relied on this conclusion to dismiss Todd's appeal of

24  various fee orders entered against him:

25

26

27      [4] For ease of reference, the California Family Code is referred to hereinafter as "the Family

28  Code."

1    Family Code section 2040, subdivision (a)(2) requires the summons in a

2    dissolution action to include various automatic temporary restraining orders

3    (ATRO's), including an order "[r]estraining both parties from transferring,

4    encumbering, hypothecating, concealing, or in any way disposing of any property,

5    real or personal, whether community, quasi-community, or separate, without the

6    written consent of the other party or an order of the court, except in the usual course

7    of business or for the necessities of life."  Such an order was included in the

8    summons in this case.

9    At the January 28, 2018 hearing, the trial court found that Todd "has violated

10    ATROs not once, not twice, but multiple times."  One of the violations concerned

11    Todd's transfer of an interest in a property in Florida (the Florida Property) that he

12    and Nicole owned along with Nicole's estranged mother, Jasmin Ismail.

13    Todd and Nicole had a 50 percent ownership interest in the Florida Property,

14    and Ismail owned the remaining 50 percent.  At the January 26, 2018 hearing, Todd

15    admitted to the trial court that he had transferred his interest in the Florida Property

16    to Ismail for a price of $10 to satisfy a debt that he and Nicole owed to Ismail.  The

17    court noted that the transfer occurred after the dissolution proceedings had begun

18    and was therefore done in violation of the ATROs."  In a subsequent order, the court

19    found that Todd had transferred a quasi-community property interest in the Florida

20    Property to Ismail without Nicole's consent or the court's authorization.  The court

21    found that the transfer was illegal, because "the ATROs set forth under [section

22    2040, subdivision (a)(2) were in full force and effect" at the time Todd made the

23    transfer.

24    Tr. Ex. 111 at 3-4.

25    On or about October 18, 2018, Nicole filed a motion and the Complaint to join Todd and

26    Jasmin and to set aside Todd's unauthorized transfer to Jasmin and/or to recover the proceeds from

27    the sale thereof.  The Complaint contended that the transfer of the Bayview Property was

28    fraudulent and a breach of Todd's fiduciary duties to Nicole.  The Complaint also asserted that

6

1 | Jasmin aided and abetted Todd's breach of fiduciary duty. The Superior Court ultimately joined

2 | Jasmin in the proceeding pursuant to the Complaint. As noted, the Complaint was subsequently

3 | removed and is now pending here.

4 | Following commencement of this bankruptcy case, the Trustee entered into a settlement and

5 | compromise with Nicole, pursuant to which Nicole agreed to transfer her 25% interest in the

6 | Bayview Property to the Trustee, to permit the Trustee to sell the property. Case Dkts. 41, 70. The

7 | Trustee also entered into a settlement and compromise with Jasmin ("Ismael Settlement"), pursuant

8 | to which Jasmin (i) agreed to transfer to the Trustee a 25% interest in the Bayview Property and

9 | (ii) consented to the sale of the Bayview Property, subject to her 50% interest. Case Dkt. 84. The

10 | Trustee thereafter obtained an order authorizing the sale of the Bayview Property and sold the

11 | property. Case Dkts. 130, 149.

12 | As a result of these developments, and the Partial Summary Judgment Order, what remains

13 | of the Complaint is Nicole's claim that Jasmin aided and abetted a breach of fiduciary duty by Todd

14 | in connection with his prior transfer to Jasmin of a 25% interest in the Bayview Property. Jasmin

15 | does not deny that Todd transferred his interest in the property in violation of the ATROs, or that

16 | doing so constituted a breach of his fiduciary duties to Nicole. Jasmin, however, denies aiding and

17 | abetting that transfer. She principally argues that she did not have knowledge of the transfer until

18 | after it was completed.

19 | **B. Legal Standards**

20 | Family Code section 1100 requires:

21 | Each spouse shall act with respect to the other spouse in the management

22 | and control of the community assets and liabilities in accordance with the general

23 | rules governing fiduciary relationships which control the actions of persons having

24 | relationships of personal confidence as specified in Section 721, until such time as

25 | the assets and liabilities have been divided by the parties or by a court.

26 | CAL. FAM. CODE § 1100(e). Family Code section 721 provides in part that "This

27 | confidential relationship imposes a duty of the highest good faith and fair dealing on each

28 |

1  spouse, and neither shall take any unfair advantage of the other." CAL. FAM. CODE §

2  721(b).

3      Family Code section 1101 describes the consequences for a breach of one spouse's fiduciary

4  duty to another:

5          A spouse has a claim against the other spouse for any breach of the fiduciary

6          duty that results in impairment to the claimant spouse's present undivided one-half

7          interest in the community estate, including, but not limited to, a single transaction or

8          a pattern or series of transactions, which transaction or transactions have caused or

9          will cause a detrimental impact to the claimant spouse's undivided one-half interest

10         in the community estate.

11  CAL. FAM. CODE § 1101(a).

12     The elements of a claim for aiding and abetting a breach of fiduciary duty under California

13  law are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual

14  knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by

15  defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing

16  harm to plaintiff. *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 343 (2014) (citations

17  omitted). Some cases also suggest that the aider and abettor must have had the specific intent to

18  facilitate the wrongful conduct. *Id.*

19     To succeed on a claim for aiding and abetting a breach of fiduciary duty under California

20  law, a plaintiff must establish that "the aider and abettor knew of and substantially assisted the

21  primary violator's breach of fiduciary duty." *Neilson v. Union Bank of California, N.A.*, 290 F.

22  Supp. 2d 1101, 1128 (C.D. Cal. 2003) (applying California law); *see also Casey v. U.S. Bank Nat.

23  Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005) ("California courts have long held that liability for

24  aiding and abetting depends on proof the defendant had actual knowledge of the specific primary

25  wrong the defendant substantially assisted.").

26     Liability for aiding and abetting may result even when the aider and abettor would not

27  otherwise be liable for the underlying tort. *See American Master Lease LLC v. Idanta Partners,

28  Ltd.*, 225 Cal. App. 4th 1451, 1475 (2014) ("Aiding-abetting focuses on whether a defendant

1  knowingly have 'substantial assistance or encouragement' to someone who performed wrongful

2  conduct, not on whether the defendant agreed to join the wrongful conduct.") (internal citations

3  omitted). Further, any financial gain realized by the aider and abettor may be evidence of

4  "knowledge, substantial assistance or both," but is not a requirement for liability. *Neilson v. Union*

5  *Bank of California, N.A.*, 290 F. Supp. 2d at 1128-29.

6      **C. Application**

7      The Court concludes that Jasmin is liable to Nicole for aiding and abetting a breach of

8  Todd's fiduciary duties to Nicole in transferring his interest in the Bayview Property to Jasmin.

9  Todd plainly violated the ATROs when he transferred his interest in the Bayview Property to

10  Jasmin. Family Code section 2040(a)(2) broadly restrains the transfer by either spouse of any

11  "property, real or personal, whether community, quasi-community or separate" without written

12  consent or an order of the Superior Court. *See* CAL. FAM. CODE § 2040(a)(2). The obvious

13  purpose of this statute and the ATROs issued under it is to preserve all property that may be subject

14  to administration in the dissolution proceeding and avoid the costs and delay of having to recover

15  any transfer of that property so that it may be allocated and/or administered in the marital

16  dissolution case.

17      Further, Todd's transfer of his interest in the Bayview Property, in violation of the ATROs,

18  constituted a breach of his fiduciary duty to Nicole. When Todd transferred his interest in the

19  property to Jasmin, he attempted to place it outside the purview of the Superior Court and the

20  creditors of the Dissolution Proceeding. At the time Todd made the transfer, the Superior Court

21  had already entered an order awarding $75,000 in attorneys' fees to Nicole and her attorneys, and

22  providing that these fees, if not paid by Todd, would be paid from a future sale of Todd's interest in

23  the Bayview Property. By selling his interest in the property to Jasmin for only $10.00 without

24  payment of the $75,000 attorneys' fee award, Todd detrimentally affected Nicole's ability to fully

25  realize her entitlement to the marital estate, as determined by the Superior Court. This, in turn,

26  required Nicole to incur attorneys' fees and litigation costs to recover the transferred property and

27  vindicate the ATROs.

28

1    The Court likewise finds that (i) Jasmin had actual knowledge of Todd's breach of fiduciary

2  duties, (ii) provided substantial assistance or encouragement of Todd's breach, (iii) Jasmin's

3  conduct was a substantial factor in causing harm to Nicole, and (iv) that Jasmine had the specific

4  intent to facilitate the wrongful conduct.

5    Nicole testified at trial that she and Jasmin spoke multiple times each day during the

6  pendency of the Dissolution Proceeding and that Nicole actively reported to Jasmin on the goings-

7  on in the case. Adv. Dkt. 166 at 53:23-54:21.[5] Jasmin had familiarity with family law proceedings

8  that her daughter, Nicole, did not. *Id.* at 55:3-55:6. Nicole testified that (i) Jasmin frequently

9  traveled to Los Angeles and would review with Jasmin court filings and other documents

10  pertaining to the case; and (ii) Jasmin would participate in conversations with Nicole's attorneys

11  regarding orders issued in and other matters in the case. *Id.* at 54:14-55:2. Specifically, Nicole

12  testified that her divorce attorney, Michael McGuire, explained to her and Jasmin that all property

13  of Nicole and Todd—whether separate, community, or quasi-community—was subject to the

14  ATROs and could not be transferred. *Id.* at 58:5-58:17. The Court found Nicole's testimony on

15  these matters credible. Jasmin testified at trial that she never had discussions with Nicole about

16  what was occurring in the divorce proceedings, but the Court did not find Jasmin's testimony

17  credible. Adv. Dkt. 161 at 99:19-99:24

18    The Court also finds that Jasmin was present at the Fee Hearing held in the Superior Court

19  on July 6, 2016, during which the judge ordered Todd to pay certain of Nicole's family law

20  attorneys' fees in the amount of $75,000, payable from Todd's interest in the Bayview Property. In

21  a deposition taken on June 13, 2018, Jasmin admitted that she was present at the Fee Hearing

22  where Superior Court announced these rulings. Tr. Ex. 107 at 9:13-10:7. On cross-examination in

23  this Court, Jasmin contradicted her deposition testimony, stating that she was not present at that

24  portion of the Fee Hearing in which the Court announced its orders. Adv. Dkt. 161 at 163:6-

25  163:11. The Court did not find credible Jasmin's attempt to contradict her prior testimony.

26

27    ────────────────

28    [5] With respect to transcripts, this Memorandum cites to internal page numbers rather than the ECF page numbers. All other docketed items utilize the applicable ECF page numbers.

1    Moreover, Jasmin admitted that she ultimately learned the substance of the Superior Court's ruling

2    from Nicole, "immediately after" the Fee Hearing. *Id.* at 163:12-164:2.

3        But more than mere knowledge, the Court finds that Jasmin provided substantial

4    encouragement for Todd's breach of fiduciary duty, specifically intended to facilitate his wrongful

5    conduct, and that her conduct was a substantial factor in causing harm to Nicole. The Court

6    reaches these conclusions, in part, because Todd and Jasmin agreed that the transfer of Todd's

7    interest in the Bayview Property would constitute full satisfaction of a substantial debt that Todd

8    and Nicole owed Jasmin. Adv. Dkt. 166 at 22:8-24:15, 29:15-29:19; R/I Ex. 5, ¶¶ 7-8; Tr. Ex. 104

9    ("You probably know by now that Todd has paid me back with his 25% interest in the Bayview

10   Property"). Jasmin testified that Todd and Nicole otherwise did not have a means to repay their

11   debt to Jasmin. Adv. Dkt. 166 at 25:18-25:19. As a result, Jasmin realized a financial gain from

12   the agreement. From this fact alone, the Court may infer intent on the part of the aider and abettor.

13   *See Nielson v. Union Bank of California, N.A.*, 290 F. Supp. 2d at 1128.

14       Jasmin testified at trial that she did not have any agreement with Todd regarding

15   satisfaction of the debt *prior* to the transfer: i.e., that her agreement to forgive certain debts was

16   made *post hoc.* Adv. Dkt. 166 at 30:1-30:17; Adv. Dkt. 171 at 57:25-58:11. Jasmin would have

17   the Court believe that Todd unilaterally transferred his 25% interest in valuable real estate without

18   Jasmin having at least offered Todd forgiveness of the debt (or other valuable consideration) as an

19   inducement. The Court does not find this testimony plausible.

20       Indeed, Jasmin suggested otherwise in a sworn affidavit she gave in 2018 in a related

21   Florida civil proceeding. At that time Jasmin testified as follows:

22       As of March 20, 2017, I was owed **$275,466.20** which included interest at 6%

23       per annum. Mr. Goldman said he did not have the cash to repay me and the California

24       property was tied up in the divorce. However, due to the bifurcation of marriage, he

25       had a twenty-five (25%) interest in the property located at 565 Bayview in Bellaire

26       [sic], Florida, which he agreed to deed to me in satisfaction of the debtors owed. I

27       settled his and Nicole's debts in the amount of $275,466.20 in exchange for the deed

28       for his 25% of the Florida property.

11

1   R/I Ex. 5, ¶ 7 (emphasis in original).[6] The foregoing testimony states that Todd "agreed to deed"

2   the Bayview Property to Jasmin in exchange for satisfaction of the debt.  The language plainly

3   indicates that Jasmin sought to facilitate the transfer and discussed an agreement with Todd *prior* to

4   his transfer of the Bayview Property. *See also* Adv. Dkt. 166 at 26:9-26:13 ("So, finally, I begged,

5   and after the judgments were put on – after Todd was ordered to pay the fees, he wanted to sell the

6   property.  He agreed to sell the property.  So — and he wanted to pay child support and all of his

7   debt, you know.").  Jasmin's attempt at trial to contradict her prior sworn statement was not

8   persuasive.

9       Other circumstances provide additional, indirect evidence that Jasmin provided substantial

10  encouragement to Todd to transfer the Bayview Property.  First, the Court finds that Jasmin, who

11  typically lived and conducted business in Ohio, was in Los Angeles and visited with Todd on

12  March 19 and/or March 20, 2017.  The latter of those dates is the date it appears that Todd

13  executed the Warranty Deed.  Jasmin testified that she could not recall where she was on March 20,

14  2017, but speculated she probably was in Cincinnati, Ohio at the time.  Adv. Dkt. 161 at 139:5-

15  139:11, 139:17-139:19.  The Court did not find this testimony credible.  In contrast, Nicole testified

16  that (i) on March 19, 2017, Jasmin was present when Nicole dropped offer her daughter for a

17  monitored visit with Todd at the Topanga Village (a shopping center in Los Angeles), Adv. Dkt.

18  166 at 109:3-111:23, and (ii) on March 20, 2017, Jasmin was in the driveway of Nicole's aunt in

19  Woodland Hills (a neighborhood of Los Angeles), yelling at Nicole's aunt. *Id.* at 111:24-112:13.

20      The Court found Nicole's testimony credible and particularly persuasive, given (i) the level

21  of detail with which Nicole recalled these events (including a discussion she had with the court-

22  appointed monitor of the supervised visit about the appropriateness of Jasmin's presence), (ii) the

23  confidence she demonstrated in her recollection of events, and (iii) her reliance on

24  _____

25      [6] As discussed in Section IV.B below, the only outstanding debt at the time, as established
    by the evidence at trial, was the $100,000 balance of a loan given by Jasmin to Todd and Nicole to
26  establish the "Tighty Whitey" business. This loan originally was made in the amount of $200,000
    in April of 2013. Tr. Exs. 116, TT at 7; Adv. Dkt. 161 at 101:9-102:15.  The sum of $100,000 in
27  principal was subsequently repaid in or around April 2014, leaving a balance of $100,000. Adv.
    Dkt. 161 at 102:16-102:18.

28

1 contemporaneous emails to refresh her recollection in preparation for trial.  That Jasmin was in Los

2 Angeles at that time and that she visited with Todd makes it all the more likely that she discussed

3 an agreement with Todd regarding the Bayview Property and encouraged him to execute the

4 Warranty Deed.

5      Further, the Court finds that Jasmin sought to obtain both Todd *and* Nicole's fractional

6 interests in the Bayview Property because Jasmin was eager to sell the property (and realize the

7 proceeds from it) rather than having it remain tied up in the marital dissolution proceedings.  On

8 March 30, 2017, after Jasmin had acquired Todd's 25% interest in the Bayview Property, Jasmin

9 wrote a passionate email to Nicole, urging her to transfer to Jasmin the remaining 25% interest in

10 the Bayview Property held by Nicole.  Tr. Ex. 104.  Among other things, Jasmin argued that if

11 Nicole did not do so, the divorce lawyers would ultimately seek to collect their fees from Nicole's

12 interest in the Bayview Property.  *See id.* ("[Michael] Maguire is filing a lawsuit against you and

13 serving you on April 14th.  FYI.  He will get a judgement against you and file for collection in

14 Florida against your share of the property.  No one will be able to stop it.  Think about this.  Brot

15 will also file a lawsuit against you for collection of fees in LA county and get a judgement against

16 you.")

17      Jasmin counseled instead to "transfer the property out of your name asap to whomever you

18 trust.  Then let all … your divorce lawyers, Gary Barr, Lisa Torres come after you and all of us.  I

19 will fight Lisa and Gary Barr.  Not handing it over without a fight.  Once Michael Maguire and

20 Brot get judgement against you, wait a while and then file a bankruptcy.  You have no choice but to

21 file a chapter-7 even if you pay all of your 25% to Brot.  Why not salvage and preserve what you

22 can for your daughter." *Id.*

23      When asked at trial why she had written this email, Jasmin testified in part:

24      And she said I was going to keep the money and so I wanted her to transfer to

25      someone she trust.  That way she would agree to sell the house *because her*

26      *attorney, Brot and Groomer they would not agree to sell the house.*  And that's why

27      I said, you know, "Trust – what – whomever you trust, you transfer that and *we can*

28      *sell the house . . .*"

1   Adv. Dkt. 161 at 170:16-172:7 (emphasis added).  Jasmin testified that she previously had

2   attempted to sell the Bayview Property, with the consent of Nicole and Todd, but Nicole's attorney

3   in Florida would not cooperate.  Adv. Dkt. 166 at 26:20-26:25; Adv. Dkt. 170 at 172:8-172:15.

4          Based on the evidence, the Court finds that Jasmin wanted control of the Bayview Property

5   for herself and was undeterred by the existence of the ATROs or the fiduciary duties that Todd and

6   Nicole owed to each other.  Jasmin not only wanted the value of Todd and Nicole's equity in the

7   Bayview Property, she wanted control of the property itself.  As the owner of only 50% of the

8   property, Jasmine was not able to cause the immediate sale of the Bayview Property and realize the

9   value of her interest.  The Court is persuaded that she sought to own and control the entirety of the

10  Bayview Property for the purpose of causing it to be sold and avoiding any further delay in doing

11  so occasioned by the Dissolution Proceeding.  She also hoped to remove the property from the reach

12  of the divorce attorneys as a means of satisfying their existing and future fees.

13         Jasmin argues post-trial that her email dated March 20, 2017 is of no probative value to the

14  aiding and abetting claim because it was sent 10 days after Todd had executed the Warranty Deed

15  in favor of Jasmin.  In other words, Jasmin argues that the email is of no relevance to whether

16  Jasmin aided and abetted Todd's breach of fiduciary duty because that breach had already occurred.

17  The Court disagrees.  This email confirms—within just 10 days of the Warranty Deed being

18  executed—Jasmin's state of mind.  She was was eager to obtain 100% control of the Bayview

19  Property.  She had a motive to encourage Todd to transfer his 25% interest to her and was eager for

20  Nicole to do the same.  It is clear, moreover, that Jasmin had no regard whatsoever for the ATROs

21  or the legal obligations Todd and Nicole had to each other with respect to the disposition of

22  property during the pendency of the Dissolution Proceeding.  To the contrary, she was encouraging

23  these transfers specifically to defeat the rights of the divorce attorneys who held and might obtain

24  additional rights in the Bayview Property.

25         Based on all of the foregoing, the Court finds that Jasmin had actual knowledge of Todd's

26  fiduciary duties, provided substantial encouragement to Todd to transfer his interest in the Bayview

27  Property in breach of those fiduciary duties, that Jasmin's encouragement was a substantial factor

28

1    (indeed, the principal factor) in causing the transfer and harm to Nicole, and that Jasmin had the

2    specific intent to facilitate the wrongful conduct.

3    **D. Damages**

4    Nicole seeks recovery of attorney's fees, in the amount of $187,069, incurred in pursuing

5    this civil action, which originated in the Superior Court and was thereafter removed to this Court. .

6    This request is supported by the evidence presented at trial, showing $106,360 incurred by Susan

7    Montgomery and $80,300 incurred by Brian Kramer.  Trial Exhibit 114A; *see also* Adv. Dkt. 166

8    at 118:4-122:25.  The Court finds that these attorneys fees are damages arising from and as a

9    proximate result of Jasmin's aiding and abetting of Todd's breach of fiduciary duty.  Although some

10   of these fees were incurred while this action was pending in the Superior Court (prior to removal to

11   this Court), and although following the commencement of this bankruptcy case the Trustee took

12   control of certain causes of action that became property of the estate (such as recovery of the 25%

13   transfer itself), the Court finds that all of these fees are recoverable as damages.  The need for

14   Nicole to pursue of all the claims in the Complaint, until the Trustee undertook to pursue those

15   belonging to the estate, was a consequence of Jasmin's tortious conduct in aiding and abetting the

16   transfer.[7]

17   **IV. OBJECTION TO PROOFS OF CLAIM 16 & 17**

18   A duly executed proof of claim is *prima facie* evidence of the validity and amount of a

19   claim.  *Diamant v. Kasparian (In re S. Cal. Plastics, Inc.),* 165 F.3d 1243, 1247–48 (9th Cir. 1999).

20   The burden of tendering sufficient evidence to overcome the *prima facie* validity of a properly filed

21   claim is on the objecting party.  *See Lundell v. Anchor Constr. Specialists, Inc. (In re Lundell),* 223

22   F.3d 1035, 1039 (9th Cir. 2000).  "If the objector produces sufficient evidence to negate one or

23   more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the

24   validity of the claim by a preponderance of the evidence." *Ashford v. Consol. Pioneer Mortgage*

25

26   _____

27   [7] Because the Court concludes that the attorneys' fees and expenses are awardable as
     damages for Jasmin's aiding and abetting Todd's breach of fiduciary duty, the Court finds it
28   unnecessary to address any other theory offered for awarding these fees and expenses.

1    *(In re Consol. Pioneer Mortgage),* 178 B.R. 222, 226 (B.A.P. 9th Cir. 1995) (quoting *In re*

2    *Allegheny Int'l, Inc.,* 954 F.2d 167, 173–74 (3d Cir. 1992)).

3    **A. Claim No. 16.**

4    Jasmin filed Claim No. 16 in the unsecured amount of $114,199.22 for "Reimbursable

5    expenses attributable to the Bayview Property." Tr. Ex. SS. The proof of claim contains an

6    itemization of expenses suggesting that the expenses were incurred between 2017 and 2019. No

7    documentary evidence was attached to the proof of claim, and none was admitted at trial. Jasmin

8    attempted to introduce evidence in this regard, but it was excluded, pursuant to the evidentiary

9    rulings of the Court, which rulings are incorporated herein and made final by this Memorandum.

10   *See* Case Dkt. 211; Adv. Dkt. 171 at 21:17-25:9.

11   In August 2021, the Court approved the Ismail Settlement between Jasmin and the Trustee.

12   The settlement agreement provides that Claim 16 is "deemed an allowed nonpriority unsecured

13   claim in the amount of $7,169.16 … Proof of Claim 16 will be treated as a community property

14   claim for purposes of a Chapter 7 distribution." Case Dkt. 159-1 at 22. The settlement preserved

15   Nicole's right to object to the claim, and she thereafter did so.

16   Notwithstanding the settlement, Jasmin's closing brief argues that Claim No. 16 should be

17   allowed in the amount of $32,750 as a community claim. Adv. Dkt. 175 at 8. Nicole argues that

18   Claim No. 16 should not be allowed as a community claim, but instead a separate claim against

19   Todd. Nicole argues that the expenses alleged in Claim No. 16 cannot be community claims

20   because they were incurred (if at all) after Nicole and Todd had separated.

21   California Family Code section 910 provides:

22   (a) Except as otherwise expressly provided by statute, the community estate is liable

23   for a debt incurred by either spouse before or during marriage, regardless of which

24   spouse has the management and control of the property and regardless of whether one

25   or both spouses are parties to the debt or to a judgment for the debt.

26   CAL. FAM. CODE § 910(a). "'During marriage' for purposes of this section does not include the

27   period after the date of separation, as defined in Section 70, and before a judgment of dissolution of

28   marriage or legal separation of the parties." CAL. FAM. CODE § 910(b).

1    Todd and Nicole separated in October 2014. Adv. Dkt. 171 at 129:20-129:22. Jasmin

2    testified at trial that the expenses for which she is seeking reimbursement were incurred beginning

3    in 2015. *See* Adv. Dkt. 171 at 95:20-96:3, 101:15-17. These facts are adequate to substantiate

4    Nicole's objection and shift the ultimate burden of proof back to Jasmin to prove these debts are

5    community debts. Jasmin did not sustain her burden to do so. Because of when these amounts

6    were incurred, Claim No. 16 cannot legally be a community debt. Further, irrespective of Jasmin's

7    effort to prove a larger amount at trial, the allowed amount of Claim No. 16 is limited by the Ismail

8    Settlement to $7,169.16.

9    Accordingly, Claim No. 16 will be allowed in the amount of $7,169.16 and treated as a

10    separate debt of Todd for distribution purposes.

11    **B. Claim No. 17.**

12    Jasmin filed her Claim No. 17 in the unsecured amount of $326,177.00 for "Money loaned

13    in event transfer of Bayview Property is set aside." Tr. Ex. TT. The premise of the claim is that

14    Jasmin loaned money to Todd and Nicole jointly, at various times beginning in 2011, the year they

15    were married *See id.* at 4. Again, the proof of claim contains an itemization of amounts, but no

16    documentary evidence. No such documentary evidence was admitted at trial. *See* Case Dkt. 211;

17    Adv. Dkt. 171 at 21:17-25:9.

18    In her closing brief, Jasmin argues that Claim No. 17 should be allowed in the amount of

19    $161,920 as a community claim. Adv. Dkt. 175 at 8. This amount allegedly is comprised of (i) a

20    $5,000 contribution to a Roth Individual Retirement Account ("IRA") for the benefit of Nicole,

21    (ii) $26,050 for the payment of moving expenses and other debts, and (iii) $130,870 for costs in

22    connection with a startup business called "Tighty Whitey," and the payment of various living

23    expenses, including mortgage payments and airline tickets. *Id.*

24    Pursuant to the Ismail Settlement, Jasmin agreed with the Trustee that Claim No. 17 is

25    "deemed an allowed nonpriority unsecured claim in the amount of $100,000. Proof of claim 17

26    will be treated as a community property claim for purposes of a Chapter 7 distribution." Case Dkt.

27    159-1 at 22. The settlement preserved Nicole's right to object to the claim, and she thereafter did

28

17

1  so.  As a result of the Ismail Settlement, Claim No. 17 may not be allowed for any amount in

2  excess of $100,000.

3       With respect to all of the debts alleged by Jasmin—*other* than the balance of the Tighty

4  Whitey loan—the Court is not persuaded these amounts constitute debts.  The Court instead finds

5  that these amounts constitute gifts.  The trial testimony established that Jasmin had a long history

6  of directly and indirectly gifting her daughter (and individuals with whom her daughter had a

7  relationship) money for living expenses and other purposes.  Although Jasmin testified that these

8  amounts were loans, there was no written agreement or other documentary evidence to support this

9  testimony, and the Court did not find her testimony credible.  To the contrary, the Court found

10  credible and was persuaded by Nicole's testimony that these various advances were gifts by her

11  mother.

12       The Court's analysis of the Tighty Whitey loan is different.  The Court is persuaded by the

13  testimony that although there was no written agreement, the parties expected this amount would be

14  repaid to Jasmin within one year.  Adv. Dkt. 161 at 102:9-102:12.  The loan originally was made in

15  the amount of $200,000 in April of 2013.  Tr. Exs. 116, TT at 7; Adv. Dkt. 161 at 101:9-102:15.

16  The sum of $100,000 in principal was subsequently repaid in or around April 2014, leaving a

17  balance of $100,000.  Adv. Dkt. 161 at 102:16-102:18.[8]  Nicole argues that the remaining balance

18  of the Tighty Whitey loan is (i) not a community debt, (ii) even if it was, it has been extinguished,

19  and (iii) is barred by the statute of limitations.

20       First, Nicole argues that she cannot be personally liable for the remaining Tighty Whitey

21  debt because it was assigned to Todd in the marital dissolution proceedings by the Superior Court.

22  Adv. Dkt. 174 at 20.  Nicole points to a minute order entered in the dissolution proceeding stating

23  "[Todd] is awarded Tighty Whitey Toys and assumes the $100,000.00 debt owed to Jasmin Ismail.

24

25  _____

26      [8] Jasmin asserts that interest has accrued on this loan, but allowing such interest would
permit her claim to exceed the $100,000 amount to which she stipulated under the Ismail
27  Settlement.  Further, the Court was not persuaded by Jasmin's testimony, which the Court did not
28  find credible, that Todd and Nicole agreed to pay interest on the loan.

1  Petitioner waives any claim in the art.  [Todd] is to hold [Nicole] harmless to the $100,000.00

2  debt."  Case Dkt. 159 at Ex. 4.

3      The hold harmless language is consistent with the Family Code which "recognizes that

4  personal liability remains for community obligations assigned to the other spouse.  The remedy is

5  to pay the debt and seek reimbursement from the spouse assigned the debt."  *In re Huskey*, 183

6  B.R. 218, 221 (Bankr. S.D. Cal. 1995) (construing Family Code sections 916(a)(1) and 916(b)).

7  Thus, the assignment of the debt to Todd gave Nicole recourse against Todd if she was required to

8  pay this debt, but it did not change the community character of the obligation.

9      Second, Nicole argues that the Tighty Whitey debt was a separate debt of Todd, not a

10  community debt.  California Family Code section 903 provides that a debt is "'incurred… at the

11  time the contract is made."  CAL. FAM. CODE § 903(a). The "community estate is liable for a debt

12  incurred by either spouse before or during marriage."  CAL. FAM. CODE § 910; *See In re Marriage*

13  *of Feldner*, 40 Cal. App. 4th 617, 622-626 (1995) (discussing interplay between section 903 and

14  910 and holding that the "effect of section 903 is to characterize contract debts as community when

15  the contract is 'made'… during the marriage").  Moreover, "[l]oan proceeds acquired during

16  marriage are presumptively community property." *In re Marriage of Grinius*, 166 Cal. App. 3d

17  1179, 1187 (1985).

18      Jasmin made the loan on April 27, 2013, during the marriage of Todd and Nicole. Tr. Ex.

19  116.  As a result, it is presumed to be a community obligation and the loan proceeds a community

20  asset.  The Court did not find persuasive Nicole's testimony to the contrary.  Although Todd was

21  the creative force behind the Tighty Whitey business, the Court found more persuasive Jasmin's

22  testimony that she made the loan jointly to Nicole and Todd during their marriage.  Adv. Dkt. 171

23  at 88:4-15; Adv. Dkt. 161 at 101:9-103:24.  Accordingly, the Court finds that this debt was

24  incurred as a community debt.

25      However, the Court also finds that the Tighty Whitey debt was extinguished on March 20,

26  2017, in exchange for the transfer of Todd's interest in the Bayview Property and all personal

27  property located there to Jasmin.  Jasmin acknowledges she agreed to this transaction but suggests

28  that the debt somehow sprung back into existence when she entered into the Ismail Settlement.

1    The Court is not persuaded.  As an initial matter, Jasmin failed to convince the Court that

2    California law (or Florida law) provides a basis to revive Jasmin's debt against Todd and Nicole.

3    Jasmin offered no pre-trial brief, and in her post-trial briefs she offered no legal authority to

4    substantiate this contention or demonstrate that the Court has the equitable power to un-extinguish

5    the debt.

6         Even so, the Court concludes, as an equitable matter, that revival would not be appropriate.

7    There is no evidence to suggest that Jasmin's express oral contract with Todd to extinguish the

8    outstanding debt owed by Todd and Nicole included any agreement to revive the debt if any

9    portion of the transferred property was recovered by a trustee or other litigant.  Moreover, Jasmin

10   thereafter entered into the Ismail Settlement and agreed to transfer a 25% interest in the Bayview

11   Property to the Trustee.  The Ismail Settlement does not itself for the revival of the debt.

12   Moreover, Nicole is not a party to (or beneficiary of) the Ismail Settlement and did not otherwise

13   agree to the revival of the debt.

14        Furthermore, the Ismail Settlement did not involve the return of *all* the property previously

15   transferred to Jasmin in exchange for extinguishment of the debt.  Specifically, the Ismail

16   Settlement did not require the return of any of the personal property located at the Bayview

17   Property.  In a sworn affidavit, Jasmin valued this personal property at no less than $200,000, see

18   R/I Ex. 5, ¶ 7, which substantially exceeds the $100,000 balance outstanding on the Tighty Whitey

19   debt immediately prior to its extinguishment.

20        Although Jasmin presented evidence at trial that the personal property was subsequently

21   stolen by tenants of the Bayview Property, this is of no consequence.  Prior to that loss, she had

22   accepted ownership of the personal property in satisfaction of the debt and bore the risk of loss.

23   Under these circumstances, it is clear that she received substantial value in exchange for her release

24   of the Tighty Whitey debt, separate and apart from Todd's interest in the real estate.  Under these

25   circumstances, the Court is not persuaded that it would be equitable to revive the debt, even if the

26   Court was persuaded it had the equitable power to do so.

27        Independently, the Court concludes that collection of the Tighty Whitey debt against the

28   estate is barred by the statute of limitations under California Code of Civil Procedure section 339,

1  which is cited by Nicole. That statute fixes a deadline of two years for an action on a loan based on

2  an oral agreement. The loan here was made in April 2013. It was due to be paid in full in April

3  2014—but was not. This means that any action to collect the debt would have had to be

4  commenced by April 2016. There is no evidence that any such action was commenced. Todd filed

5  his bankruptcy case in 2018 and Claim No. 17 was filed thereafter.[9] Moreover, although the parties

6  do not address choice of law issues, and no one has challenged whether California law is the

7  correct law on this issue (or any other issue), the Court notes that the result is the same under

8  Florida law.[10]

9  **V. THE COUNTERCLAIMS**

10         Jasmin filed three counterclaims: (1) breach of contract; (2) unjust enrichment; and (3) a

11  "common count." Adv. Dkt. 9. Jasmin's closing briefs make only passing reference to her

12  counterclaims. There is no discussion of the elements of these causes of action or how the facts

13  adduced at trial might satisfy those elements. Jasmin argues only that (i) any judgment in favor of

14  Nicole should be reduced by her counterclaims, see Adv. Dkt. 175 at 8, and (ii) Jasmin's

15  counterclaims are not barred by any statute of limitations. Adv. Dkt. 178 at 4. Nicole argues that

16  Jasmin has failed to meet her burden to demonstrate that Nicole is liable to Jasmin on any of these

17  claims. The Court agrees with Nicole.

18     **A. Breach of Contract**

19         The Counterclaim alleges that between 2011 and October 2014, Jasmin advanced in excess

20  of $300,000 to and for the benefit of Todd and Nicole. Adv. Dkt. 9, ¶ 97. The Counterclaim

---

22  [9] Jasmin cites California Code of Civil Procedure section 431.70, arguing that the statute of
23  limitations is not a bar to asserting a claim defensively, as an offset. Adv. Dkt. 178 at 4. The
    Court, however, is not aware of any claim of the estate against Jasmin that would be offset by the
24  debt asserted in Claim No. 17 against the estate. Accordingly, section 431.70 has no application
    here.

25     [10] Under Florida law, the statute of limitations for "[a] legal or equitable action on a
    contract, obligation, or liability not founded on a written instrument is four years. . . ." FLA. STAT.
26  95.11(3)(j) (emphasis added). Thus, an action for breach of the Tighty Whitey loan, which
    matured in April 2014, would have to have been initiated by April 2018 under Florida law. Todd's
27  bankruptcy case was filed on December 11, 2018, and Claim No. 17 was filed on September 20,
    2019. By the time of each of these events, the statute of limitations had run.

alleges Jasmin advanced these funds with the understanding that they would be applied toward a new business venture, living, and moving expenses, and a home renovation. *Id.*, ¶ 98. Following commencement of the Dissolution proceeding, the Counterclaim alleges Jasmin advanced an additional $35,000 to and for the benefit of Nicole for the purpose of paying basic living expenses and attorneys' fees. *Id.*, ¶¶ 97, 98. The Counterclaim alleges that Todd and Nicole agreed to repay all of the foregoing advances (collectively, the "Loan"), together with six percent interest. *Id.*, ¶ 99.

The Counterclaim alleges that following commencement of the marital dissolution proceedings, Todd transferred his interest in the Bayview Property to Jasmin "in satisfaction of the $275,466.20 Loan balance then owing." *Id.* at ¶ 101. The Counterclaim then acknowledges the pendency of an action to recover that transfer, the Trustee's assertion of an interest in the transfer, and the possibility that the transfer may be unwound—which is the premise of Jasmin's contractual breach claim. *Id.* at ¶¶ 102-105.

Specifically, the Counterclaim concludes: "In the event the March 20, 2017 transfer of the Bayview Property to Ismail is set aside, Counter-Defendant is liable to Ismail for breach of contract in an amount equal to the principal balance owing on the Loan, plus accrued interest." *Id.* at ¶ 105. Based on this claim, the Counterclaim prays for "an award of damages in favor of Ismail equal to the outstanding amount owing on the Loan, plus accrued interest, in an amount to be proven at trial." *Id.* at ¶ 112.

Jasmin's trial testimony was that the Tighty Whitey loan in the original principal amount of $200,000 was paid down by $100,000 in 2014, leaving a principal balance of $100,000. Adv. Dkt. 161 at 102:16-102:18. As noted above, the Court was not persuaded that Todd or Nicole agreed to pay interest on the loan, in any amount. Also as discussed above, the Court was not persuaded that any of the other amounts advanced by Jasmin were loans, but instead gifts to aid the support of her daughter and granddaughter.

Thus, the only contractual debt proven at trial was Nicole's obligation to Jasmin on the $100,000 balance of the Tighty Whitey loan. (As a community debt, both Todd and Nicole were jointly liable on this debt.)

1    However, as the Court explained above, that debt is no longer enforceable pursuant to the

2    agreement between Jasmin and Todd to extinguish the debt in exchange for his interest in the

3    Bayview Property and the personal property located there. Although Jasmin has suggested that this

4    debt was revived when she entered into the Ismail Settlement, she has not provided the Court with

5    legal authority that compels this result.[11] Nor has she persuaded the Court—even if it had the

6    equitable power to reach such a conclusion—that such a conclusion would be justified.[12]

7    Accordingly, on the first claim of the Counterclaim, breach of contract, the Court concludes

8    that Jasmin is not entitled to any recovery.

9    **B. Unjust Enrichment**

10    The second claim in the Counterclaim is for unjust enrichment. Like the contractual claim,

11    this claim concludes as follows: "In the event the March 20, 2017 transfer of the Bayview Property

12    to Ismail is set aside, Counter-Defendant will have been unjustly enriched and must remit, transfer,

13    turnover or make restitution to Ismail of all unjustly enriched gains, equal to the principal amount

14    owing on the Loan, plus accrued interest." Adv. Dkt. 9 at ¶ 109. This claim fails for multiple

15    reasons.

16    First, under California law, "[u]njust enrichment is not a cause of action" but rather "a

17    general principle, underlying various legal doctrines and remedies." *Rutherford Holdings, LLC v.*

18    *Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (Cal. Ct. App. 2014) (quotation omitted). Nevertheless,

19    the Court can and does construe this claim as a quasi-contract claim seeking restitution. *See id.*

20    The problem is that "'an action based on an implied-in-fact or quasi-contract cannot lie where there

21    _____

22    [11] The Court also observes that each of the claims in the Counterclaim is premised on the
contingency that the transfer of Todd's interest in the Bayview Property is "set aside." Adv. Dkt. 9,

23    ¶¶ 105, 109, 112. The Ismail Settlement requires, among other things, that Jasmin "quitclaim" a
25% interest in the Bayview Property to the Trustee but does not provide that any transaction be set

24    aside.

25    [12] Any action on the Tighty Whitey debt is generally barred by the statute of limitations (as
discussed above with respect to Claim No. 17), but as Jasmin argues, it nevertheless may be

26    asserted defensively, as an offset. *See* Adv. Dkt. 178 at 4 (citing Cal. Civ. Pro. Code § 431.70).
Ultimately, no offset is available here because the Court has concluded that the underlying debt

27    was extinguished pursuant to the agreement between Todd and Jasmin with respect to the Bayview

28    Property and related personal property.

exists between the parties a valid express contract covering the same subject matter.'" *Id.* (quoting *Lance Camper Mfg. Corp. v. Republic Indem.* Co. 44 Cal. App. 4th 194, 203 (Cal. Ct. App. 1996); *see also Alhassid v. Nationstar Mortg. LLC,* 771 Fed. App'x 965, 969 (11th Cir. 2019) (citing Florida law) ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter."). Here, the record supports the conclusion, and the Court has found, that there was an express oral loan contract with respect to the Tighty Whitey debt. That debt was contractually extinguished pursuant to a subsequent agreement between Todd and Jasmin. Under these circumstances, quasi-contract is not a viable theory of recovery.

Second, as noted, the transfer of Todd's 25% interest in the Bayview Property was not "set aside." Pursuant to the Ismail Agreement, Jasmin contractually agreed to quitclaim a 25% interest in the Bayview Property to the Trustee. Thus, the stated premise of the alleged cause of action was not proven.

Third, independent of the foregoing, the evidence does not support the conclusion that Nicole was unjustly enriched. As discussed above, as part of the transaction that extinguished the Tighty Whitey debt, Jasmin also received all of the personal property located at the Bayview Property, which Jasmin valued at $200,000. Even though Jasmin returned 25% of the real property interest in the Bayview Property under the Ismail Settlement, she did not agree to return the personal property she received in satisfaction of the debt, or the value of that personal property. She claims the personal property was stolen following her agreement to extinguish the Tighty Whitey debt, but acknowledges she agreed to accept ownership of that property as part the agreement. Given that the balance of the Tighty Whitey debt was only $100,000 at the time, the Court finds she received more than adequate value in exchange for the extinguishment of the debt. Nicole was not unjustly enriched at the expense of Jasmin and no restitution is warranted.

### C. Common Count

The third and final claim in the Counterclaim is for a "common count." The Counterclaim alleges that "[Nicole] became indebted to Ismail in the amount of the Loan that was made at Counter-Defendant's request." Adv. Dkt. 9, ¶ 111. It alleges further: "In the event the March 20,

1    2017 transfer of the Bayview Property to Ismail is set aside, Counter-Defendant is liable to Ismail

2    for breach of contract in an amount equal to the principal balance owing on the Loan, plus accrued

3    interest." Jasmin cites no law whatsoever in support of this claim.

4        California law recognizes the "common count" as "a general pleading which seeks recovery

5    of money without specifying the nature of the claim. . . ." *Title Ins. Co. v. State Bd. Of*

6    *Equalization*, 4 Cal. 4th 715, 731 (1992). "Although such action is one at law, it is governed by

7    principles of equity…. It may be brought 'wherever one person has received money which belongs

8    to another, and which "in equity and good conscience," or in other words, in just and right should

9    be returned. . . .'" *Mains v. City Title Ins. Co.*, 34 Cal. 2d 580, 586 (1949) (citations omitted); *see*

10    *also Payne v. Humana Hosp. Orange Park*, 661 So. 2d 1239, 1240-1241 (Fla. Sup. Ct. 1995)

11    (Florida law).

12        Jasmin has failed to prove a common count. As discussed with respect to the contractual

13    count, she had a contractual debt against Todd and Nicole. She subsequently agreed to extinguish

14    that debt, and her agreement to do so did not include any right to revival of the debt if any part of

15    the consideration given for that extinguishment was later transferred—voluntarily or

16    involuntarily—to a bankruptcy trustee (or any other person). Furthermore, irrespective of her

17    decision to quitclaim 25% of the Bayview Property to the Trustee, she also received ownership of

18    valuable personal property with a value (according to Jasmin) substantially in excess of the

19    extinguished debt. Under these circumstances, the Court is not persuaded that Nicole's "retention"

20    of the benefit of the extinguishment is unjust. Jasmin is entitled to no recovery on account of her

21    "common count."

22

23

24

25

26

27

28

# V. CONCLUSION

On the only remaining count in the Complaint, the Court will enter judgment against Jasmin Ismail and in favor of Nicole Goldman in the amount of $187,069. Claim No. 16 will be allowed in the amount of $7,169.16 and treated as a separate debt of the Debtor. Claim No. 17 will be disallowed in its entirety. On the Counterclaim, the Court will enter judgment against Jasmin Ismail and in favor of Nicole Goldman.

###

Date: November 9, 2023

Martin R Barash
United States Bankruptcy Judge